# IN THE UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

---

## UNITED STATES
*Appellee*,

v.

Senior Airman (E-4)
**ANDREW P. WITT, USAF**
*Appellant*.

---

A.F. Ct. Crim. App. No. ACM 36785
(recon)

Before the Court En Banc

---

# OPINION OF THE COURT
# UPON RECONSIDERATION

---

## JUDGES

HELGET, HARNEY, SARAGOSA, MARKSTEINER, MITCHELL, and PELOQUIN

This opinion is subject to editorial correction before final publication.

## Table of Contents

*I. Background*.................................................................................................................5

*II. Findings Issues*..........................................................................................................8

   A. Qualifications of Trial Defense Counsel.................................................................8

   B. Challenge for Cause of Colonel DH....................................................................10

   C. Unlawful Command Influence .............................................................................13

   D. Findings Argument ..............................................................................................15

   E. Admission of Crime Scene and Autopsy Photographs.........................................18

   F. Findings Instructions ...........................................................................................19

   G. Impeachment of Staff Sergeant PG .....................................................................21

*III. Assistance of Counsel* ............................................................................................26

   A. Counsel's Performance in Findings .....................................................................26

      1. Military Judge's Sentencing Comments During Voir Dire.............................27

      2. Trial Counsel's Voir Dire Questions..............................................................28

      3. Peremptory Challenge of Colonel DC ..........................................................28

      4. Courtroom Security.......................................................................................29

      5. Promises Made During Opening Statement...................................................30

      6. Witnesses' Sequestration .............................................................................33

      7. Mental Health Issues ...................................................................................35

   B. Counsel's Performance in Sentencing..................................................................37

      1. Motorcycle Accident Injury .........................................................................40

      2. Mental Health Records of the Appellant's Mother ........................................52

      3. Evidence of Remorse ...................................................................................68

      4. Failure to Offer Evidence of Future Violence Risk .......................................75

      5. Failure to Offer Testimony of SP and KP.....................................................75

      6. Failure to Object to Inadmissible Victim Impact Evidence and Argument, and Failure to Request Appropriate Curative Instruction ...........................................................76

*IV. Additional Sentencing Issues*.................................................................................80

   A. Sentencing Argument..........................................................................................80

   B. Military Judge's Instructions...............................................................................81

      1. Voir Dire Reference to Sentencing Procedure ..............................................81

2.  Presentencing Instructions on Voting Procedure ...........................................................83

3.  Presentencing Instruction on Members' Duty – Community Expectations ...................85

C.  Other Impermissible Trial Counsel Sentencing Arguments.............................................92

D.  Erroneously Admitted Victim Impact Testimony ...........................................................93

V.  *Cumulative Error*.......................................................................................................................94

VI.  *Post-Trial Issues*......................................................................................................................94

A.  Post-Trial Challenge of Military Judge...........................................................................94

B.  Assistant Trial Counsel's Authentication of the Record .................................................95

C.  Post-Trial Delay ..............................................................................................................95

VII.  *Assignments of Error Regarding New Convening Authority Action*....................................96

VIII.  *Systemic Issues* ....................................................................................................................105

IX.  *Summary Assignments of Error*............................................................................................112

X.  *Proportionality Review*...........................................................................................................113

XI.  *Conclusion*..............................................................................................................................113

**UNITED STATES AIR FORCE COURT OF CRIMINAL APPEALS**

**UNITED STATES**

**v.**

**Senior Airman ANDREW P. WITT**
**United States Air Force**

**ACM 36785**
**(recon)**

**30 June 2014**

**\_\_\_\_ M.J. \_\_\_\_**

Sentence adjudged 13 October 2005 by GCM convened at Bibb County Courthouse, Georgia. Military Judge: W. Thomas Cumbie.

Approved Sentence: To be put to death.

Appellate Counsel for the Appellant: Dwight H. Sullivan, Esquire (argued); Major Daniel E. Schoeni (argued); Colonel Nikki A. Hall; Lieutenant Colonel Shannon A. Bennett; Major Michael A. Burnat; Major Timothy M. Cox; Major Michael S. Kerr; Major Matthew T. King; Major Nicholas W. McCue; and Captain Tiaundra D. Sorrell.

Appellate Counsel for the United States: Major Charles G. Warren (argued); Gerald R. Bruce, Esquire (argued); Colonel Don M. Christensen; Colonel Douglas P. Cordova; Colonel Martin J. Hindel; Colonel Matthew S. Ward; Lieutenant Colonel Linell A. Letendre; Lieutenant Colonel Jeremy S. Weber; Lieutenant Colonel Nurit Anderson; Major Deanna Daly; Major Jason M. Kellhofer; Major G. Matt Osborn; Major Donna S. Rueppell; Major Roberto Ramirez; and Major Ryan N. Hoback.

EN BANC

HELGET, HARNEY, SARAGOSA, MARKSTEINER, MITCHELL, and PELOQUIN
Appellate Military Judges

OPINION OF THE COURT
UPON RECONSIDERATION

This opinion is subject to editorial correction before final publication.

MARKSTEINER, S.J., delivered the opinion of the Court, in which HELGET, C.J.,[1] and HARNEY, S.J., join. MITCHELL, J., filed an opinion concurring dubitante. SARAGOSA, J., with whom PELOQUIN, J.,[2] joins, filed an opinion concurring in part and dissenting in part. PELOQUIN, J., filed an opinion concurring in part and dissenting in part.

MARKSTEINER, Senior Judge:[3]

The appellant was tried by a general court-martial composed of twelve officers, between April and October 2005. He was found guilty of the premeditated murders of Senior Airman (SrA) AS and his wife JS, as well as the attempted premeditated murder of (then) SrA JK, in violation of Articles 118 and 80, UCMJ, 10 U.S.C. §§ 918, 880, respectively. On 13 October 2005, the members sentenced the appellant to death. The convening authority approved the findings and sentence as adjudged.

On appeal, the appellant has raised 89 issues which relate to the findings of guilty, the sentence, post-trial processing, and other miscellaneous systemic errors. In a previous decision, this Court affirmed the findings but set aside the sentence, ordering the record of trial to be returned to The Judge Advocate General for remand to the convening authority. *United States v. Witt*, 72 M.J. 727 (A.F. Ct. Crim. App. 2013). Following our decision, the Government motioned the Court, inter alia, for reconsideration and reconsideration en banc, opposed by the appellant. On 21 October 2013, we granted the Government's motion, vacating our previous opinion, and on 28 January 2014 heard oral argument on a specified issue relating to three of the appellant's ineffective assistance of counsel claims.

For the reasons set forth below, we now affirm the approved findings and sentence.

## I. Background

On the evening of 4 July 2004, SrA AS and his wife, JS, arrived at the on-base home of SrA JK and his wife to celebrate Independence Day. SrA JK's wife went to bed

---

[1] The Judge Advocate General of the Air Force designated Senior Judge Helget as Chief Appellate Military Judge for *United States v. Witt*, ACM 36785 (recon), via memorandum dated 18 October 2013, due to the recusal of Chief Judge Roan.

[2] Judge Peloquin was a member of the Court when it heard oral argument en banc and participated in the decision before his retirement on 1 June 2014.

[3] Although it is customary for the opinion of the Court to appear after the name of a single author judge, we note that significant portions of this opinion—in particular Parts I, II.D–G, III.A, IV.A–B, VI, and IX—represent the original authorship of Judge Saragosa, who wrote the Court's majority opinion when it first considered this case. *See United States v. Witt*, 72 M.J. 727 (A.F. Ct. Crim. App. 2013). As much of that opinion was left unchanged by our reconsideration, it was unnecessary to refashion those sections previously authored by Judge Saragosa.

at approximately 0100 hours on 5 July 2004. At some point in the morning hours, JS told her husband and SrA JK that on the evening of 3 July 2004, when the appellant was a guest at her home, the appellant had made a sexual advance toward her. This disclosure made her husband angry, so he called and confronted the appellant at 0137 hours. He followed up with two additional completed phone calls to the appellant and nine additional unanswered calls. The last call originating from either SrA AS or SrA JK was at 0212 hours. At 0221, the appellant called SrA AS, and they spoke for 33 minutes.

At some point during the phone call exchanges, the appellant changed into his battle dress uniform (BDU). He retrieved a knife from his closet, placed the knife in the trunk of his car, and drove onto Robins Air Force Base, Georgia, arriving at approximately 0315. He would later write in a statement to the Air Force Office of Special Investigations (AFOSI) that he wore his BDU because he "wanted to observe them unseen to see what was going on." He also told his roommate he wore the BDU so "they wouldn't see [him]." He further told his roommate that SrA AS had threatened to get him into trouble by disclosing his advance toward JS and an affair he was having. In his written statement, the appellant stated that SrA AS was yelling at him during the phone calls and threatened his career.

After arriving on base, the appellant parked his car in base housing about 50 yards from SrA JK's residence. From there, he went to the residence and observed SrA JK, SrA AS, and JS from behind the bushes and the trees. There were additional heated phone calls between the appellant and SrA JK after the appellant arrived on base. There were also phone calls in which the appellant was apologetic or told SrA JK that he and SrA AS "should come over here and kick [his] ass." SrA JK responded with words to the effect of, "You need your ass kicked."

At approximately 0400 hours, SrA JK, SrA AS, and JS drove from SrA JK's house to SrA AS's house, approximately 0.2 miles away and still in base housing. The appellant watched the three get into a vehicle and drive away. He then traveled to SrA AS's house by foot. The trio was already inside the home when the appellant let himself in and found SrA AS in the kitchen. SrA AS yelled at the appellant to get out of his house, and a scuffle ensued between them. SrA JK came in and tried to get the appellant off of SrA AS by putting him in a headlock. The appellant took out his knife and stabbed SrA JK in the chest. As SrA JK backed up, JS screamed, "Oh my God, you're bleeding!" The appellant stabbed SrA AS, who "fell to the floor," as one of the wounds rendered SrA AS paralyzed from the upper waist down. JS fled to a bedroom where she locked herself in. SrA JK attempted to run out of the house through a kitchen door, but as he struggled with a deadbolt the appellant stabbed him again. SrA JK was eventually able to get outside, where he ran for "the first house [he] could see that had a light on." SrA JK ultimately reached the neighbor's home, bleeding profusely, and the neighbor called for help.

Not wanting "to leave any evidence," the appellant returned to SrA AS's house and found SrA AS on the phone with 911. He went to the bedroom where JS had locked herself in and broke through the door. He found JS in a fetal position and, "scared to leave a witness," he broke her arm and stabbed her multiple times. He then returned to SrA AS, stabbing him in the ribs and the heart.

During the AFOSI's investigation, the appellant led the special agents to the location where he disposed of the knife he used in the crimes, as well as his BDU cap and boots. DNA analysis revealed blood stains from the appellant's BDU blouse, BDU pants, BDU hat, and boots matched the DNA profile of JS. Trace evidence in the form of red fibers were recovered from the knife. Microscopic analysis showed the fibers were consistent with the characteristics and color of the fibers in the shirts worn by SrA AS and SrA JK, who were both wearing red shirts on the night of 4 July 2004.

SrA JK was stabbed four times and sustained a laceration to his arm. Three of these stab wounds were potentially life-threatening. He suffered a stab wound to the chest that punctured his left lung and nearly went through his entire chest cavity. He also suffered stab wounds to his back—one to the splenic hilum that cut the splenic artery and a second to the kidney. He underwent emergency surgery and was hospitalized for 15 days. He also underwent four to five follow-up surgeries, spending over 30 cumulative days in the hospital.

SrA AS suffered three stab wounds. The first of these wounds was to the left side of his back. The knife entered the right chest cavity, penetrated his diaphragm and went into his liver. A second wound cut through SrA AS's backbone at the thoracic vertebrae and severed his spinal cord. This wound left him instantly paralyzed from his upper waist down. While these two wounds were medically significant, they were not lethal or life-threatening. The final stab wound was to his chest, piercing the front and back of the left ventricle of his heart. This wound was immediately lethal and delivered after the previously described paralyzing wound.

JS was stabbed a total of five times, four of which were to her back. One of these wounds was to her left chest cavity, through her diaphragm, and into her spleen, causing her left lung to collapse. A second wound entered the side of her body, going into the abdomen and spleen. A third wound was to her lower back, entering into her kidney and liver. The fourth wound was to the right edge of her back, entering her right chest wall and collapsing her right lung. She also suffered an incised wound to the back, cutting into her sixth, seventh, and eighth ribs. Her final stab wound was located beneath her right armpit, piercing the soft tissue of her breast and entering her chest cavity.

The court-martial convicted the appellant of all the charges and specifications; the

findings of guilty of the capital offenses, the premeditated murders of SrA AS and JS, were announced as unanimous. A sentencing hearing was conducted pursuant to Rule for Courts-Martial (R.C.M.) 1004, after which the court-martial, by unanimous vote, sentenced the appellant to be put to death.[4]

Additional relevant facts are set out below in connection with specific issues.

## II. Findings Issues

We begin our analysis by addressing the various issues the appellant has raised related to the findings portion of the case.

## A. Qualifications of Trial Defense Counsel

As a preliminary issue, the appellant argues that his three trial defense counsel were not qualified to represent him because they did not satisfy the American Bar Association *Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases* (rev. ed. 2003), *reprinted in* 31 Hofstra L. Rev. 913 (2003) [hereinafter "*ABA Guidelines*"]. Relying on various policy memoranda to support his argument, the appellant asserts that the *ABA Guidelines* are binding on military and civilian trial defense counsel in Air Force courts. In 2005, The Judge Advocate General (TJAG) of the Air Force issued TJAG Policy Memorandum TJS-3, *Air Force Standards for Criminal Justice* (AFSCJ) (15 May 2005). That memorandum states, in part, that the AFSCJ "were adapted from the *American Bar Association Standards for Criminal Justice* [hereinafter "*ABA Standards*"]." *Id.* at ¶ 2. Because paragraph 4-1.2(c) of the *ABA Standards* incorporates the *ABA Guidelines*,[5] the appellant argues that the *ABA Guidelines* are binding upon Air Force practitioners through the AFSCJ. We disagree.

We review questions of regulatory construction de novo. *United States v. Estrada*, 69 M.J. 45, 47 (C.A.A.F. 2010) (citing *United States v. McCollum*, 58 M.J. 323, 340 (C.A.A.F. 2003); *United States v. Phillips*, 39 C.M.R. 230, 234 (C.M.A. 1969)). When interpreting regulations, we will apply normal rules of statutory construction. *Id.* (citing *United States v. Custis*, 65 M.J. 366, 370 (C.A.A.F. 2007)). In our view, the *ABA Standards*, including those that refer to the *ABA Guidelines*, are only recommended

---

[4] A sentence of death includes a dishonorable discharge and, as a necessary incident of the sentence, confinement. Rule for Courts-Martial (R.C.M.) 1004(e). By operation of Article 58b, UCMJ, 10 U.S.C. § 858b, such a sentence also results in forfeiture of pay and allowances during that confinement.

[5] Paragraph 4-1.2(c) of the *American Bar Association Standards for Criminal Justice* states, in part: "Since the death penalty differs from other criminal penalties in its finality, defense counsel in a capital case should respond to this difference by making extraordinary efforts on behalf of the accused. Defense counsel should comply with the [American Bar Association] Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases."

guidelines and not mandatory rules. Here, the *ABA Standards* state that they are "intended to be used as a guide to professional conduct and performance" and not as criteria for the "judicial evaluation of alleged misconduct of defense counsel to determine the validity of a conviction." *ABA Standards*, ¶ 4-1.1. Moreover, the *ABA Standards* state only that defense counsel "should comply with the *ABA Guidelines*." *ABA Standards*, ¶ 4-1.2(c). The AFSCJ also provides a means for resolving any conflict between the AFSCJ and any standard or guideline inconsistent with legal precedent: "[I]n the event of conflict, the [UCMJ, *Manual for Courts–Martial, United States* (*MCM*)], Air Force Instructions (AFI), the Air Force Rules of Professional Conduct [(AFRPC)], case law, and the Air Force Uniform Code of Judicial Conduct (AFUCJC) will control." *See* TJS-3, Attachment 1 (15 October 2002).

We also note that our superior court has declined to mandate compliance with the *ABA Guidelines*. *United States v. Loving*, 41 M.J. 213, 300 (C.A.A.F. 1994). That Court has also noted that limited experience does not raise a presumption of ineffectiveness. *Id.* (citing *United States v. Cronic*, 466 U.S. 648, 665 (1984)). *See also United States v. Murphy*, 50 M.J. 4, 9-10 (C.A.A.F. 1998) (citation omitted). Instead, the "quality of legal representation" is determined under the standards set by *Strickland v. Washington*, 466 U.S. 668 (1984), as analyzed below.

More practically, the absence of enumerated qualifications does not equate to deficient performance in a particular case. This is not a case where trial defense counsel "put on a halfhearted mitigation case" or "abandoned their investigation of [appellant's] background after having acquired only rudimentary knowledge of his history from a narrow set of sources." *See Wiggins v. Smith*, 539 U.S. 510, 526 (2003) (holding trial defense counsel rendered constitutionally deficient performance by failing to investigate petitioner's life history beyond the presentence investigation report, notwithstanding availability of funds to conduct thorough social history investigation). Similarly, counsel's performance in the case at bar does not resemble the conduct of counsel in cases where the courts have specifically recognized pronounced shortcomings in attorney performance. *See Sears v. Upton*, 561 U.S. 945 (2010) (trial defense counsel spent a single day on sentence preparation and failed to discover voluminous non-speculative information about severe privation and mental illness); *Porter v. McCollum*, 558 U.S. 30 (2009) (trial defense counsel failed to obtain any school, medical, or military service records, and to interview any members of Porter's family); *Rompilla v. Beard*, 545 U.S. 374 (2005) (trial defense counsel failed to retrieve and examine an easily obtainable file pertaining to appellant's prior conviction, which he was clearly on notice the prosecutor intended to reference); *Williams v. Taylor*, 529 U.S. 362 (2000) (trial defense counsel's one-week preparation for sentencing case failed to uncover extensive records of a "nightmarish" childhood).

The appellant was represented by three counsel in this case: two appointed

military counsel and a civilian of his own selection. His civilian counsel, FS, who was lead counsel on the case, was a retired judge advocate. Though FS had no capital experience, he did have experience defending many complex military cases. At the time of trial, he had been practicing military law for over twenty-five years, having spent most of that time as a defense counsel working at both the trial and appellate levels. He had represented hundreds of military members at trial and on appeal, and taught military law for four years at the United States Air Force Academy. He also served on the adjunct faculty at the Air Force Judge Advocate General's School, where he taught basic and advanced trial advocacy.

One of the appellant's two military counsel, Captain (Capt) DR, was, at the time of trial, a Circuit Defense Counsel. A graduate of Cornell Law School and licensed in Massachusetts, Capt DR served as the Chief of Military Justice at Rhein-Main Air Base, Germany, the Area Defense Counsel (ADC) at Kunsan Air Base, Korea, and was newly appointed as a Circuit Defense Counsel (CDC) roughly the month before the appellant's crimes. By the start of the appellant's trial, Capt DR had defended thirteen non-capital cases in his capacity as a CDC. He attended three separate advocacy courses between Spring 2003 and Spring 2004, plus an additional three-day course sponsored by the National Association of Criminal Defense Lawyers entitled "Making the Case for Life." The focus of this law course, which Capt DR attended in Fall 2004, was on jury selection, developing mitigation evidence, and working mitigation into the findings case. In addition to his formal training, he visited the Navy-Marine Corps Death Penalty Resource Center and reviewed a substantial number of files, which at the time consisted mostly of records of trial from the various Navy-Marine Corps death penalty cases as well as the appellant briefs that had been filed in those cases. Further, he regularly communicated with the Navy appellate judge advocate who was assigned to the Navy-Marine Corps Death Penalty Resources Center as he and the trial defense team worked the case.

FS and Capt DR worked with the base ADC, who was admittedly very inexperienced in defense work at the time. In short order, they had retained a mitigation expert and a highly-recommended expert forensic psychologist to augment their trial defense team. Although it is true that none of the appellant's trial defense counsel had ever defended a capital case prior to representing the appellant at trial, their combined qualifications and demonstrated performance at trial do not reveal them to have been per se unqualified or otherwise substantively unqualified to represent the appellant, as our dissenting colleague argues.

Accordingly, we find this alleged error to be without merit.

B. Challenge for Cause of Colonel DH

The appellant argues that the military judge abused his discretion by denying the

defense challenge for cause against Colonel (Col) DH. The appellant asserts that the military judge (1) failed to grant the challenge on implied bias and (2) failed to refer to the liberal grant mandate in his ruling. We disagree on both counts.

Rule for Courts-Martial 912 includes challenges based upon the concepts of both actual and implied bias. *United States v. Moreno*, 63 M.J. 129, 133 (C.A.A.F. 2006) (citing *United States v. Napoleon*, 46 M.J. 279, 283 (C.A.A.F. 1997); *United States v. Minyard*, 46 M.J. 229, 231 (C.A.A.F. 1997)). The issue sub judice concerns implied bias. Rule for Courts-Martial 912(f)(1)(N) provides that a member shall be excused for cause whenever it appears that the member "[s]hould not sit as a member in the interest of having the court-martial free from substantial doubt as to legality, fairness, and impartiality."

The test for implied bias is objective, viewed through the eyes of the public, and focuses on the appearance of fairness in the military justice system. *United States v. Leonard*, 63 M.J. 398, 402 (C.A.A.F. 2006) (citations omitted); *Moreno*, 63 M.J. at 134; *United States v. Rome*, 47 M.J. 467, 469 (C.A.A.F. 1998); *United States v. Daulton*, 45 M.J. 212, 217 (C.A.A.F. 1996). If the public perceives that an accused received less than a court composed of fair, impartial, and equal members, our superior court has not hesitated to set aside the affected findings and/or sentence. *See Leonard*, 63 M.J. at 403; *Moreno*, 63 M.J. at 135; *United States v. Wiesen*, 56 M.J. 172, 176-77 (C.A.A.F. 2001). However, implied bias should be relied upon sparingly. *United States v. Strand*, 59 M.J. 455, 458 (C.A.A.F. 2004).

We review rulings on challenges for implied bias under a standard that is less deferential than abuse of discretion, but more deferential than de novo review. *Moreno*, 63 M.J. at 134; *United States v. Armstrong*, 54 M.J. 51, 54 (C.A.A.F. 2000); *Napoleon*, 46 M.J. at 283. Military judges are required to follow the liberal-grant mandate in ruling on challenges for cause made by an accused. *Moreno*, 63 M.J. at 134 (citing *United States v. James*, 61 M.J. 132, 139 (C.A.A.F. 2005)); *United States v. Downing*, 56 M.J. 419, 422 (C.A.A.F. 2002); *United States v. White*, 36 M.J. 284, 287 (C.M.A. 1993). "[I]n the absence of actual bias, where a military judge considers a challenge based on implied bias, recognizes his duty to liberally grant defense challenges, and places his reasoning on the record, instances in which the military judge's exercise of discretion will be reversed will indeed be rare." *United States v. Clay*, 64 M.J. 274, 277 (C.A.A.F. 2007).

The defense challenged Col DH based upon his relationships with the convening authority and the staff judge advocate (SJA), Col JR. During individual voir dire, Col DH stated that his relationship with the convening authority consisted of attending church and Sunday school together and having an occasional lunch together after church. Col DH stated he had never been to the convening authority's house, and that the

convening authority had been to his house on two occasions: once for a birthday celebration and the other to offer condolences after Col DH had been injured.

Col DH also stated he knew the SJA, Col JR, and that he and Col JR interacted together at social activities and at the gym: "We basically only see each other in the locker room. We do not work out together. We see each other in the locker room, we have normal conversation for literally a matter of minutes and that's the extent of our normal relationship." He also stated that he and Col JR had never been to each other's house for dinner, but he had on two occasions sought legal advice from Col JR, though he interacted mostly with Col JR's subordinate attorneys.

We find that the military judge did not abuse his discretion in denying the challenge for cause against Col DH and that he applied the correct legal standard. Prior to issuing his ruling on all the challenges for cause, both for the Government and the defense, the military judge set forth legal standards governing bias and the liberal-grant mandate:

> In making my determination on the challenges for cause, there are two potential bias standards that I'm required to look at. One is actual bias, which involves an allegation that the member's bias will not yield to the military judge's instructions, and that is a subjective determination on my part. The second test is implied bias, which indicates would a reasonable member of the public have substantial doubt as to the legality, fairness, and impartiality of the proceedings if the challenge for cause were not granted, and again, an objective test of the public—through the eyes of the public. The court is also mindful of our appellate court's direction that challenges for cause be granted liberally.

In his ruling denying the challenge for cause against Col DH, the military judge stated the following:

> As to [Col DH], the defense challenge for cause appears to be based primarily on the implied bias standard based on his relationships with the convening authority and/or [Col JR]. In that regard, the defense challenge for cause is denied. While [Col DH] attends Sunday school and church with the convening authority, he is not a close friend. Further, he has not discussed the case with the convening authority, nor has the convening authority mentioned the case to him. The relationship in this case is much less close than many of the other panel members. The fact that [Col DH] sees [Col JR] in the gym—or [Col DH] sees [Col JR] in the gym but does not work out with him, nor have they discussed the case. Neither of these relationships arise to the level of actual or implied bias. His answers and

the answers of [another court member] in voir dire gave me no indication that they would be unable to give fair and balanced consideration to all of the evidence presented by both sides and clearly indicated that they could follow my instructions.

Viewing the ruling through the eyes of the public and focusing on the appearance of fairness in the military justice system, we also find that the military judge did not err. He considered the challenge based upon implied bias, recognized his duty to liberally grant defense challenges, and placed his rationale on the record. Under the "totality of the circumstances particular to [this] case," we find no reason to disturb his ruling. *United States v. Terry*, 64 M.J. 295, 302 (C.A.A.F. 2007) (citing *Strand*, 59 M.J. at 456). *See also United States v. Bagstad*, 68 M.J. 460, 463 (C.A.A.F. 2010).

## C.  Unlawful Command Influence

The appellant argues that Col JR exercised Unlawful Command Influence (UCI) throughout the court-martial, based on his role as the SJA for the convening authority. He alleges three ways the actions of the SJA amounted to UCI:  (1) the SJA attended most days of the court-martial; (2) the SJA sat in the immediate vicinity of the victims' families and the prosecution's paralegals; and (3) the SJA engaged in communications with the prosecutors during the court-martial proceedings. We find no UCI.

We review allegations of UCI de novo. *United States v. Wallace*, 39 M.J. 284, 286 (C.M.A. 1994). Article 37(a), UCMJ, 10 U.S.C. § 837(a), states in part, "No person subject to this chapter may attempt to coerce or, by any unauthorized means, influence the action of a court-martial or any other military tribunal or any member thereof, in reaching the findings or sentence in any case . . . ." The appellant has the initial burden of raising UCI. *United States v. Stombaugh*, 40 M.J. 208, 213 (C.M.A. 1994). Once the issue of command influence is properly placed at issue, "no reviewing court may properly affirm findings and sentence unless [the court] is persuaded beyond a reasonable doubt that the findings and sentence have not been affected by the command influence." *United States v. Thomas*, 22 M.J. 388, 394 (C.M.A. 1986). At the appellate level, we evaluate UCI in the context of a completed trial using the following factors:  "[T]he defense must (1) show facts which, if true, constitute [UCI]; (2) show that the proceedings were unfair; and (3) show that [UCI] was the cause of the unfairness." *United States v. Biagase*, 50 M.J. 143, 150 (C.A.A.F. 2003) (citing *Stombaugh*, 40 M.J. at 213). *See also United States v. Simpson*, 58 M.J. 368, 374 (C.A.A.F. 2003); *United States v. Reynolds*, 40 M.J. 198, 202 (C.M.A. 1994).

Both the appellant and the Government submitted affidavits addressing this issue. After reviewing the record, to include these affidavits, we find the SJA did not exert UCI.

With respect to Col JR's presence at the court-martial, the record merely shows that he attended the trial but is silent on how his presence created actual or apparent UCI. In his post-trial affidavit, Col JR states that he "attended most days of the trial." He further states that "Public Affairs asked that I be the spokesperson to the media in attendance to answer their questions and provide sound bites." Other trial participants, however, only recall Col JR attending portions of the trial. For example, the lead prosecutor, then-Major VS, recalls that Col JR "attended portions of voir dire, opening statement, maybe a day or so of testimony, closing argument, and sentencing argument." This is corroborated by assistant trial counsel, Capt SW, who states in his affidavit, "[Col JR] did attend portions of the trial, but I do not believe it was on a regular basis." Affidavits from the appellant affirm that Col JR attended the court-martial but shed no light on how his presence created UCI. The defense paralegal states, "I recall [Col JR] attending portions of [the appellant's] court-martial." Likewise, another affiant states that Col JR would "make an appearance" at the courthouse but would "not always stay the entire day."

With respect to Col JR sitting near the victims' families when he attended the court-martial, the record convinces us that where he sat was a matter of logistics, not a conscious decision to deliberately align himself with the victims or the prosecution. The record indicates that the courtroom gallery held between 175-200 persons. The appellant's family and friends sat on the side of the courtroom nearest the court members and farthest from the courtroom entrance. The victims' families and friends sat on the side of the courtroom nearest the prosecution, as well as the main entrance and exit to the courtroom, and typically sat in the second and third rows. If someone entered the courtroom during a session, as did Col JR, they would "naturally gravitate" towards the seats nearest the entrance and exit to the courtroom, which happened to be closest to the prosecution and the victims' families. We find no actual or apparent UCI stemming from where Col JR sat during the court-martial.

Finally, with respect to Col JR communicating with the prosecution during the court-martial, we also find no actual or apparent UCI. The record demonstrates that Col JR sometimes, but not often, spoke to both the prosecution and trial defense counsel during recesses in the court-martial and did so outside the presence of the members. Col JR characterized the conversations as "light in nature, but when official would usually deal with the logistics of the proceeding." He periodically sent updates to the convening authority but only asked assistant trial counsel for information on one occasion. The lead prosecutor also stated that it is "simply inaccurate" that Col JR sent notes to the prosecution or frequently gave them trial advice. He notes that "[Col JR] gave us remarkably little advice on the course of the trial. He was hands off on the strategy decisions, list of witnesses, selection of exhibits, and the like. He left those decisions completely in the hands of the trial team."

There must be more than "[command influence] in the air" to justify action by an appellate court. *United States v. Allen*, 33 M.J. 209, 212 (C.M.A. 1991) (alteration in original). The appellant has failed to show facts which, if true, constituted UCI by Col JR. The facts instead only show that he attended the trial, sat near the victims' families, and sometimes interacted with counsel for both sides. Having reviewed the appellant's claim, we also conclude that a fact-finding hearing is not necessary. *United States v. Ginn*, 47 M.J. 236 (C.A.A.F. 1997).

## D. Findings Argument

The appellant asserts trial counsel committed plain error during his closing argument of the findings portion of the court-martial by "seeking vindication for family members of the victims." The appellant highlights several passages from the argument in support of his position. First, trial counsel stated:

> As has become apparent, Mr. President, Members of the Court, evil does exist in this world. And it didn't take your week here, when we were putting on our case, to learn that very fact. All you have to do is read a newspaper, watch a movie, or watch the news. The hard part for people to recognize is that evil can walk through anyone's door at anytime, for the most senseless of reasons. That's the part that people would struggle with, that's the part that those families struggle with every day.

> At times, this argument may sound like it's going to go long and I apologize for that, but I think they deserve to hear what happened that night, because what you're going to find out is that the [G]overnment has to prove what you see on that screen, the specifications, beyond a reasonable doubt. But as many of your questions have already shown, you all have questions well beyond the elements.

Trial counsel further argued:

> And I'm going to tell you members, some of those things you will never know when you deliberate. You will guess, you will talk about, you will theorize about. And another thing you will do, besides just deal with whether or not these things happened, is you're going to want to try to put what happened in the house, blow by blow, stab by stab and you already know you can't; just from hearing the evidence here, you know you will not be able to, because that man killed two of the witnesses.

> He chased one of the witnesses out of the house, who, by all accounts—his doctor, himself, EMT and everybody—should have been

dead. Evil exists, and for those families evil exists right here, he sits right here.

At a later point in the argument, trial counsel argued:

> The defense will suggest to you that adrenaline, adrenaline can cause this. And you heard from [Dr. BM] in the Stipulation of Testimony, we all have it. Members, I would suggest that getting up to give a closing argument in a case with all of the family members here watching can cause a rush of adrenaline. My memory feels fine.

In his closing remarks, trial counsel stated:

> When you go back and deliberate and you look at the evidence and the premeditation, it is so very obvious. Talk about the crime, go through the order of the crime, understand the order as best you can with the knowledge that you will never have all of your answers. We have struggled to give you as many as we can and the families as many as we can, but at the end of this go back and deliberate on the elements of premeditation and use your common sense and your knowledge of human nature and your understanding of the facts of this case. And take a reasonable doubt instruction that you've now heard and you apply this one that's so obvious and so clear, while sad, and while tragic, and while difficult to comprehend a man like that in the Air Force. You know what he did. You know his purpose. You know his plan. You know his method. Now convict him of premeditated murder and attempted premeditated murder.

Finally, trial counsel's references to the victim's family members in rebuttal argument included:

> [T]hroughout this process we've tried to give you the facts. That does not just mean the facts that prove our case beyond a reasonable doubt. We gave you those facts because you need those for us, the [G]overnment, to satisfy our burden. We gave you others because you all have the same questions the families grapple with every day, every night.
>
> . . . .
>
> The prosecution agrees that justice is what we require. Premeditated murder is, by its nature, the hardest thing to understand. But do not cheapen it by finding passion where there's none, by finding passion where you see planning, by finding passion where you see motive, by finding

passion where you see opportunity, ruins what we have set up to protect our citizens. We do demand justice. Those families have waited 15 months for their day for their kids, because [SrA AS] and [JS] aren't here to tell you they need justice. Your common sense tells you what happened to them.

The standard of review for determining the propriety of counsel's argument is whether the statement is erroneous and materially prejudices substantial rights of the accused. Article 59(a), UCMJ, 10 U.S.C. § 859(a); *United States v. Baer*, 53 M.J. 235, 237 (C.A.A.F. 2000). Failure to make a timely objection to matters raised in argument constitutes waiver in the absence of plain error. *United States v. Ramos*, 42 M.J. 392, 397 (C.M.A. 1995). "To establish plain error, an appellant must satisfy a four-pronged test. There must (1) be error (2) that is plain (3) that affects substantial rights of an accused." *United States v. Roberson*, 46 M.J. 826, 828 (A.F. Ct. Crim. App. 1997) (citing *United States v. Olano*, 507 U.S. 725, 732 (1993)), *aff'd*, 48 M.J. 411 (C.A.A.F. 1997). "Once these first three criteria are met, an appellate court may exercise its discretion to notice a forfeited error only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* In the case at hand, trial defense counsel did not object to the passages of trial counsel's arguments laid out above. As such, we embark upon the plain error analysis by first asking if these remarks were error at all.

"Argument must be limited to evidence of record and to the fair inferences that can be drawn from that evidence." *United States v. Edmonds*, 36 M.J. 791, 792 (A.C.M.R. 1993) (citing *United States v. Nelson*, 1 M.J. 235 (C.M.A. 1975)). It is appropriate for trial counsel—who is charged with being a zealous advocate for the Government—to argue the evidence of record, as well as all reasonable inferences fairly derived from such evidence. *Nelson*, 1 M.J. at 239. However, arguments designed by trial counsel to inflame the passions or prejudices of the court members are clearly improper. *United States v. Clifton*, 15 M.J. 26, 30 (C.M.A. 1983).

With respect to arguments pertaining to a victim or victim's family, military courts have long held that "Golden Rule" arguments asking the court members to place themselves in the position of a near relative of the victim are improper. *United States v. Shamberger*, 1 M.J. 377 (C.M.A. 1976) (trial counsel asked members to place themselves in the position of rape victim's husband, who was restrained and watched as his wife was repeatedly raped); *United States v. Wood*, 40 C.M.R. 3 (C.M.A.1969) (trial counsel asked members to sentence accused from the perspective that their own sons had been the victims of indecent liberties by the accused); *see also United States v. Teslim*, 869 F.2d 316, 328 (7th Cir. 1989) ("A 'Golden Rule' appeal in which the jury is asked to put itself in the plaintiff's position 'is universally recognized as improper because it encourages the jury to depart from neutrality and to decide the case on the basis of personal interest and bias rather than on the evidence.'" (citations omitted)).

Nothing about the arguments posed by trial counsel in this case asked the members to place themselves in the position of a near relative of the victims. Instead, the arguments made reference to the presence of the victims' family members throughout the trial and their lingering questions about what happened the night of the murders. The appellant argues these passages in trial counsel's argument were presented with the singular purpose of highlighting "the families and their pain." We disagree.

As a threshold matter, the argument by a trial counsel must be viewed within the context of the entire court-martial. The focus of our inquiry should not be on words in isolation but on the argument as "viewed in context." *United States v. Young*, 470 U.S. 1, 16 (1985). *See also Dunlop v. United States*, 165 U.S. 486, 498 (1897) ("If every remark made by counsel outside of the testimony were ground for a reversal, comparatively few verdicts would stand, since, in the ardor of advocacy, and in the excitement of trial, even the most experienced counsel are occasionally carried away by this temptation."). In this regard, we are not swayed by the handful of passing comments in a rather lengthy argument. We note:

> In reviewing criminal cases, it is particularly important for appellate courts to relive the whole trial imaginatively and not to extract from episodes in isolation abstract questions of evidence and procedure. To turn a criminal appeal into a quest for error no more promotes the ends of justice than to acquiesce in low standards of criminal prosecution.

*Johnson v. United States*, 318 U.S. 189, 202 (1943) (Frankfurter, J., concurring).

An overall review of the record of trial, including consideration of the gruesome nature of the offenses themselves, and the entire findings argument, leaves no basis for us to conclude that trial counsel's argument was calculated to inflame the members' passions or possible prejudices. We find no error.

### E. Admission of Crime Scene and Autopsy Photographs

The appellant further alleges the military judge committed error by admitting crime scene and autopsy photographs over defense objection. We review a military judge's ruling on the admissibility of evidence for abuse of discretion. *United States v. Holt*, 58 M.J. 227, 230-31 (C.A.A.F. 2003). A decision to admit or exclude evidence based upon the balancing test set forth in Mil. R. Evid. 403 is within the sound discretion of the military judge. *United States v. Smith*, 52 M.J. 337, 344 (C.A.A.F. 2000); *United States v. Phillips*, 52 M.J. 268, 272 (C.A.A.F. 2000). "To reverse for 'an abuse of discretion involves far more than a difference in opinion. The challenged action must be found to be 'arbitrary, fanciful, clearly unreasonable,' or 'clearly erroneous' in order to be invalidated on appeal.'" *United States v. Travers*, 25 M.J. 61, 62 (C.M.A. 1987)

(citations and ellipses omitted). "An abuse of discretion arises in cases in which the judge was controlled by some error of law or where the order, based upon factual, as distinguished from legal, conclusions, is without evidentiary support." *Id.* (citation and internal quotation marks omitted).

The exhibits at issue included autopsy photographs for JS and SrA AS, and 29 photographs of the crime scene. Before trial, the defense moved to exclude 18 of these photographs. A full hearing was held on the motion, wherein the military judge heard testimony from Dr. (Lt Col) ER, the medical examiner who conducted the autopsies, and Mr. PK, an expert witness who examined the blood spatter evidence at the crime scene. The witnesses each articulated why every one of the proposed photographs was necessary and helpful to the presentation of their prospective testimony and explanation to the members.

In ruling on the motion to suppress, the record reflects the military judge considered the expert witness testimony, written pleadings, proposed exhibits, as well as a full set of autopsy and crime scene photographs, including those not offered into evidence. The military judge took the matter under advisement, returning to deliver his ruling on the motion nearly two hours after the close of the hearing. He presented an accurate recitation of the applicable rules, Mil. R. Evid. 401, 402, and 403, and gave detailed findings as to why each of the challenged photographs satisfied evidentiary relevance. He granted the motion to suppress four photographs. He found that all of the other 14 photographs had probative value that was not substantially outweighed by prejudicial impact.

"Photographs, although gruesome, are admissible if used to prove time of death, identity of the victim, or exact nature of wounds." *United States v. Gray*, 37 M.J. 730, 739 (A.C.M.R. 1992), *aff'd*, 51 M.J. 1 (C.A.A.F. 1999). "It is not a matter of whether the photographs were inflammatory but whether they served a legitimate purpose." *Id.* (citing *United States v. Whitehead*, 30 M.J. 1066, 1070 (A.C.M.R. 1990); *United States v. Bartholomew*, 3 C.M.R. 41, 48 (C.M.A. 1952)).

In this case, the testimony of the expert witnesses clearly established the need for the photographs in order to convey the exact nature of the wounds and the crime scene. The probative value of the photographs was not substantially outweighed by any prejudicial effect. The proper law with respect to relevancy and admissibility was applied. We find the military judge did not abuse his discretion in admitting these photographs.

F. Findings Instructions

The appellant asserts the military judge committed reversible error by denying two

of their requested instructions. Reviewing the military judge's decision not to give a requested instruction under an abuse of discretion standard, we note that the test to determine if denial of a requested instruction constitutes reversible error is whether: (1) the charge is correct; (2) it is not substantially covered in the main charge; and (3) it is on such a vital point in the case that the failure to give it deprived the accused of a defense or seriously impaired its effective presentation. *United States v. Damatta-Olivera*, 37 M.J. 474, 478 (C.M.A. 1993).

The first proposed instruction was tailored from the standard instruction regarding evidence negating mens rea.[6] *See* Department of the Army Pamphlet (D.A. Pam.) 27-9, *Military Judges' Benchbook* [hereinafter "*Benchbook*"], ¶ 5-17 (1 April 2001). Trial defense counsel argued the proposed instruction was proper because the evidence raised an "issue of whether the accused had an emotional or cognitive impairment that interfered with his ability to form specific intent." Specifically, the defense relied on Dr. BM's stipulation of expected testimony to argue that recent scientific studies have shown "there is an impairment that arises in the ability to plan, to think, to control impulses, when a stressor is presented," and that rises to an "emotional condition of the kind that could impact or impair the ability to premeditate."

The military judge questioned whether the law intended for an instruction to be given on a mental condition when "everybody in the entire world" has the ability to or will naturally produce adrenaline. The military judge initially ruled that he would not give the proposed instruction because he felt the mens rea issue had not been raised by the evidence. After further deliberation on the matter overnight, the issue was again argued and the military judge ruled as follows:

> Okay. I have carefully considered the defense's request and did so at length last evening after we first talked about it and I do not believe that

---

[6] The proposed language of the appellant's mens rea instruction was as follows:

> The evidence in this case has raised an issue whether the accused had an emotional and/or cognitive impairment and the required state of mind with respect to the offenses of premeditated murder and attempted premeditated murder. In determining this issue, you must consider all the relevant facts and circumstances. One of the elements of [these] offenses is the requirement of premeditation. You are advised that an accused, because of some underlying impairment, may be mentally incapable of entertaining the premeditated design to kill. You should, therefore, consider in connection with all relevant facts and circumstances, evidence tending to show that the accused may have been suffering from an emotional and/or cognitive impairment of such consequence and degree as to deprive him of the ability to entertain the premeditated design to kill. The burden of proof is upon the government to establish the guilt of the accused by legal and competent evidence beyond a reasonable doubt. Unless in light of all the evidence you are satisfied beyond a reasonable doubt that the accused, at the time of the alleged offenses was mentally capable of entertaining the premeditated design to kill, you must find the accused not guilty of those offenses.

the mens rea instruction has been reasonably raised by the evidence. Obviously, if [Dr. BM] had testified and testified in accordance with his testimony during an Article 39(a) Session, my decision would have been different, but the evidence before the members shows nothing more than one, that people's ability to remember specific facts are impaired as a result of a stressful situation and the adrenaline that arises from that stressful situation, and there is evidence before the Court that adrenaline does cause stress. The problem here is that there's no fit, there is no testimony to indicate that adrenaline or memory would affect the accused more or less than it would affect the average person. And based on the facts of this case, as they currently exist, it would seem that [trial defense counsel's] request would require a mens rea instruction in every case where someone acted in a violent way as a result of a stressful situation, whether it was caused by them or caused by someone else. So I will not give the mens rea instruction.

Within the given instructions regarding heat of passion and the ability to premeditate, the military judge instructed the members several times, "An accused cannot be found guilty of premeditated murder if, at the time of the killing, his mind was so confused by anger, rage, sudden resentment or fear that he could not or did not premeditate." In applying the test set forth in *Damatta-Olivera*, we find that the military judge did not abuse his discretion. The evidence of adrenaline was properly before the members for consideration, and the instructions covered the confusion of the mind that may negate the ability to premeditate. As such, we find this alleged error without merit.

The second defense-requested instruction also addressed premeditation.[7] However, instead of giving the additional instruction requested, the military judge properly instructed the members on premeditation from the standard *Benchbook* instructions. The definition and requirements for premeditation were substantially covered in the main instruction given to the members in this case. As such, the members were properly instructed, and the appellant has failed to meet the second prong of the *Damatta-Olivera* test. We find the military judge did not abuse his discretion in giving only the standard *Benchbook* instruction on premeditation.

G. Impeachment of Staff Sergeant PG

The appellant alleges the military judge erred in not allowing the presentation of

---

[7] The requested instruction read, "Premeditation requires that one with a cool mind did, in fact, reflect on the intent to kill before committing the lethal act. Intent to kill alone is insufficient to reach a finding of guilty for premeditated murder. To reach such a finding of guilty, the lethal act must have been committed after reflection on the consequences by a cool mind."

extrinsic evidence of a prior inconsistent statement of Staff Sergeant (SSgt) PG. Specifically, the defense wanted to call a witness who had interviewed SSgt PG prior to trial to testify about SSgt PG's prior statements regarding whether the door to SrA AS's home was open or closed when he arrived to investigate.

This Court reviews a military judge's ruling on the admissibility of evidence for abuse of discretion. *United States v. Ediger*, 68 M.J. 243, 248 (C.A.A.F. 2010). A trial judge will typically have a great deal of discretion to determine whether trial testimony is inconsistent with a prior statement. *United States v. Harrow*, 65 M.J. 190, 200 (C.A.A.F. 2007).

Here, SSgt PG was called as a Government witness. When first questioned on direct examination about the front door to SrA AS's home, SSgt PG testified:

Q. When you got there, did you ascertain whether the front door was locked or not?

A. I didn't.

Q. Did somebody?

A. I don't know.

Q. What door—well, did you enter the [S]'s residence?

A. We did.

Q. What door did you go through?

A. The side door under the carport.

Q. And, what room does that lead you into?

A. The kitchen.

Q. And, what is your—who was the lead cop?

A. Sergeant [A] was in the lead.

Q. All right. What was your understanding as to why you went through that door and not another door to the house?

A. The door was already open.

Q. So, you did not go through the front door?

A. I did not go through the front door.

Q. All right. I'm showing you Prosecution Exhibit 22, picture 066. What is that a picture of, Sergeant [PG]?

A. It appears to be the front door of the residence.

Q. All right. That is not—that door was not in that configuration. In other words, it was not open when you arrived at the house?

A. No, it wasn't.

On cross-examination, trial defense counsel further questioned SSgt PG about his observations as follows:

Q. I want to take you to when you first went to the [S] house, excuse me. When you got there, were you the person at the front door?

A. I was.

Q. You actually knocked on the front door?

A. I did.

Q. But you didn't try to open the front door, is that correct?

A. I did not.

Q. Okay. The other three Security Forces members you were with, that was Sergeant [A], Sergeant [HA], and Sergeant [G]. Is that correct?

A. Correct.

. . . .

Q. Okay. And, you did not try the door?

A. I didn't.

Q. And, you don't know if the door was locked or not?

A. I do not know.

. . . .

Q. Okay. And, the door itself was closed?

A. The door is closed.

Q. Okay. Do you remember speaking with the [AFOSI] agents on the 13th of July, 2004, about what you did that night?

A. Vaguely.

Q. Okay. You spoke with Sergeant, or—Special Agent [N] and Special Agent [R]?

A. I don't recall their names.

Q. Okay, but two Special Agents. Do you do [sic] remember that?

A. Yes, sir.

Q. Do you remember them taking notes on that incident?

A. I do.

Q. Okay. During that interview, they took notes that said you said the front door was opened.

ATC1: I'm going to object as to improper 613.

DC: Your Honor, I'll rephrase the question.

MJ: Rephrase the question.

Q: If the agents had written that you had seen that the door was opened, would that have been accurate, inaccurate?

ATC1: Your Honor, that's not a proper question. There is a procedure for

doing this. Counsel needs to follow it.

MJ: Overruled. Go ahead.

DC: Thank you.

Q. If the Agents had said that you had said the door was opened in that interview, would they have been correct in writing that down?

A. That would have been correct.

Q. Okay. So, it's possible that the door was open—you told them?

A. I never stated the door was open.

The process of impeachment by prior inconsistent statement is a tool to attack the credibility or recollection of a witness. "By showing self-contradiction, the witness can be discredited as a person capable of error." *United States v. Banker*, 15 M.J. 207, 210 (C.M.A. 1983); 3A John H. Wigmore, Evidence § 874 (Chadbourne rev. 1970). Military Rule of Evidence 613(b) provides that "[e]xtrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon." If the inconsistency is not admitted, or the witness equivocates, extrinsic evidence may be admitted, but only for impeachment. *Damatta-Olivera*, 37 M.J. at 478 ("[W]hether testimony is inconsistent with a prior statement is not limited to diametrically opposed answers but may be found as well in evasive answers, inability to recall, silence, or changes of position.").

Here, proper procedure was followed, and a proper foundation was laid for the appellant to admit extrinsic evidence of the inconsistent statement for impeachment purposes. The military judge's evidentiary ruling was an abuse of discretion in that the findings of fact upon which he predicated his ruling are not supported by the evidence contained in the record of trial. *See United States v. Ellis*, 68 M.J. 341, 344 (C.A.A.F. 2010).

Having found error, "we conduct a de novo review to determine whether this error had a substantial influence on the members' verdict in the context of the entire case." *United States v. Harrow*, 65 M.J. 190, 200 (C.A.A.F. 2007) (citing *Kotteakos v. United States*, 328 U.S. 750, 764-65 (1946); *United States v. Berry*, 61 M.J. 91, 97 (C.A.A.F. 2005)). "We consider four factors: (1) the strength of the government's case; (2) the strength of the defense case; (3) the materiality of the evidence in question; and (4) the quality of the evidence in question." *Id.* (citing *Berry*, 61 M.J. at 98).

In the appellant's court-martial, the Government's case was very strong and included significant admissions by the appellant. Trial defense counsel conceded that the case was not a question of who committed the crimes, but instead, why the crimes were committed. The focus of the defense case throughout was the state of mind of the appellant at the time of the offenses. The inconsistent statement sought to be introduced in this case would have offered extremely little, if any, impact on the defense's theory of the case or presentation of evidence such that it cannot be said to be material to the case. After full consideration of all of the above factors, as well as the fact that the military judge gave trial defense counsel an opportunity to recall SSgt PG to confront him with the prior statement,[8] we find the error was harmless in this case.

## III. Assistance of Counsel

The appellant has asserted numerous allegations that his trial defense counsel were deficient in their representation of him during the court-martial. He contends he received ineffective assistance of counsel during both the findings and sentencing phases.

### A. Counsel's Performance in Findings

The appellant cites *Strickland v. Washington*, 466 U.S. 668 (1984), to assert that he was denied his constitutional right to effective assistance of counsel during the findings phase of the court-martial. He lists seven different areas where he asserts his counsel were deficient, which prejudiced him and resulted in his conviction. We review ineffective assistance of counsel claims de novo. *United States v. Anderson*, 55 M.J. 198, 201 (C.A.A.F. 2001); *United States v. Wiley*, 47 M.J. 158, 159 (C.A.A.F. 1997).

In *Strickland*, the Supreme Court found that the Sixth Amendment[9] entitles criminal defendants to the "effective assistance of counsel"—that is, representation that does not fall "below an objective standard of reasonableness" in light of "prevailing professional norms." *Strickland*, 466 U.S. at 686, 688. Inquiry into an attorney's representation must be "highly deferential" to the attorney's performance and employ "a strong presumption that counsel's conduct falls within the wide range of professionally competent assistance." *Id*. at 689. Our superior court has applied this standard to military courts-martial, noting that "[i]n order to prevail on a claim of ineffective assistance of counsel, an appellant must demonstrate both (1) that his counsel's performance was deficient, and (2) that this deficiency resulted in prejudice." *United States v. Green*, 68 M.J. 360, 361 (C.A.A.F. 2010) (citing *Strickland*, 466 U.S. at

---

[8] A review of the record of trial reveals trial defense counsel elected not to pursue this opportunity granted by the military judge.
[9] U.S. CONST. amend. VI.

687; *United States v. Mazza*, 67 M.J. 470, 474 (C.A.A.F. 2009)).

We "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 690. In making that determination, we consider the totality of the circumstances, we bear in mind "that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work," *Id.*, and we "recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* "[T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order [as the Court in *Strickland* did,] or even to address both components of the inquiry if the defendant makes an insufficient showing on one." *United States v. McConnell*, 55 M.J. 479, 481 (C.A.A.F. 2001) (alterations in original) (quoting *Strickland*, 466 U.S. at 697).

With these standards in mind, we separately analyze the seven alleged deficiencies in counsel's performance during the findings portion of the court-martial.

## 1. Military Judge's Sentencing Comments During Voir Dire

In his first raised issue, the appellant alleges his trial defense counsel were constitutionally ineffective when they failed to object to an instruction given by the military judge during voir dire that commented on sentencing.

At the outset of voir dire of the initial panel of members detailed by the convening authority, the military judge instructed:

> This is a capital murder case. I want to direct your attention specifically to Specifications 1 and 2 of Charge I, on the copy of the charges that you have there. Both are a violation of [A]rticle 118 of the Uniform Code of Military Justice, commonly referred to as premeditated murder. If the accused is convicted of premeditated murder by a unanimous vote, then the court may, but is not required to, impose the death penalty.

This instruction is adapted from the *Benchbook*. D.A. Pam. 27-9, ¶ 8-3. The instruction is accurate and appropriate. Therefore, we find that, given the dual role of the court-martial panel to decide both the findings of the case as well as an appropriate sentence, trial defense counsel were not deficient in their performance by failing to object.

## 2. Trial Counsel's Voir Dire Questions

During voir dire, trial counsel individually questioned seven of the members who were ultimately seated on the appellant's court-martial panel regarding their views as to the comparative loss a family with multiple children would feel as opposed to a family who lost an only child. The appellant argues these questions exceeded the permissible scope of voir dire and that trial defense counsel were constitutionally ineffective for failing to object.

We need not undertake the related inquiry of ruling on whether or not the questions of counsel were objectionable to resolve the issue in this case. *McConnell*, 55 M.J. at (C.A.A.F. 2001) (quoting *Strickland*, 466 U.S. at 697). Instead, we find that the failure to object to individually posed voir dire questions of this sort is not error that rises to the level of a constitutional violation because there is no evidence of prejudice arising from the members' answering such a question. Thus, the appellant has not met his burden under the second *Strickland* prong.

## 3. Peremptory Challenge of Colonel DC

Trial defense counsel lodged a challenge for cause against potential court-martial member Col DC, stating they "felt that [Col DC]'s responses [] show a bias and in favor of the death penalty. And his close relationship to both the convening authority and the Staff Judge Advocate creates a further implied bias. And the combination of those two is such that [they] believe[d] he should be challenged for cause." The military judge denied this challenge. Subsequently, trial defense counsel exercised their peremptory challenge against Col DC.

The appellant argues the use of the peremptory challenge amounts to ineffective assistance of counsel because, "by voluntarily reducing the panel size, the defense counsel made the [G]overnment's burden lighter." He further asserts that trial defense counsel's use of the peremptory challenge "made it measurably easier for the [G]overnment to obtain a death sentence."

Beyond their concerns elucidated on the record at trial, trial defense counsel, in their post-trial affidavits, articulated that, prior to exercising the peremptory challenge, they were cognizant that more members on the panel is better. However, they balanced that against their concerns that this member "would be both unfavorable to our position and also be a strong advocate to persuade others [sic] members to his position." Ultimately, they decided to exercise the challenge.

Here, trial defense counsel coherently expressed a strategic and tactical basis for deciding to exercise their peremptory challenge. We will not second guess the strategic

or tactical value of these decisions. *Anderson*, 55 M.J. at 202; *United States v. Morgan*, 37 M.J. 407, 410 (C.M.A. 1993). Trial defense counsel were faced with an almost impossible dilemma. A decision by the appellant's trial defense counsel not to exercise their peremptory challenge to excuse Col DC could likely have resulted in a different claim of ineffective assistance of counsel. We find trial defense counsel were not deficient in their performance in using the peremptory challenge to remove a member from the panel whom they believed would be biased against the appellant.

## 4. Courtroom Security

The appellant's trial was held at the Bibb County Courthouse in Macon, Georgia. The courthouse provided heightened security not typically found in a courtroom at a base legal office. This included x-ray screening, metal detectors, and armed security present in the courtroom, in addition to the security forces personnel escorting the appellant. The appellant argues his counsel should have objected to this additional security and their failure to do so constitutes ineffective assistance of counsel. In his affidavit, trial defense counsel explained:

> [The trial defense team] made sure that [the appellant] was never physically restrained in front of the members and prevailed upon his escorts to minimize their appearance alongside [him] when the members were in the courtroom. . . . [W]e did not perceive there was anything excessive about the number of uniformed law enforcement personnel present in the courtroom during the trial.

The appellant cites to an excerpt from trial defense counsel's argument in which the security is referenced:

> The prosecution made note of the fact that there's guards in the room, and that's why [the appellant] was conducting himself, conducting himself [sic] appropriately. But, I ask you: Are the guards not here as much here [sic] to protect him from people who are probably angry at him, as they are from stopping him from going anywhere?

The issue as raised is one of ineffective assistance of counsel during the findings portion of the court-martial. However, this commentary regarding the guards was made during counsel's sentencing argument. Based on the facts presented by both the appellant and his counsel, we see nothing objectionable about the nature of the courthouse security. Accordingly, a failure to object to the described security does not meet the *Strickland* standard for ineffective assistance of counsel. In addition to finding no deficiency in trial defense counsel's decision not to object to the security, we also find no prejudicial impact to the appellant.

## 5. Promises Made During Opening Statement

Next, the appellant asserts his trial defense counsel were constitutionally ineffective when they made promises during the opening statement to produce certain testimony and then failed to present that testimony. Civilian trial defense counsel gave the opening statement in the case and explained:

> The defense is going to put on witnesses who will tell you who [the appellant] is; where he came from; the Christian home that he was raised in; the divorce of two loving parents; the facts that led him into the United States Air Force; the environment that created the person who committed the acts on the 5th of July. [The appellant] is in his early twenties. For the most part, he was raised by [his step father, GP, and his mother, MP].

> . . . .

> [Y]ou will hear evidence regarding [the appellant's] upbringing. You will hear from his parents, his natural mother and stepfather, and you will hear from his natural father [CW] and [EW], who was married to [CW] at one point, but is not married to him today. I also anticipate that you will hear from the sister of [MP], [the appellant's] aunt, [LS]. With their testimony, you're going to learn about those forces that shaped [the appellant] and brought him to the point where he was handed over to the Air Force and began an Air Force career.

> I anticipate that you're going to hear from two expert witnesses that the defense will call. [Dr. BM] is a forensic psychologist. He has looked at the facts of this case; he's interviewed multiple individuals and witnesses; and he will testify regarding [the appellant's] state of mind on the night of the 4th and into the early morning hours of the 5th of July of 2004.

> . . . .

> [Dr. BM], the forensic psychologist, I anticipate will testify about [the appellant's] state of mind at that point in his life; his state of fear about the fact that these people were threatening to ruin his career; the provocation that flowed from that.

In his post-trial affidavit, trial defense counsel states that, at the time the opening statement was delivered, the trial defense team whole-heartedly intended to present the evidence alluded to in their opening statement. They understood the risk of making a promise and not delivering but were confident based upon their lengthy trial preparation

with Dr. BM, that there was "no conceivable reason that [they] would not call [Dr. BM]" as a witness. Additionally, they fully intended "to call [the] appellant's family members to provide the context for Dr. [BM]'s testimony."

On 26 September 2005, civilian trial defense counsel announced, at a hearing outside the presence of the members pursuant to Article 39(a), UCMJ, 10 U.S.C. § 839(a), that the defense had "elected to name [Dr. BM] as an expert witness based on the opinions he's formed as a result of performing his duties [as a consultant]." The findings testimony of Dr. BM was intended to address issues of the appellant's ability to premeditate. Pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the defense presented preliminary testimony to establish Dr. BM's qualifications as an expert witness.

Dr. BM testified that he subjected the appellant to a series of psychological tests when he first met with the appellant in October 2004. Dr. BM subsequently met with the appellant on 19 June 2005, 23 June 2005, and 10 September 2005. He testified that, as of 17 September 2005, he still had not formulated a psychological diagnosis of the appellant. It was not until after the trial began that he concluded the appellant had an Axis II diagnosis of a Personality Disorder, Not Otherwise Specified. During direct examination at the hearing, he testified that he identified schizoid and borderline traits in the appellant. He also acknowledged telling the prosecution in an interview that the appellant displayed schizoid features. However, during cross-examination, he clarified his testimony, stating the schizoid traits diagnosis was inaccurate, and that his actual diagnosis included paranoid and borderline traits. Trial defense counsel admitted to the court that he was surprised at Dr. BM's direct examination testimony given his previous discussions with him.

Due to the late diagnosis, change in diagnosis, and testimony from Dr. BM regarding other tests that were not administered, the Government argued for an independent psychological evaluation of the appellant. The defense objected. The military judge found Dr. BM's testimony admissible under *Daubert* but reserved ruling on the Government's request for an independent psychological evaluation. Based on Dr. BM's testimony at the *Daubert* hearing, trial defense counsel concluded his ability to testify in the case had been compromised due to errors and inconsistencies between what he told the defense and the Government.

Some time prior to the morning of 28 September 2005, the defense came to an agreement with the Government to avoid a court-ordered independent psychological evaluation. They agreed to allow Dr. CR, the Government's expert consultant, to conduct further testing of the appellant and to interview the appellant. The results of this further evaluation would only be revealed to trial defense counsel, but they could potentially be revealed to the Government under limited circumstances. The appellant

was thoroughly involved in the decision regarding his agreement to subject himself to this further voluntary evaluation with Dr. CR.

Trial defense counsel explained that "Dr. [CR]'s opinion countered Dr. [BM]'s assessment on several points. . . . [Dr. CR identified] that Dr. [BM] had improperly read the results of at least one personality test . . . [although Dr. CR] did not offer an opinion that would have assisted [the defense] at trial." At this critical stage in the proceedings, trial defense counsel decided they would not call Dr. BM as a witness and reevaluated their findings strategy, opting to proceed with their theory regarding the effects of adrenaline. The decision to not call Dr. BM was supported by Dr. BM. As a result, all sides agreed upon a stipulation of expected testimony for Dr. BM.

At trial, the defense presented the testimony of Dr. RS, who testified regarding the physiological and psychological effects of stress, adrenaline, and alcohol on perception and memory. They further presented two stipulations of expected testimony. The first was from CC, the appellant's roommate, who testified that he received a voicemail message from SrA AS, in the early morning hours of 5 July 2004, telling him that the appellant had made a pass at his wife and wanting CC to call him back to talk about it. The second was from Dr. BM, who testified about the physiology of "fight or flight" and the cognitive effects of stress-induced release of epinephrine from the adrenal glands into the body. Specifically, he testified these adrenal gland releases can impair cognitive functions that guide behavior, thoughts, feelings, impulse control, judgment, decision-making, and insight. Finally, the defense introduced the curriculum vitae of Dr. RS; the curriculum vitae of Dr. BM; and a timeline of the phone calls made between the appellant, the victims, and related individuals on the night of 4 July 2004 and early morning of 5 July 2004. The defense then rested without presenting any of the evidence referenced in opening statement regarding the appellant's upbringing, life, family, or what brought him to the Air Force.

"'It is important for counsel to evaluate all of the evidence and determine the strategy that is most likely to be successful.'" *United States v. Christy*, 46 M.J. 47, 50 (C.A.A.F. 1997) (quoting *United States v. Fluellen*, 40 M.J. 96, 98 (C.M.A. 1994)). This evaluation should include tactical decisions regarding which witnesses to call during the trial. In this case, those tactical decisions were made and included a reasonable strategy to call Dr. BM and the appellant's family members to help explain the mental health issues the appellant may have been experiencing at the time of the murders in an effort to dispel premeditation. While there may have been some risk in highlighting this anticipated testimony during opening statement pending a ruling on its admissibility, that risk was laid to rest when the military judge ruled the testimony admissible. To the extent the appellant argues that his counsel were deficient in the presentation of their opening statement, we disagree.

"A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. Counsel's performance at the time the opening statement was delivered was based on a sound theory of the case developed over months of consultation with Dr. BM. We find no deficient performance by trial defense counsel in the content of his opening statement.

Turning to counsel's decision to not call the witnesses they told the members they anticipated hearing from, we again find no error. "[U]nexpected events at trial may lead to changed circumstances or different trial tactics." *Christy*, 46 M.J. at 50. This is exactly the scenario presented in this case. The record establishes the inconsistencies in Dr. BM's testimony at the *Daubert* hearing. Civilian trial defense counsel noted his surprise at the testimony in an Article 39(a), UCMJ, hearing. Counsel's affidavits sufficiently demonstrate their tactical quandary: calling an expert witness who had lost credibility and who, in their minds, had become at least somewhat unreliable, or limiting their presentation of witnesses but still presenting some expert testimony as promised.

The success of the strategy they chose is irrelevant. The question is whether their strategy was reasonable given an evaluation of "counsel's perspective at the time." *Strickland*, 466 U.S. at 689. We find the decision to limit Dr. BM's testimony to the effects of adrenaline and to present it in the form of a stipulation of expected testimony was reasonable. We also find that, under the circumstances, the decision not to seek the testimony of the family members, without the corresponding expert testimony from Dr. BM, was also reasonable and conclude that such testimony would have likely been inadmissible. Thus, we find this theory of ineffective assistance of counsel to be without merit.

### 6. Witnesses' Sequestration

The appellant next claims that his counsel were ineffective during the findings phase of his trial by failing to move the court to sequester the family member witnesses. In a related issue, the appellant argues that the military judge committed plain error as well by allowing the family members and friends of the victims to remain in the courtroom during the entire trial. We will address these related issues together.

The trial defense team's decision not to request sequestration of the witnesses pursuant to Mil. R. Evid. 615 was not an oversight. Rather, as discussed in an Article 39(a), UCMJ, hearing, it was a conscious decision. Both parties agreed that family members for both the appellant and the victims would be allowed to remain in the courtroom. Capt DR noted, "[W]e felt that it was important for our client to have his family present in the courtroom as a show of support and because they had an obvious

interest in what was being discussed in the trial." Both Capt DR and Capt DJ recounted that they reached an agreement with trial counsel that neither side would object to their sentencing witnesses being in the courtroom.

The underlying purpose of Mil. R. Evid. 615 is to preclude witnesses from listening to the testimony of another witness in the trial, then shaping or conforming their subsequent testimony to match what was heard. *United States v. Langston*, 53 M.J. 335, 337 (C.A.A.F. 2000). The appellant has made no argument that the witnesses who remained in the courtroom without sequestration proffered findings testimony that was fabricated, tainted, or shaped in any way. In fact, JB (victim JS's father) was the first witness called by trial counsel. As such, his testimony could not have been tainted in any way that could be deemed a violation of the policy behind Mil. R. Evid. 615. The second witness called to testify was DS, who gave limited testimony to identify his son, one of the victims, from a photograph. The record reflects no evidence that his testimony was altered in any way by his presence in the courtroom during the prior witness. The third witness was JPS, the wife of SrA JK. She was the first witness to testify as to her memory of what transpired on 4 July 2004. SrA JK was the last of the findings witnesses noted in the appellant's brief. A review of the record of trial belies any insinuation that either JPS's or SrA JK's testimony was tainted by the testimony that preceded it.

As previously mentioned, to prevail on a theory of ineffective assistance of counsel, the appellant must demonstrate both prongs of the *Strickland* test: (1) that his counsel's performance was deficient, and (2) that this deficiency resulted in prejudice. *Green*, 68 M.J. at 361 (citing *Strickland*, 466 U.S. at 687). Thus, we may address these prongs in any order we choose. *Strickland*, 466 U.S. at 697; *United States v. Loving*, 68 M.J. 1, 6 (C.A.A.F. 2009).

We find that the appellant has failed to meet his burden of demonstrating prejudice based on his counsel's decision not to move for sequestration of the witnesses. As such, an ineffective assistance of counsel claim cannot be sustained.

Turning to the related issue of the military judge's failure to sua sponte sequester the witnesses, we also find no error. To establish plain error by the military judge for allowing the witnesses to remain in the courtroom, the appellant bears the burden of demonstrating "(1) there was an error; (2) it was plain or obvious; and (3) the error materially prejudiced a substantial right [of the appellant]." *United States v. Kho*, 54 M.J. 63, 65 (C.A.A.F. 2005); *United States v. Miller*, 64 M.J. 666, 671 (A.F. Ct. Crim. App. 2007). Once the appellant persuades this Court of the plain error, "the burden shift[s] to the Government to show that the error was not prejudicial." *United States v. Powell*, 49 M.J. 460, 464-65 (C.A.A.F. 1998). After review of the entire record, we find no evidence of error, plain or obvious, that violated the appellant's right to a fair trial. The military judge accepted the agreement of the parties with respect to the spectators,

and we find no evidence that the appellant suffered a material prejudice to his substantial rights based upon the presence of the family members of the victims during the findings phase of this court-martial.

We also note that while these issues appear under the appellant's assignments of errors affecting the findings portion of the trial, the majority of the factual assertions regarding the emotional display of the victims' family members occurred during sentencing. In lieu of addressing the lack of a motion for sequestration on grounds underlying the policy behind Mil. R. Evid. 615, the appellant instead more plainly argues counsel were deficient because they should have anticipated and avoided the emotional displays by the aggrieved family members. Alternatively, the appellant argues that once emotions were displayed, the military judge's admonition to the spectators was insufficient and it amounted to plain error not to force sequestration at that point. Because these factual allegations took place during the sentencing phase of the court-martial, neither the spectator's conduct, whether prejudicial or not, nor counsel's performance, whether deficient or not, would have impacted the members' determination of guilt.

Additionally, counsel specifically considered the sequestration issue, weighed the pros and cons, and made a choice not to request sequestration. Whether the luxury of hindsight ultimately reveals the choice counsel made to have been the most effective option is not the standard. "Because of the difficulties inherent in making [such an] evaluation, a court must indulge a strong presumption that counsel's conduct f[ell] within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 690 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). Trial defense counsel's judgment with respect to sequestration was not unreasonable, and we find no ineffectiveness based on the approach they chose.

### 7. Mental Health Issues

The appellant argues six different areas in which his trial defense counsel were ineffective with respect to the handling of mental health issues that arose during trial. The first of these claims is that counsel acted ineffectively by releasing statements made by the appellant contained within the full sanity board report to the Government.

Military Rule of Evidence 302(c)[10] clearly provides the accused protection from

---

[10] The Rule states:

> If the defense offers expert testimony concerning the mental condition of the accused, the

the disclosure of statements made during an examination performed pursuant to R.C.M. 706. This protection does not automatically translate into a corresponding prohibition on the part of the accused from voluntarily releasing statements for strategic or tactical purposes.

The appellant's allegation that the release of his sanity board statements "played a significant role in crippling [his] case" is unsupported and merely conclusory. The appellant's statements that were disclosed to the Government were not introduced to the members, none of the witnesses' testimony was derived from the appellant's incriminating statements, and the appellant's statements were not the subject of any other testimony presented. As such, we find the appellant has not demonstrated how he was prejudiced by counsel's alleged error. Thus, he has not satisfied the second prong of the *Strickland* test. We do not address whether counsel's performance was deficient. *See McConnell*, 55 M.J. at 481.

The next four issues all stem from trial defense counsel's decision to allow an independent evaluation of the appellant by Dr. CR, the Government's expert witness, and what the appellant believes would have happened had the military judge ordered an independent evaluation.

As previously discussed, unexpected things happened during the *Daubert* hearing that impacted the defense decision to have Dr. BM provide expert testimony. Dr. BM's direct examination testimony regarding his diagnosis of the appellant contradicted his previously stated diagnosis to trial defense counsel during consultation. This came as a surprise to the trial defense team, who had intended to use Dr. BM to establish a psychological diagnosis of the appellant that could have contributed to an inability to premeditate his actions. On cross-examination, the situation worsened when Dr. BM changed his testimony, indicating he had inaccurately stated his diagnosis during direct examination. However, cross-examination revealed that he not only erred in stating the appellant's diagnosis during direct examination, but also erroneously conveyed this inaccurate diagnosis to the prosecution during an interview in the days prior to his testimony. This unusual situation—arising in the middle of trial—left the defense team concerned that these obvious inconsistencies could degrade his credibility and their theory of the case. Additionally, the Government asked for an independent evaluation of

---

military judge, upon motion, shall order the release to the prosecution of the full contents, other than any statements made by the accused, of any report prepared pursuant to [R.C.M.] 706. If the defense offers statements made by the accused at such examination, the military judge may upon motion order the disclosure of such statements made by the accused and contained in the report as may be necessary in the interests of justice.

Mil. R. Evid. 302(c).

the appellant, given Dr. BM's testimony.

Viewing the strategic and tactical decisions of counsel in light of the circumstances at the time of the decision, we find neither deficient performance nor prejudice after application of the *Strickland* test. *See Strickland*, 466 U.S. at 687. Trial defense counsel was placed between the proverbial rock and a hard place after the *Daubert* hearing testimony. They had to decide whether to use Dr. BM as a witness during the findings phase, whether his credibility issues would hinder or help their theory of the case, and how to handle the Government's request for an independent evaluation of their client. While unorthodox, we cannot find the decision to allow their client to be evaluated by Dr. CR was deficient given the unique circumstances that surfaced mid-trial. Concern over Dr. BM's testimony and his credibility arose unexpectedly during the *Daubert* hearing, not due to the evaluation by Dr. CR. Attorneys may disagree with the approach taken, but counsel's performance here reflects strategic and tactical decisions that will not be second-guessed by this Court. *Anderson*, 55 M.J. at 202.

Furthermore, the appellant agreed to this approach at the time of trial. He was present during the *Daubert* hearing, aware of Dr. BM's change in testimony regarding his diagnosis, and knew of the Government's request for an independent evaluation and the possibility of the military judge's granting such request. The record fails to establish that he was inadequately advised by trial defense counsel. Instead, he was thoroughly questioned by the military judge regarding the approach and restrictions on Dr. CR's evaluation. The record of trial reflects he was in full agreement. His change of heart at the appellate level does not justify any relief.

The final issue presented in this area is that it was trial defense counsel's mishandling of the mental health issues that caused a "catastrophic decision" to abandon Dr. BM as a sentencing witness. While raised in the context of ineffective assistance of counsel during the findings phase of the trial due to alleged mishandling of mental health issues, in reality this is a claim of ineffective assistance of counsel during sentencing. As such, we will address this issue further below.

In accordance with the analysis above, we find that the trial defense counsel were effective throughout the findings portion of the court-martial.

B. Counsel's Performance in Sentencing

We turn now to the appellant's assignments of error alleging ineffective assistance of counsel in the sentencing phase of the case. We will first examine the three issues this Court previously found to have constituted ineffective assistance of counsel: (1) the scope of trial defense counsel's investigation into, and failure to present evidence deriving from, a motorcycle accident the appellant was involved in four and a half

months prior to the murders; (2) trial defense counsel's failure to investigate and obtain records pertaining to the appellant's mother's treatment at an inpatient mental health facility; and (3) trial defense counsel's failure to investigate and develop evidence of remorse through Deputy Sheriff LF. Then we will examine whether counsel were ineffective in failing to offer evidence of the appellant's future risk of violence, failing to offer testimony of SP and KP, and failing to object to inadmissible victim impact evidence.

We conclude that although trial defense counsel were deficient in some areas, the appellant was not prejudiced by these deficiencies, and therefore under the second prong of *Strickland* we must resolve these issues against the appellant.

When the issue is the adequacy of counsel's investigatory efforts in preparation for the sentencing phase of a capital trial, "hindsight is discounted by pegging adequacy to 'counsel's perspective at the time' investigative decisions are made, and by giving a 'heavy measure of deference to counsel's judgments.'" *Rompilla*, 545 U.S. at 381 (citing *Strickland*, 466 U.S. at 689, 691). To assess the thoroughness of counsel's investigative efforts, this Court reviews performance for "reasonableness under prevailing professional norms." *Wiggins*, 539 U.S. at 523 (citing *Strickland*, 466 U.S. at 688).

The Supreme Court has historically noted that the ABA Standards for Criminal Justice are informative guidelines for assessing "prevailing professional norms" and determining what is reasonable. *See Strickland*, 466 U.S. at 688-89; *Williams*, 529 U.S. at 396; *Wiggins*, 539 U.S. at 524; *Rompilla*, 545 U.S. at 387. Although these standards are instructive, it is important to note, as we did earlier, that they are not mandated for military defense counsel. *Murphy*, 50 M.J. at 9 (citing *Loving*, 41 M.J. at 300), *quoted in Loving*, 68 M.J. at 19-20 (Stucky, J., concurring in part and in the result).

With respect to investigative efforts, Guideline 10.7 of the *ABA Guidelines* sets forth that "[c]ounsel at every stage have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty." *Id.*, *reprinted in* 31 Hofstra L. Rev. 913, 1015. The Commentary to Guideline 10.7 states counsel need to explore medical history, including hospitalization, mental illness, family history of mental illness, physical injury, and neurological damage. *Id.* at 1022. Guideline 10.11 also sets forth an ongoing duty of counsel to "seek information that supports mitigation or rebuts the prosecution's case in aggravation." *Id.* at 1055.

In *Lockett v. Ohio*, 438 U.S. 586, 604 (1978), the Supreme Court concluded:

[T]he Eighth and Fourteenth Amendments[11] require that the sentencer . . .

---

[11] U.S. CONST. amend. VIII, XIV.

not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.

Similarly, the sentencer may not "refuse to consider, *as a matter of law*, any relevant mitigating evidence." *Eddings v. Oklahoma*, 455 U.S. 104, 114 (1982). These well-established rules necessarily imply that counsel should seek to investigate and develop any evidence which might mitigate against the appropriateness of the death penalty. "In assessing the reasonableness of an attorney's investigation . . . a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins*, 539 U.S. at 527.

The case at hand is not one in which trial defense counsel shirked their responsibility to conduct any investigation into the appellant's family and social history, upbringing, or history of mental illness, or utterly failed to present a case in mitigation and extenuation. To the contrary, prior to the Article 32, UCMJ, 10 U.S.C. § 832, investigation, trial defense counsel secured the services of a professional mitigation specialist, CP, whose role was to:

> collect any and all records regarding a criminal defendant [and] interview friends, family members, co-workers, acquaintances, teachers, therapists, social workers, medical doctors, and anyone who has had contact with the defendant[;]
>
> . . . .
>
> obtain all discovery materials from defense attorneys, law enforcement agencies [sic] documents, previous criminal history records of the defendant, all records from the jail, autopsy report, crime scene pictures and videos, defendant's audio and/or videotaped statement, indictment as well as factors that the state intends to use as aggravating factors[; and]
>
> . . . .
>
> research, obtain, evaluate and coordinate the use of any and all information from the life of the defendant that may serve in the process of mitigation.

From August 2004 until 13 October 2005, when the sentence was announced, CP "collected thousands of pages of documents related to [the appellant] and interviewed approximately a hundred individuals with the goal of understanding the crime as well as the person of who [the appellant] was." Trial defense counsel also retained a forensic

psychologist, Dr. BM, prior to the Article 32, UCMJ, investigation. Consequently, the question presented in the first three issues is whether, despite the assistance of the mitigation specialist and forensic psychologist, trial defense counsel's investigation and failure to present what the appellant argues would have been mitigating evidence fell short of the performance expected by reasonably competent counsel.

### 1. Motorcycle Accident Injury

In August 2004, the trial defense team's mitigation specialist, CP, sent a memorandum to the appellant's military trial defense counsel strongly recommending the appellant undergo a full battery of psychological testing because he had been involved in a motorcycle accident four and a half months before the murders. She conveyed her opinion that the defense team had a responsibility to pursue any possible brain damage due to the closed head injury and behavioral changes reportedly observed in the appellant after the accident, and emphasized this was an important area of inquiry. She described her experience with closed head injuries, opining that often such injuries can explain aberrant behavior, and made clear her recommendations for further investigation, neuropsychological testing, and brain scanning.

In October 2004, the defense forensic psychologist consultant, Dr. BM, spent between 12 and 14 hours over the course of two days conducting more than a dozen tests on the appellant, including neuropsychological, intellectual, and personality tests. At some point, the defense team asked Dr. BM about the mitigation specialist's suggestion that additional testing and inquiry be conducted into the possibility of a traumatic brain injury (TBI). Although trial defense counsel were aware that the Government would likely fund additional expert assistance if they needed it, they ultimately accepted Dr. BM's conclusion that there was no connection between the accident and the murders, and that there would be no value to be gained by conducting further neuropsychological testing. Trial defense counsel conducted no further investigation into the possibility of a TBI and introduced no evidence of the motorcycle accident at the appellant's trial.

The appellant asserts trial defense counsel were ineffective when they failed to investigate and develop potential mitigation evidence related to the motorcycle accident. The argument can be summarized as follows: (1) the appellant was involved in a motorcycle accident on 22 February 2004, four and a half months before his crimes; (2) occurrence of a blow to the head during the accident itself is sufficient to establish the appellant suffered a traumatic brain injury, and even if it is not, his symptoms immediately following the accident in combination with a behavioral change noted in the months following the accident clearly do so; (3) TBIs can cause disinhibited impulse control and aggressive behavior; (4) therefore, the appellant was prejudiced when his trial defense counsel did not introduce evidence of the motorcycle accident, because there is a reasonable probability the panel would have found the injury mitigating on the question

of the appellant's moral culpability and imposed a sentence other than death.

In the abstract, and considering only the unrebutted assertions listed above, the argument sounds reasonable. However, our review is not limited to favorably-presented assertions. Instead, we "must consider all the evidence—the good and the bad—when evaluating prejudice." *Wong v. Belmontes*, 558 U.S. 15, 26 (2009). "In assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence." *Wiggins*, 539 U.S. at 534. The question is whether if the members had been able to place the additional evidence "on the mitigating side of the scale, there is a reasonable probability that at least one [member] would have struck a different balance." *Wiggins*, 539 U.S. at 537.

Regardless of whether counsel's performance was deficient, in order for an appellant to demonstrate prejudice under the second prong of a *Strickland* analysis, the appellant bears the burden on appeal of demonstrating a reasonable probability that but for his counsel's error(s), there would have been a more favorable outcome. *Strickland*, 466 U.S. at 694. In other words, it is not enough for the appellant to show that his counsel overlooked certain mitigation and extenuation evidence and that such evidence might have made a difference; rather, the appellant must show that such overlooked evidence would have been sufficiently persuasive to give rise to a reasonable probability of a different outcome. *Id.* at 695.

As discussed below, we agree that a panel member could find a TBI mitigating on the question of a person's moral culpability if there were evidence the injury influenced that person's behavior. However, the appellant has failed to demonstrate the injuries he sustained in his motorcycle accident had any impact on his behavior the night of the murders, or that the members would have considered an unsupported proposition in that regard to have been sufficiently mitigating to render a more lenient sentence. We therefore conclude that the appellant was not prejudiced by his counsel's failure to introduce evidence of the accident and the appellant's injuries, because under the facts of this case we do not find a reasonable probability of a different outcome.

Because of the volume of after the fact interpretations—and reinterpretations—of what the evidence actually showed, or should have shown, it is necessary to individually analyze the assertions made in the appellant's argument.

(a) The motorcycle accident

There is no dispute the appellant was involved in a motorcycle accident on 22 February 2004. According to Ms. DP (then Technical Sergeant DH), who encountered the appellant sometime after the accident, the appellant told her he lost control on a patch of gravel about two blocks from his house. It is also undisputed he

suffered some injuries in the accident. The severity of the accident, however, is difficult to assess. While the appellant's post-trial affiants describe the motorcycle he was riding as "totaled" and his helmet as "badly damaged," the appellant evidently rode the same motorcycle two miles to base without incident after the accident, as opposed to the two blocks to his home. Despite the accident occurring at "the corner of a neighborhood street," there was no reported emergency medical or law enforcement response.

The appellant's mitigation expert, CP, initially described the damage to the appellant's helmet when she wrote, "[Capt DJ] and I noticed numerous scratches on the helmet and that the front plate was missing." In subsequent post-trial affidavits, her descriptions of the damage to the helmet and motorcycle take on a more serious tone. For example, CP writes, "The helmet was scratched, gouge [sic] in the front, and the visor was completely missing." Other post-trial affiants, who never saw the motorcycle or the helmet, appear to accept as fact CP's descriptions of the damage to both and include it in their assessments. For example, relying on CP's description, Dr. CA writes, "[The appellant's] motorcycle was badly damaged, and his helmet was scratched and gouged in the front." Similarly, MF writes, "I am aware that [the appellant] was involved in a serious motorcycle accident that totaled his motorcycle, caused serious damage to his helmet . . . ."

Consequently, while the occurrence of the accident is undisputed, the appellant's post-trial commentators who describe the accident do so in terms indicating certain assumptions about its seriousness. The post-trial affidavits establish that an accident occurred, though the actual severity of the accident is unclear.

(b) Evidence the appellant suffered a TBI

We next examine the appellant's contention he suffered a TBI in the motorcycle accident.

From the opening language of the appellant's Reply Brief, to his counsel's oral argument before us, the appellant argues that the accident and an unspecified period of unconsciousness that followed are sufficient to establish that he suffered a TBI. In the "Introduction" section of the brief, the appellant's counsel unequivocally states an "effective mitigation case would have included evidence *that Appellant suffered a traumatic brain injury in a motorcycle accident just four-and-a-half months before the murders*." (emphasis added). The brief continues: "The members *would have seen full-color exhibits showing the regions of Appellant's brain injured in the motorcycle accident*." (emphasis added). When questioned about where, precisely, the record demonstrated that the appellant in fact suffered a TBI, the appellant's counsel responded, "The very fact that he suffered from a motorcycle accident and was unconscious, that was a brain injury of some kind, a traumatic brain injury of some kind." When asked what he

based that conclusion on, counsel responded, "Your Honor, I think that's common knowledge. That traumatic brain injury occurs when people lose consciousness. I think that's—any neuropsychologist would tell you that."

We are not convinced the record before us provides us with such a concrete conclusion. In the absence of what Dr. CA described as "gold standard" diagnostic tests or results generated by his "neuroradiological technique of choice," we have only the record and post-trial submissions to discern how the parties would have endeavored to establish or rebut the existence of a TBI, had trial defense counsel pursued this strategy at trial.

The appellant argues that if occurrence of the accident itself is not sufficient to establish he suffered a TBI, his symptoms immediately following the accident and a behavioral change noted in the months following the accident clearly do so. Several critical components of the appellant's argument—that overlooked mitigation and extenuation evidence related to the motorcycle accident would have made a difference at trial—rest on representations made, many now long after the fact, by the defense mitigation expert, Ms. CP.

Regarding acute symptoms following the accident, Ms. DP would have testified that when she encountered the appellant after the accident, she noticed he was bleeding over his left eye, looked disheveled, seemed disoriented, spoke slowly, and walked in a slow and cautious manner. According to the appellant, he lost consciousness for some unspecified period of time. After Ms. DP encouraged the appellant to seek medical attention, medical personnel treated and released the appellant the same day of the accident. According to the Tricare billing statements, physicians conducted a CT scan without dye of the appellant's "head/brain" and another of his "orbit/ear/fossa." They also performed an X-ray exam of his hand and "repair[ed] superficial wound(s)." There is no evidence or suggestion that after the accident he missed work or manifested any other physical symptoms or limitations relating to his injuries.

While we agree DP's observations show the appellant suffered a head injury of some indeterminate severity, the appellant's experts base their opinions on that fact in combination with a reported change in the appellant's personality to support their conclusion the appellant suffered a TBI. The evidence in the record of such a personality change, however, is tenuous and in many respects substantially contradicted. The only data point for this alleged personality change is a summary of an interview written by CP, the defense mitigation specialist. After interviewing "approximately a hundred individuals," CP found one person who, according to her interview summary, said the appellant's behavior changed following the accident. Specifically, CP reported that [the appellant's] roommate, EL, said the appellant "became more outspoken. He wouldn't put up with anything anymore. After the accident was the first time [EL] saw him in a

fight."[12]

Relying on CP's report of EL's statement, one post-trial affiant—an attorney and death penalty litigation expert—argues that additional testing was obviously necessary: "[A]t least one potential witness noted [the appellant's] personality changed. Where he *had previously not been violent*, he was *prone to emotional outbursts*. . . . 'When a person seems to have undergone a *sudden personality change* . . . possible links to brain injury should be assessed.'" (emphasis added). Similarly, Dr. FW makes repeated references to the appellant's "behavioral changes" as evidence "highly typical of the impairment in emotional self[-]regulation and impulse control that results from anterior temporal lobe damage."

Neither MF, Dr. CA, nor Dr. FW, however, appear to have considered other materials within DP's and CP's post-trial affidavits that contradict the suggestion the appellant's personality changed from a non-confrontational, pleasant co-worker or acquaintance to someone prone to violence or emotional outbursts. For example, CP elsewhere states that a correctional officer, who supervised the appellant during his pretrial detention in the Houston County jail, "spoke very positively" of him and described him as "dependable and respectful." CP reports that Deputy LF, who guarded the appellant during the Article 32, UCMJ, hearing and who maintained contact with him for some unspecified time thereafter "would have testified to [the appellant's] good behavior, readiness to follow instructions, and obedience." CP additionally states Airman KL "had never seen him angry,"[13] and Senior Master Sergeant JM "described [the appellant] as smart and quick, never angry."[14] Similarly, Ms. DP states in her own post-trial declaration she would have testified "the [appellant] she knew was good, kind, funny, and . . . did not have any enemies. [She] also would have testified that [his crimes] were completely out of character."

Aside from the post-trial affidavits, the transcript of the trial includes additional testimony, apparently not considered by the appellant's post-trial psychological experts, that contradicts EL's opinion, as reported by CP, of the appellant's personality change. Most notably, CW, the appellant's biological father, testified that two weeks prior to the murders he took the appellant on a week-long golf vacation in Europe. First they visited Capernwray, a private college the appellant attended after high school, so the appellant could pick up a copy of his transcripts and show his father around the campus. From there they "drove to the nearest golf course, played golf. Got up the next morning and

---

[12] There is no affidavit or statement from EL in the record before us. Rather, the only record of what EL would have allegedly said is contained in CP's notes recounting her conversation with him.

[13] CP's affidavit does not specify whether Airman KL's observations occurred before or after the accident.

[14] CP's affidavit does not specify whether Senior Master Sergeant JM's observations occurred before or after the accident, but as he was the appellant's second line supervisor, it is reasonable to assume he was aware of the appellant's behavior before and after 22 February 2014.

drove to another place, played golf. That's all [they] did for seven days." Trial defense counsel asked CW, "When you were together, did you notice any difference in his behavior or how he acted and what was the young man you had known all his life?" CW replied, "Not one bit." Trial defense counsel pressed, "And so did you notice any differences in [the appellant] you'd known his whole life and [the appellant] that was with you—no clue?" CW answered, "No. No. Not one—nothing. No clue." Although some witnesses at trial did testify to personality changes in the appellant, these changes were observed before the motorcycle accident and did not relate to a disposition towards violence or emotional outbursts.[15]

The appellant also told the Government's forensic psychologist, Dr. CR, that while it was true he had been involved in a fight, he became involved only because he was trying to break it up. While it is not inaccurate to say the appellant was "involved in a fight" following the accident, his own words explaining his non-violent motivation for doing so provide an important context for evaluating his proneness toward violent behavior or emotional outbursts. During the interview with Dr. CR, the appellant also "denied having experienced any cognitive impairment or behavioral changes at any time before his arrest and specifically denied having had any difficulty in the areas of controlling anger, rage or impulsivity."

The only data point standing for the proposition that the appellant's motorcycle accident changed his personality, then, comes from CP's recitation of a conversation she had with EL. CP described EL, moreover, as "arrogant," "flighty," and "not happy . . . quite upset" with her and the defense team because they refused to return the motorcycle helmet EL had purchased from the appellant's father.[16] Capt DR describes the following defense concerns about EL:

> [CP] had interviewed [EL] at least once, possibly multiple times, and expressed concerns to us about his possible testimony. We also had concerns that [EL] had proven to be an unfaithful friend in the time leading up the [sic] trial and had said things negative about [the appellant]. We concluded [EL] would have been a risky witness.

---

[15] For example, MP, the appellant's mother, spoke of the changes she saw in her son following his entry into the Air Force, testifying that she had become aware that he had started drinking. MR, a friend with whom the appellant had started a grass-cutting business in junior high school, testified that when the appellant came home for a visit in December 2003 he had changed. MR described his surprise at the appellant's use of swear words, that he had "five or six" girlfriends, and that he "was bragging about partying and doing all kinds of stuff." By early 2004, the appellant—whose parents and friends described him as a teenager as shy and immature around women—had confided in a close friend, Staff Sergeant PS, that he was having an affair with a married woman who had a 17-year-old daughter, and that "eventually he was going to try and sleep with the daughter as well as the mother."

[16] This is also circumstantial evidence that the motorcycle helmet was not badly damaged. We find it improbable EL would have been upset about relinquishing a badly damaged helmet.

Finally, neither the record nor CP recount that others close to the appellant, such as SSgt PS, who described herself as the appellant's "best friend," Mr. CC, appellant's roommate from February through July 2004, or SrA SF, who "was going to have [the appellant] be his best man at this [sic] wedding," reported any post-accident personality change in the appellant. Substantial evidence, including the testimony of CW and Dr. CR, squarely rebut the assertion that the appellant's personality dramatically changed as reported by CP's characterization of EL's observation. Consequently, to the extent the evidence of a TBI is based on purported changes in the appellant's personality, we find this point to be resoundingly contradicted by the record.

(c) The battle of the experts waged in post-trial affidavits

We turn now to the competing opinions of the experts submitted by the parties. Dr. FW, whose declaration was submitted by the appellant, takes issue with what he describes as numerous errors made by Dr. AM, Dr. BM, and Dr. CR, when they arrived at their independently derived conclusions that there was no connection between the motorcycle accident and the appellant's actions the night of his crimes. Dr. FW goes so far as to say that, had he been contacted by the defense, he would have told them "with proper scanning . . . [he] would expect to find not only whether [the appellant] suffered from a TBI, but [he] would also be able to locate the lesion and identify the specific behavioral abnormalities associated with the lesion." In point of fact, Dr. FW, and another expert, Dr. CA, cannot tell us the appellant *actually experienced* a TBI; the most they tell us is that certain behaviors or symptoms exhibited by the appellant are *consistent* with a TBI.

As the appellant's counsel observed during oral argument, "[t]o what extent that brain injury affected [the appellant's] actions on the nights [sic] of the murders is a separate question and whether that affected the left anterior temporal lobe as [Dr. FW] said, would require further testing." Nevertheless, more than two years since Dr. FW's first affidavit raised verifiable brain injury as a potentially overlooked mitigating factor, no such scanning has ever been performed.[17]

Dr. FW and Dr. CA attack the expert opinions supporting the Government by saying that "gold standard" diagnostic methods were not brought to bear by the first three

---

[17] The affidavits by Dr. FW and Dr. CA both appear to say that while the symptoms of a TBI may abate over time as the brain essentially finds a way to create new, usable pathways around brain tissue damaged by a TBI, evidence of the TBI itself remains detectable if the proper imaging technology is used. According to Dr. FW, "[C]linical and research experience both teach that even permanent brain damage typically shows some remission in symptoms as the temporarily dysfunctional areas (surrounding the overtly destroyed areas) recover, and as other initially impaired functions are re-programmed and re-routed through healthy brain tissue." If the correct scan or scans were to be conducted, the threshold issue—whether the appellant suffered a TBI in the motorcycle accident—could have been conclusively resolved. We have no such evidence before us.

forensic psychologists who evaluated the appellant.[18]  However, instead of providing evidence of what such tests—performed by them or others—have subsequently shown, they appear to aver simply that the right tests, performed correctly, *could reveal* a TBI and its effects.  Dr. FW also states that the Government's experts overlooked and misread tests pertaining to the appellant's grip strength and apparent disparities between his verbal and visual memory capacity.  But what Dr. FW does not provide us is any sort of reference by which to assess the diagnostic persuasive weight of those indicators.  For example, though he notes the percentile of visual and verbal memory as being in the top and bottom tenth percentiles, respectively, he does not say "and X percent of people who demonstrate such disparities in fact have a TBI in the left temporal lobe."  He says verbal memory deficits "are typical of left anterior lobe damage."  This raises more questions.  What else are they typical of?  If typical of specified conditions, how often?  Can such disparities signal nothing at all?  If the appellant's dominant hand was weaker, how much weaker was it?  How unusual is it for a person to have a weaker dominant hand?  Are there reasons not related to a TBI that a person might have a weaker dominant hand?[19]

At the end of the day, Dr. FW's conclusions remain, just as Dr. CA described them when commenting on Dr. FW's comments, tentative and qualified.

Under similar circumstances, when addressing how to approach a post-trial battle of the experts, our superior court has observed,

> "We . . . note that divergence of opinion among psychiatrists is not novel and does not provide a legal basis for concluding that one or the other is performing inappropriate tests or examinations.  In *Ake*, the Supreme Court said:  'Psychiatry is not, however, an exact science, and psychiatrists disagree widely and frequently on what constitutes mental illness, on the appropriate diagnosis to be attached to given behavior and symptoms, on care and treatment, and on likelihood of future dangerousness.'"

*United States v. Gray*, 51 M.J. 1, 17 (C.A.A.F. 1999) (quoting *Ake v. Oklahoma*, 470 U.S. 68, 81 (1985)).

The opinions proffered by the appellant's post-trial experts conflict not only with the opinions of other forensic psychologists who evaluated the appellant, but they also conflict to some extent with one another.  For example, a death-penalty defense expert,

---

[18]  Neither Dr. FW nor Dr. CA have met or evaluated the appellant.

[19]  The information we do have before us would seem to suggest the appellant's right-handed grip strength at the time of the murders was substantial.  Dr. FW states that the appellant is right handed, and the appellant told the interrogating AFOSI agent he used his right hand to inflict the fatal wound on Senior Airman (SrA) AS.  Whatever grip strength the appellant had in his right hand enabled him to thrust the knife into the victim's chest with sufficient force to reach the hilt, leaving visible abrasions noted during the autopsy.

MF, filed a post-trial affidavit supporting the appellant. She criticized the methodology used by Dr. BM, who concluded the accident had no connection to the murders, on the basis that "only three of [the tests he performed] were designed to identify neurological dysfunction."[20] Dr. CA, on the other hand, states "I can attest that the methodology used by [Dr. BM] . . . is consistent with a standard of practice in the field."

The post-trial battle of the experts in the case now before us illustrates precisely the reason our superior and sister service courts are disinclined to descend into the "'psycho-legal' quagmire of battling psychiatrists and psychiatric opinions, especially when [as in the case sub judice] one side wages this war against its own experts by means of post-trial affidavits." *United States v. Gray*, 51 M.J. 1, 17 (C.A.A.F. 1999) (citing *Harris v. Vasquez*, 949 F.2d 1497, 1518 (9th Cir. 1990)).

The appellant was evaluated before trial by two forensic psychologists: Dr. AM, a forensic psychologist, who performed the sanity board; and Dr. BM, a forensic psychologist and J.D., who was the defense expert consultant. During the trial, following the *Daubert* hearing, the appellant was evaluated by a third forensic psychologist, Dr. CR, pursuant to a joint request by trial and defense counsel. None of these extensively educated and experientially well-pedigreed specialists believed the appellant suffered from any mental disease or defect that would operate as a defense or mitigating factor resulting from the motorcycle accident. Nearly nine years after the date of the appellant's crimes—roughly eight from his trial—two other mental health experts, neither of whom ever met the appellant, let alone evaluated him, have provided written statements attacking the methodology and diagnoses of three other experts who have. They do so based on admittedly incomplete information,[21] through the lens of hindsight, and informed at least in part by surgical extracts from larger conversations presented, or in some cases subtly reframed, by CP, whose job as she describes it is "to research, obtain, evaluate and coordinate the use of any and all information from the life of the defendant that may serve in the process of mitigation."[22]

### (d) Prejudice

---

[20] The argument raises the question: How many tests specifically designed to identify neurological dysfunction must a defense team, or a defense-retained expert consultant, conduct to meet an acceptable standard of investigation? Notwithstanding MF's criticism of the tests Dr. BM performed as "incomplete," we note the Supreme Court has considered two of those tests, the STROOP and Trail Making-B tests, to constitute "clear and compelling evidence" of an appellant's frontal lobe brain function. *See Sears v. Upton*, 561 U.S. 945, __, 130 S. Ct. 3259, 3263 (2010).

[21] Dr. CA points out she bases her conclusions "not on independent review of the underlying facts and testing data but on the facts as set forth in [Dr. W's] two declarations and [Ms. DP's] declaration." She also characterizes Dr. FW's conclusions as "qualified and tentative, as I would expect them to be, given that additional neurological scans were not performed."

[22] We do not suggest any willful misrepresentation by any affiant. However, see section III.B.2.(b), post, regarding trial defense counsel's description of the reliability of CP's summaries of potential witness testimony.

Even if we assume, arguendo, that there was sufficient evidence available to the parties below to establish the appellant sustained a TBI in the motorcycle accident, we are then bound to inquire:  Is there is a reasonable probability that the omitted evidence would have changed the panel's conclusion that the aggravating circumstances outweighed the mitigating circumstances and, hence, the sentence imposed?

According to Dr. FW, brain damage is "essentially certain" if the unconsciousness from the trauma lasted as much as five minutes after the blow to the head and is present in the majority of cases of unconsciousness lasting for less than five minutes.  Even so, he acknowledges that the "severity [of such damage] . . . would still need to be assessed."  The parties do not dispute that the appellant was rendered unconscious for some period of time as a result of the motorcycle accident.  The unanswered question is the extent to which this accident impacted the appellant, or if it did so at all.

While various affidavits and arguments now before us stand for the proposition that TBIs occurring to a person's left frontal temporal lobe may be related to increased aggressiveness and disinhibited impulse and emotional control, other authority cited by the appellant suggests that is not the norm.  The appellant argues "a 2003 study found that 33.7% of traumatic brain injury patients demonstrated significant aggressive behavior during the first six months after their injury."  The obvious implication of this data and the assertion it supports is that the other 66.3% did not.  If two out of every three people suffering a TBI do not demonstrate significant aggressive behavior, what evidence available to the parties at the trial level would or could have tied such an injury to the appellant's actions in the early morning hours of 5 July 2004?

The crux of appellant's claim with regard to the accident and a TBI is that his counsel prejudicially erred by not showing the members the damaged helmet and arguing the appellant was less culpable for his actions because a brain injury he sustained made him act impulsively, impaired his cognitive functions, and suppressed his emotional self-regulation.  If they had done so, the appellant argues, there is a reasonable probability the jury would not have sentenced him to death.

The Government, however, would have been entitled to marshal evidence to counter such an argument had trial defense counsel made it.  When examining for prejudice, we look not only at what evidence trial defense counsel could have presented, but also at how the Government could have responded in light of all the evidence.  As observed by the Supreme Court in *Belmontes*, "In balancing the mitigating factors against the aggravators, the [lower court] repeatedly referred to the aggravating evidence the State presented as 'scant.'  That characterization misses *Strickland*'s point that the reviewing court must consider all the evidence—the good and the bad—when evaluating prejudice."  558 U.S. at 26 (citation omitted).

The appellant's side of the balance includes CP's recitation of EL's observation about the appellant's change in personality. That recitation forms the basis for a substantial portion of the appellant's post-trial experts' qualified conclusions[23] that a head injury reduced the appellant's ability to refrain from acting impulsively, controlling violent outbursts, or thinking clearly when he was killing two people and seriously wounding a third. On the Government's side of that balance, trial counsel could reasonably be presumed to have pointed out the other evidence squarely contradicting any suggestion that the appellant's actions were impulsive and that he was unable to think clearly.

SrA AS first called the appellant at 0137 hrs. Over the course of the next several hours, when telephone exchanges between the appellant, SrA AS, and SrA JK made it clear that SrA AS intended to inform the appellant's supervisory chain about his lecherous behavior toward JS and with another married woman, the appellant methodically executed a protracted, multi-step plan to kill the people who threatened to derail his career. The appellant had an IQ in the top third of the population, there is no indication his injury impacted his ability to perform his job as an avionics technician in an acceptable fashion, and Dr. CR observed no deficits in the appellant's ability to plan, organize, sequence, or abstract. Based on his two-hour interview with the appellant, Dr. CR concluded:

> [The appellant] demonstrated meticulous planning, organization skills to carry out his plan, a logical sequencing of behavior to accomplish his goals, and abstract reasoning.
>
> . . . .
>
> A question arises whether it is clinically possible that [the appellant] could have suffered a severe transient cognitive impairment from his February 2004 accident that impaired his mental functioning on the night of the July 2004 murders, but then totally remitted afterward such that an evaluation conducted some fourteen or fifteen months later (September to October 2005) might fail to show signs of impairment. While almost anything is clinically possible, I consider it extremely unlikely that such a sequence of events would occur, especially given [the appellant's] detailed explanations for his behavior. First of all, [the appellant's] recounting of his reasoning and behavior at the time of the offenses, including asocial motivation and planning, is not consistent with cognitive impairment nor is

---

[23] As noted previously, tests or imaging that would meet the confirmatory "gold standard" for appellant's experts have never been conducted.

his intact memory for details of those events.

> [The appellant] has provided extensive information inconsistent with impulsivity. He was negative for any symptoms of brain impairment . . . when evaluated and described no such symptoms occurring while committing the underlying offenses. [The appellant] denied having experienced any cognitive impairment or behavioral changes at any time before his arrest and specifically denied having had any difficulty in the areas of controlling anger, rage or impulsivity.

The results of one component of the Minnesota Multiphasic Personality Inventory-2 (MMPI-2), which Dr. CR administered during his evaluation, comported with the appellant's self-reported assessment that he experienced no change in aggressive behavior. Dr. CR reports, "Various scale results [from the MMPI-2] indicated no neurological symptoms . . . no general health concerns . . . nor anger/explosive behavior . . . ." Dr. CR's assessment appears to line up with the opinion of another of the appellant's post-trial psychological experts, Dr. TR, who opines that group statistical data applied to the appellant "reveals no known risk factors that would suggest raising his violence risk estimate above the low cited base rates." Dr. TR also opines that "[s]everal factors pointed to [the appellant] having a lower risk for serious prison violence than the rate of capital offenders in general . . . ." Finally, the testimony of CW stands in stark contradiction to the after-the-fact suggestion that the motorcycle accident changed the appellant's personality.

"The appellant bears the heavy burden of establishing his trial defense counsel were ineffective." *United States v. McPherson*, 72 M.J. 862, 870 (A.F. Ct. Crim. App. 2013) (citing *United States v. McConnell*, 55 M.J. 479, 484 (C.A.A.F. 2001)). "There is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order the Court in *Strickland* did, or even to address both components of the inquiry if the defendant makes an insufficient showing on one." *McConnell*, 55 M.J. at 481 (quoting *Strickland*, 466 U.S. at 697) (alterations and quotation marks omitted). "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691.

Although the motorcycle accident is undisputed, it has never been determined that the appellant sustained a TBI. But even assuming he did, not all TBIs make a person more prone to violence. More importantly, even if some TBIs do make a person more prone to violence, the evidence in this case resoundingly contradicts the single data

point[24] suggesting the appellant's behavior changed following his accident. Simply raising a possibility of a different outcome, had information about the motorcycle accident been introduced and argued, is not enough. *Strickland* places the burden on the appellant to show a reasonable probability that the result would have been different. 466 U.S. at 694. The appellant has failed to meet that burden.

We do not dispute the appellant's assertion that panels find mental disorders mitigating as to the question of a person's moral culpability in death cases when the evidence supports a conclusion that a specific injury influenced a person's behavior. Such evidence is simply not present in the case before us.

Whether trial defense counsel rendered substandard assistance under the deficiency prong of a *Strickland* analysis may be subject to debate. Considering the role of the mitigation specialist in this case, whose sole function was to develop mitigation evidence, the argument may be made that trial defense counsel were deficient for not further investigating the possibility of a TBI—in spite of their forensic psychologist's conclusion that doing so was unwarranted—when such an investigation could have produced concrete evidence of an injury through "gold standard" diagnostic testing. One could also argue that as sentencing in a capital case involves the weighing of mitigating and aggravating factors, a premature foreclosure of any potentially mitigating factor, no matter how tenuous, could raise doubts about the professional judgment of the trial defense counsel. Finally, the very existence of disagreement between two of the defense team's experts, CP and Dr. BM, on the question of whether to further investigate the motorcycle accident, could be argued to support the proposition that further examination was warranted. Conversely, on the facts now before us, where CP's investigation on behalf of the defense produced only one witness in a hundred who observed a personality change in the appellant following the accident, where there was substantial evidence the appellant's personality was not at all affected by the accident, and where the defense's forensic psychologist concluded there was no reason to pursue such a theory, counsel may be deemed to have acted reasonably. We base our holding on the second prong of a *Strickland* analysis, finding no prejudice to the appellant.

### 2. Mental Health Records of the Appellant's Mother

The appellant asserts his trial defense counsel were ineffective when they failed to investigate his mother's mental health history and obtain her mental health records from an inpatient stay when the appellant was in his early teens.

As discussed above, trial defense counsel's rationale for not pursuing the known

---

[24] The single data point indicating a change in the appellant's personality is CP's memorandum recounting EL's observations about the appellant.

lead of possible traumatic brain injury was because Dr. BM did not believe the accident contributed to his crimes. Instead, trial defense counsel acknowledged their theory of the case, based upon Dr. BM's evaluation, was that the appellant's actions were directly influenced by his historical familial experiences, childhood, and the manner and environment in which he was raised. At least one of the trial defense counsel acknowledged that "as part of the case theory rested on Dr. [BM]'s assessment of [MP]'s past mental health concerns . . . we would have wanted these records." However, none of the trial defense counsel presented any tactical, strategic, or other reason as to why investigation into this known lead was not pursued. In addressing this issue, civilian trial defense counsel stated, "To the extent we did not seek [MP]'s mental health records, in my mind it was simply that Dr. [BM] did not ask us to obtain them. Had he done so, we would have had trial counsel obtain them."

The appellant argues that although the members were generally aware of MP's treatment at Minirith Meier New Life Clinic [hereinafter "MMC"] through "a passing reference to [MP's] stay at [MMC] for depression from her husband, [GP], and some general discussions of [MP's] family history of mental issues, no witness described, explained, or discussed in any manner any of the results of [MP's] psychological testing from the [MMC] or her doctors' conclusions." (record citations omitted). Additionally, the appellant argues, "No witness suggested that [MP] had struggled with depression for years, or 'has trouble with anger and setting boundaries. That she was having many vegetative signs of depression; hopelessness. Or that she has had some explosive temper with yelling.'" (internal brackets and alterations omitted).

CP felt strongly that the defense team should have subpoenaed MP's mental health records regarding her treatment at the MMC. In one of her six post-trial affidavits, she uses the following terms to describe her frustration:

> As part of my investigation, I learned that [MP, the appellant's] mother, had been *placed in a mental health facility* when he was a young boy. I also had learned . . . [the appellant's] family, on both sides, had a history of mental diseases and/or afflictions. I therefore believed obtaining as much information as possible about the mental histories of [the appellant's] family was necessary.

> I created a release for [MP] to sign in order for [the defense team] to obtain records pertaining to her *institutionalization*. Despite my repeated requests to her, [MP] refused to sign the release. . . .

> [MP's] refusal to allow us access to her mental health records upset me. . . . [B]ecause of her mental health issues, [MP] *was removed from the home and placed in an institution specifically for mental health*

*treatment. . . .*

I told MP that we are trying to save her son's life and that this information can help. This did not seem to have an effect on her. I found this appalling and took my concerns to [the appellant's] defense counsel.

(emphasis added).

DB, an attorney with expertise defending death penalty cases, observes in a post-trial affidavit:

[T]he defendant's formative environment—not only at the time of his mother's psychiatric hospitalization when he was 14, but throughout his short life prior to that time—was marred by circumstances that could have been expected to do grave harm to any young child. Specifically, the records indicate or *suggest* the following:

. . . .

[The appellant's] biological father was "addicted to alcohol and drugs" during the brief time when he was married to [MP] (and when [the appellant] was born).

The home environment into which [the appellant] was born was marked by physical abuse of his mother by his father.

. . . .

. . . [T]he deleterious impact of his mother's serious mental illness would have been exacerbated by his social isolation and lack of peer interaction or educational supervision at school.

. . . .

Taken together, these records tend to establish both a genetically-based risk that [the appellant] would suffer from substance abuse and major mental illness, and also suggested that his childhood, from infancy through early adolescence, *may have been* marked by domestic violence, chronic fear, emotional withdrawal, social isolation, and pervasive instability.

(emphasis added).

Similarly, Dr. RC, a clinical psychiatrist submitted a post-trial affidavit in which he offers his opinion based on "review[ing] 30 hours of interview with and testing of [the appellant], psychiatric evaluations (including the original sanity board) of [the appellant] performed by other mental health professionals, the psychiatric evaluation of [MP] . . . and the transcripts of the trial," and meeting with and evaluating the appellant. In his opinion, the appellant's "upbringing and biological inheritance severely inhibited his development." After reciting his interpretation of what the MMC records said about MP's history of depression and emotional difficulties, noting "numerous markers for profound personality disorder[s]," he writes that "while [MP] completed high school, she had *indulged in alcohol and illegal drugs on a reasonably regular basis*." He eventually concludes, "It is my professional opinion that [the appellant] was stunted by environmental and biological factors such that he did not have the emotional capacity commensurate with his biological age."

Such declarations and the appellant's arguments paint a picture of a child born to two drug-addled parents, whose upbringing in their care, in combination with other disadvantaging circumstances, left him with irreparable emotional injuries one would reasonably expect as a result of severe physical and emotional adversity. But voluminous other evidence produced at trial painted what can only be described as a markedly different picture.

(a) Evidence in the record regarding MP's mental health

MP was the fourth of five children in her family. She had what she described as a "great relationship" with her mother and denied any history of physical abuse. When her father began acting violent toward her mother, on occasion requiring police to come to the home, her family life became difficult. When she was in the eighth grade, her mother attempted suicide. Shortly thereafter the family split up, and she lived with two sets of neighbors, the second of whom paid for her college. At trial, MP testified she never became part of social services, was an avid reader, graduated from high school in 1975, and went on to earn a bachelor's degree in Journalism. Following college, she worked in what she described as "some pretty good jobs."

MP met CW in 1980, married him roughly eight months later, then quit her job three or four months after that when she became pregnant. Prior to the appellant's birth in June of 1982, MP and CW split chores in the home and enjoyed many athletic activities together. CW coached her soccer and softball teams. MP drank socially from the time she met CW until their divorce a few years later. She tried cocaine once but denied any other illicit drug or cigarette use. CW testified that after the appellant was born, MP "spent a lot of time at the tennis club. She went to photography classes, stained glass classes, woodworking classes, acting classes. She did a lot of that in the evening,

and so [CW] got to be with [the appellant] and change him and feed him and bond with him." CW said this experience "was wonderful."

When asked to describe her marriage to CW, MP said, "I really appreciated [CW]'s—at that time CW was gregarious and fun and I was looking for someone to help me feel secure. And I know . . . I felt very secure with him." Later she described how, over time, he became verbally abusive. "So you know, it was disintegrating . . . I didn't realize he was an alcoholic. And I didn't realize that there was a drug problem at that time too. So, that kind of snuck in the back door as well." The couple divorced when the appellant was three years old.

Between his parents' divorce in 1985 and about a year and a half later when MP moved to Wichita with him, the appellant spent Wednesdays and every other weekend with CW, during which time CW "never missed a [visitation] day" and "never missed a support check." MP decided not to go back to work immediately after the divorce, in order "to stay and just kind of sort things out." She eventually got a "very good job" as a copywriter and ended up staying there for another three years. She bought a house and, with the help of her mother, who by that time had gotten her life back together and had become a part of the appellant's life, managed well as a single working mom.

After MP and the appellant had moved to Wichita, the appellant spent summers and every other Christmas with CW. CW described himself during that time as "a Disneyland dad." He explained:

I bought [the appellant] a four-wheeler. I had a car and a boat. [The appellant] would get out in the backyard and buzz around. . . . He just had a ball. We'd take it out to the lake. We went to the lake every Sunday. I never could get him to ski, but he sure liked to drive the boat.

In 1988, MP and the appellant moved to Wisconsin, as MP wanted to put some distance between the two of them and CW, whose life was starting to spiral downward. MP took a job with another catalogue, and the appellant attended school during the day. After school hours, before MP got off work, the appellant spent time with other children at a church across the street from his school.

Though CW admitted to having struggled with drugs, he testified that his problem did not start adversely impacting his life until MP moved to Wisconsin, when the appellant would have been about six years old. He testified that he started using drugs during the appellant's visitations, after the appellant would go to sleep. Later, when the appellant was eight or nine, CW said he used drugs around the appellant, but added, "He didn't know what I was doing. . . . He had his own TV, VCR, Nintendo, and he'd be in his room playing. That's what he liked to do. That's what he basically did." CW

explained that he tried to make the appellant's visits with him as enjoyable as possible: "I wanted to be Disneyland dad. I wanted him to do nothing but have a good time."

After MP married Dr. GP, whom she had met in 1988, she again became a stay-at-home mom. She experienced some frustration associated with the appellant's visits to CW. While CW had very few rules and would let the appellant do essentially anything he wanted, MP's rules were considerably more strict when the appellant returned home. [25] MP testified:

> [The appellant] came home usually constipated, you know, just wired up. I think they kind [sic] of like go, go, go. It was just not a real restful time. I had to like just slow life down a little bit. . . . [H]e loved Legos and so we would—I would just buy Legos and we would just sit there together, you know, not that we had to talk a lot, but to accomplish something together. So, it was just like I had to just slow life down and get reconnected with him.

CW described how at a certain point his drug use got out of control and he fell into an "abyss" and "hit bottom." But during that time, when the appellant was about 10 years old, MP discontinued the appellant's visitations with CW. CW agreed with MP's decision: "I totally agreed because I was in no shape to watch a kid. I was in the abyss." As the appellant's biological father, CW stated he was never violent during the entire course of their relationship, but he believed he was verbally abusive. He described an occasion when he found the appellant, at the age of six or seven, "covered in blood," so he rushed him to the hospital. The doctor explained to CW "[the appellant] just had a nose bleed, and he swallowed the blood and he just regurgitated." Nevertheless, CW was concerned that his verbal abuse was causing the appellant to have recurrent nose bleeds, so "from that day on, [he] never yelled at him. [He] never verbally abused him again."

CW explained that during the time he was getting cleaned up and going through rehab, MP and her new husband, Dr. GP, were very accommodating. "Once I got to rehab, I didn't hide anything, and we talked about the child support and they were so happy that I was trying to get well, that they said, 'Don't worry about it. We're just happy you're there.'" When the appellant was 12 years old, CW started seeing the appellant again for 10-day visitation periods. By that time CW had remarried, and the appellant did not mesh well with his new wife's children.

Describing her relationship with the appellant during the years they spent together in Wisconsin, MP testified:

---

[25] MP also described that on one occasion the appellant returned from a visit with CW with a knife she believed to be inappropriate for a nine year old, so she took it away from him.

[H]e was so much fun.  I loved being his mom [crying].  There would be times that—many days I would just think these are just golden days.  I taught him how to drive the stick shift and I mean we—it's not like we didn't have sparks fly, but it was, you know, he got frustrated because he couldn't do the gear shifts, but, you know, that's what it takes, but then you just practice and you keep going and you learn and all of a sudden, boom, it all fits together.

She recounted how she helped the appellant start his own lawn mowing business in 1986, and how she mentored him through the process:

I worked with him, we did the books together, I took him through every different, you know, the stages so that he could, maybe, be later on his own business person.  So I didn't just do it.  I took him along side and showed him how to do a slogan, how to present yourself to the families, and it was very successful.  He did it for two years, employed a couple of his friends, saved up enough money to buy his truck that he purchased by his eleventh grade year.

The same year MP helped the appellant launch his lawn business, she began to experience difficulties coping with her family situation.  After learning about the MMC, she and Dr. GP decided it would be a good option for her to get treatment there for the emotional difficulties she was experiencing.  She checked into the MMC on 18 September 1996 and "reported that she had been stressed out by issues related to a summer job, teaching Vacation Bible School, and the requirements of home schooling her children."

Dr. GP elaborated on what he believed were sources of friction in the home, explaining that in addition to the long hours he worked, MP was "more free-wheeling in terms of credit card spending."  He added:

I'm ["]get the credit cards paid off.["]  And that has been a real source of problems, I guess.  She likes to—she likes horses and we have spent a lot of money with the horses and I have not been on board at some points in our decision—in the decision-making to do that, and that's been a source of great annoyance, at the very least, and bitterness in part.

After the appellant was home-schooled in the seventh and eighth grades, MP and Dr. GP sent him to Coulee, a nearby private high school.  After one year at Coulee, they sent him to Aquinas High School, "one of the best, if not the best" high schools in the area, with "nice computer labs, good curriculum, [and] good quality teachers."  During

high school, where he was described as a "very fine student," the appellant had friends, was in the jazz band, and played numerous sports, particularly excelling in golf. His golf coach observed:

> As the years went on, in junior year, he got better, and by the time he was a senior, he had improved his game quite a bit, so he played part-time varsity and part-time JV, so I saw a lot of improvement in his game in the next three years.
>
> . . . .
>
> I had some pretty quality golfers. It was pretty hard to crack the top five, so he spent his time, you know, working on his game, and eventually, when the opportunity came, he took advantage of it.

Following high school graduation, the appellant spent nine months at Capernwray Bible School, a private college in England. Dr. GP and MP paid his tuition, and the appellant paid his travelling expenses while he was in Europe with money he had earned at various jobs while in junior high school and high school. During his time at Capernwray, the appellant and friends spent weekends seeing local sights, took a week-long trip to the Canary Islands, visited Scotland, and attended a concert in London by the musical group Smashing Pumpkins. Describing life at Capernwray, the appellant's friend, TW, recalled:

> It is in the lakes district and there is . . . lots of green hills and sheep, and we'd take walks and talk about all sorts of things. We both loved literature, and we talked about books, and we talked about the Bible and whatever. . . . We were running buddies for a while too.

TW also described the appellant as "a good student, a deep thinker" who "interacted well" with his peer group.

The appellant did not appear to be suffering financial challenges. When the appellant turned 18 years old, he also came into free and clear possession of $30,000 worth of oil well stock CW had placed into conservatorship in the appellant's name after the divorce.

CW and Dr. GP both commented about the appellant's atypical clarity of focus on his plans for the future. Dr. GP noted, "I think he thought about being some kind of person in the armed services who would do—he didn't just want a desk job or a factory job, he wanted some action." Speaking of his son's long term goals, CW recounted:

I never met a 19-year-old so entrenched in what he—had his life all planned out. He not only was going to join the Air Force, he was going to work on his schooling and then work with the Air Force to get out, to go to college, come back in as an officer. He wanted to be a pilot, and eventually, maybe work into the astronaut program. . . . [I]t was just so strange for a 19-year old to have all this planned and how he was going [to] do it. He even had his retirement planned. He told me not to worry about his retirement—that he had it all taken care of. He wanted to retire in Italy, and he was already studying Italian.

Based on the foregoing, there is no dispute that CW and MP came from upbringings troubled in various ways, and that MP was diagnosed with depression and suffered from stress at various points in her life. Likewise, it is factually accurate to say that CW struggled with drugs, that he and MP divorced when the appellant was very young, and that MP received treatment for stress at an in-patient counselling facility for 17 days when the appellant was a teenager. It is quite another matter, however, to suggest that these facts, had they only been correctly presented to the members, would have made the difference between a life and death sentence.

Addressing whether pursuing a theory related to, or actually introducing, MP's mental health records would have made a difference in the appellant's sentence is similar to our discussion of the TBI issue above to the extent that much of the post-trial discussion of the issues turns on the affiants' framing of those issues.

(b) CP and other affiant's representations of the mental health evidence

CP's representations about who would have said what, if only they had been interviewed or testified, merits comment. Some witnesses, because of affinity with a litigant, or relationship to an issue or cause presented in a given case, may view the utility of one theory or another, or the persuasive impact of certain evidence, differently than counsel. In the appellant's case, it is quite apparent that CP felt strongly about certain components of the case that trial defense counsel chose not to pursue.

In fact, the strength of CP's opinions about MP's upbringing and mental health records created an entirely separate challenge for the trial defense team to deal with. Capt DJ, one of the appellant's trial defense counsel, notes that CP's disagreement with MP over the mental health records issue created "a growing tension between [CP] and [MP]. The tension grew to a point that [FS] would have to serve as a messenger between CP and MP." Capt DR relates a similar recollection:

I do not recall why the [mental health] records were not obtained but believe it very possible that [MP] would have refused to sign a consent

form. This was particularly likely if [MP] had been asked to do so by [CP] – these two people did not seem to get along and this created some friction during the trial preparation.

Discussing the divergence of opinion between himself and CP about how certain testimony or evidence should be presented in the case, FS added:

[I]t must be noted that while I valued [CP's] work and input, I felt that she did not fully appreciate the unique challenges of defending military cases with members senior in rank to the accused as opposed to trying a case before a civilian jury. I spent most of my entire professional life defending military cases in front of members. My approach is to be focused in presenting a defense or a sentencing case. In other words, I do not as a rule call marginal witnesses or raise marginal issues before members. In my opinion there is too much risk they will ultimately hurt your case. [CP] seemed to be more willing to throw everything against the wall and hope that at least one member would respond. . . . I did not want lukewarm witnesses or uncharged misconduct coming before the members. In [the appellant's] case, I believed we should go with our strongest witnesses and stay focused.

While it may be true that CP had more experience in capital cases than the defense lawyers who represented the appellant at trial, that is not the same thing as saying she was in the best position to assess the pros and cons of various litigation strategies. Moreover, we note the difficulties that could be expected to arise if a mitigation specialist were to allow her personal disagreement with the attorneys over litigation strategy to alienate quite possibly the most sympathetic witness available—so much so that one of the appellant's attorneys had to act as a messenger between the two.

When commenting about CP's role in helping to identify potential sentencing witnesses, Capt DR notes that he and FS initially intended to call two witnesses based on CP's recommendation. However, when preparing the first of the two to testify, Capt DR recounts:

[I]t became clear in speaking with [the witness] that [CP] had not made him aware of the details of the allegations against [the appellant] when she interviewed him. Once we told him about the findings of the court in anticipation of the trial counsel's likely cross-examination, he was no longer interested in helping us by testifying.

When preparing the second witness, Capt DR states:

> [W]e found that [the witness] did not offer information consistent with what [CP] had documented in her notes. [The witness] was particularly "wishy-washy," and not nearly as definitive or helpful with her opinion evidence as she was previously documented being according to [CP's] notes. Ultimately, we decided not to call what we deemed as a weak witness.

CP's interactions with trial defense counsel and potential witnesses provide an important background for assessing counsel's performance. Our assessment of counsel's performance includes a "context-dependent consideration of the challenged conduct as seen from counsel's perspective at the time" and "[e]very effort must be made to eliminate the distorting effects of hindsight." *Wiggins*, 539 U.S. at 523 (internal quotations marks and citations omitted). Though dramatic flair and passionate presentation skills are undoubtedly useful in a mitigation specialist's line of work, they are less so when attempting to objectively evaluate, after the fact, the wisdom of a trial attorney's tactical choices or the persuasive impact of evidence he decided to use—or to forego.

For example, although it is a compelling sound bite in a written memo for CP to describe MP's mental health counseling in 1986 as "remov[al] from the home and place[ment] in an institution," we can be assured such a dramatic characterization would not have gone unchallenged at trial.[26] In point of fact, MP was not *removed* from the home in any sense of the word. MP and GP jointly decided she would seek treatment there, of her own volition, because they had heard good things about the facility on a Christian radio show and "it appeared to be a good fit for [them]." Saying a parent is *removed* from a home conjures up a collection of images of parents being separated from their children as a result of state intervention to protect endangered children. That simply was not the case in the young life of the appellant.

Similarly, DB concludes the records he reviewed "indicate or suggest . . . physical abuse of [the appellant's] mother by his father . . . [and] lack of peer interaction or educational supervision at school," and further, "that [the appellant's] childhood, from infancy through early adolescence, may have been marked by domestic violence, chronic fear, emotional withdrawal, social isolation, and pervasive instability." These observations, and by implication their utility as part of a sentencing mitigation theory, are

---

[26] Government counsel's cross examination of Dr. BM at the *Daubert* hearing provides an informative example of their preparedness to vigorously challenge appellant's expert psychiatric and psychological evidence in the crucible of focused, spirited cross-examination.

either specifically contradicted or persuasively rebutted by the testimony of numerous witnesses at trial, the substance of which DB appears not to have considered.

Along similar lines, Dr. RC's statement that MP "indulged in alcohol and illegal drugs on a reasonably regular basis" is nowhere mentioned in the mental health records the appellant now argues should have been admitted. In fact, those records contradict Dr. RC's assertion; they note, "Alcohol use has been limited, not problematic at any time. No drug or smoking history. . . . [MP] had used alcohol 'socially' when she was ages 23-28. She tried cocaine on one occasion and denied other illicit drug or cigarette use." After briefly recounting his own interpretation of the records he reviewed regarding MP's upbringing and social history, Dr. RC states his professional opinion that the appellant "did not have the emotional capacity commensurate with his biological age" and diagnoses the appellant "as suffering from a chronic dysthymia disorder." We note that even if we were to accept Dr. RC's diagnosis as accurate, we would still have nothing to suggest any relationship, in any causal or mitigating fashion, between the diagnosis and the appellant's crimes.

We do not recount these lengthy record-based observations in an effort to nit-pick minor discrepancies between the documents now before us as they relate to the appellant's arguments regarding a TBI or the handling of his mother's mental health treatment records. Indeed, the appellant's appellate counsel have meticulously gathered evidence and advocated vigorously in as convincing a fashion as possible. Rather, we carefully scrutinize the appellant's submissions in furtherance of our charge to review the record in its totality—both the good and the bad—when assessing whether trial defense counsel were ineffective as the appellant alleges.

(c) Analysis

The gravamen of the appellant's argument is that if trial defense counsel would have presented evidence or information about MP's mental health records, there is a reasonable probability the appellant would not have been sentenced to death. Based on our review of the entire record and the law governing the conduct of our analysis, we disagree.

Again, we must look first at what the defense could have done or said in relation to the mental health records, and second to how the prosecution could have responded in light of all the evidence, ultimately asking whether the overlooked mitigation and extenuation evidence, if presented, would have made a reasonably probable difference in light of all the aggravating evidence. As to MP's mental health records, the members were generally aware that the appellant's parents had what could certainly be referred to as difficult or challenging upbringings. What the record squarely rebuts, however, is any reasonable assertion that either of their childhoods or life experiences prior to the

appellant's birth adversely impacted the appellant in a way that would have made a difference in his court-martial. Despite the members' general awareness of these issues, he contends MP's mental health records constitute the same sort of overlooked sympathy-evoking social history and privation evidence upon which courts in other cases have based findings of prejudicial ineffectiveness. We disagree.

As a preliminary matter, evidence adduced at trial undercuts the appellant's experts' post-trial opinions about MP's mental health and the appellant's parents' backgrounds. Moreover, even if that were not the case, we would still find the significance of MP's mental health records pales in comparison to similar evidence other courts have considered persuasive in capital cases where trial defense counsel were alleged to be ineffective.[27]

A decision from our superior court, *United States v. Curtis*, 44 M.J. 106 (C.A.A.F. 1997), warrants some discussion. In *Curtis* the Court of Appeals for the Armed Forces, in pertinent part, affirmed the findings and sentence of a Marine convicted of stabbing his company commander and his wife to death in their home. Evidence at trial established

---

[27] *See, e.g.*, *Sears*, 561 U.S. 945 (defendant performed at or below first (lowest) percentile in several categories of cognitive function; suffered sexual abuse at hands of an adolescent male cousin; struggled in school demonstrating substantial behavior problems from a very young age; failed second grade; was referred to a local health center for evaluation at age nine, and by the time he reached high school was "described as severely learning disabled and as severely behaviorally handicapped"; his mother's favorite word for referring to her sons was "little mother f[**]kers" and father was verbally abusive; his father disciplined him with "age-inappropriate military-style drills"; and two different psychological experts testified that he had substantial deficits in mental cognition and reasoning, that is, "problems with planning, sequencing and impulse control," and "was among the most impaired individuals in the population in terms of ability to suppress competing impulses and conform behavior only to relevant stimuli"); *Porter v. McCollum*, 558 U.S. 30 (2009) (defendant had been placed in classes for "slow learners" and left school at age 12 or 13; his father shot at him for coming home late once and, when he missed, beat him instead; after enlisting in the military to get away from a disturbed home life, he fought heroically in two Korean War battles described as "very trying, horrifying experiences" by his company commander, got shot in the leg, and came home plagued by nightmares; he was diagnosed with post-traumatic stress disorder, had drinking problems, and was diagnosed by a doctor who examined him as suffering from brain damage that could manifest in impulsive, violent behavior); *Rompilla v. Beard*, 545 U.S. 374 (2005) (defendant's parents were both severe alcoholics who drank constantly; his mother drank during her pregnancy; he and his brothers eventually developed serious drinking problems; his father frequently beat his mother, leaving her bruised and black-eyed, and bragged about his cheating on her; on at least one occasion his mother stabbed his father; his father beat him when he was young with his hands, fists, leather straps, belts, and sticks; his father locked him and his brother in a small wire mesh dog pen that was filthy and excrement-filled; he had no indoor plumbing in the house; he slept in the attic with no heat; and post-trial experts found he "suffer[ed] from organic brain damage, an extreme mental disturbance significantly impairing several of his cognitive functions"); *Wiggins v. Smith*, 539 U.S. 510 (2003) (defendant had an alcoholic absentee mother; suffered physical torment, sexual molestation, and repeated rape during years in foster care; experienced frequent lengthy absences from school; and on at least one occasion, his mother left him and his siblings at home alone for days without food.); *Williams v. Taylor*, 529 U.S. 362 (2000) (defendant had extensive records of "nightmarish childhood," was "borderline mentally retarded," was committed at age 11 to state custody for two years after his parents were prosecuted for criminal neglect of him and his siblings, and suffered repeated head injuries as a child).

that the appellant drank at least a pint of gin within roughly half an hour before the killings. On appeal, the appellant claimed his defense counsel were ineffective at trial, *inter alia*, by (1) failing to argue his voluntary intoxication as a mitigating factor and (2) by failing to hire a mitigation specialist or to conduct an adequate background investigation, which would have uncovered mitigating evidence regarding the appellant's social history. On first review, the Court found error in neither instance. Regarding the background investigation, the Court observed that, in light of defense's theory pursued at trial, "[i]t is therefore inconsequential to [the Court's] review of ineffectiveness that an *ex parte* post-trial background investigation *revealed that appellant was physically, mentally, and sexually abused as a child and had a 'genetic predisposition to alcohol abuse*.'" *Id*. at 122 (emphasis added).

On reconsideration of the case, the Court ultimately overturned Curtis' death sentence, holding, "We conclude that trial defense counsel's performance during the sentencing hearing was deficient and that there is a reasonable probability that there would have been a different result if *all available mitigating evidence* had been exploited by the defense." *United States v. Curtis*, 46 M.J. 129, 130 (C.A.A.F. 1997) (emphasis added). The majority did not further specify what the overlooked "available mitigating evidence" would have been, but the dissenters' comments focus exclusively on trial defense counsel's failure to pursue the voluntary intoxication theory. *Id*. at 130-32 (Sullivan, J., Crawford, J., dissenting). In isolation, *Curtis* could be argued to stand for the proposition that if overlooked evidence of voluntary intoxication was sufficient to set aside a sentence in that case, overlooking the potential existence of a TBI and MP's mental health records in the appellant's case should justify such a result in his case as well.

As a threshold matter, we would distinguish the overlooked potentially mitigating evidence in *Curtis* as less speculative than the potentially mitigating evidence the appellant argues was overlooked in his case. Curtis was a 185-pound male who consumed a pint of gin within a half hour prior to committing his crimes. The effects of alcohol are, one could reasonably argue, considerably more universally understood than the connections between the psychological impacts of a person's social history on his participation in an act of criminal violence. Accordingly, the potential mitigating impact of voluntary intoxication in *Curtis* was significantly less attenuated than the potential mitigating impact of a *possible TBI* or MP's mental health treatment history in the appellant's case.

Our understanding of *Curtis* is also informed by *United States v. Gray*, 51 M.J. 1 (C.A.A.F. 1999), in which our superior court rendered a decision two years after *Curtis*. Gray was convicted and sentenced to death for a number of violent, heinous crimes, including two premeditated murders, rapes, and forcible sodomies. Post-trial, he attempted to raise an insanity defense and introduce additional mental-state mitigation

evidence via the written statements of two psychiatrists and the results of additional sanity boards and neurological testing ordered by the then-Army Court of Military Review. *Id.* at 13.

One of the post-trial sanity boards found evidence of undifferentiated brain damage, but the evaluating psychologist stated "despite appellant's mild organic brain damage, the appellant is now, and [the psychologist] believe[d] was at the time of the offenses, able fully to appreciate the nature and quality of his acts and the wrongfulness of his acts." *Id.* at 14. On appeal, Gray challenged his death sentence alleging he was not provided competent psychiatric assistance at his court-martial because, according to his post-trial submissions, the doctors who previously evaluated him misdiagnosed him as having an unspecified personality disorder instead of organic brain damage. Rejecting his claim, our superior court noted that "the establishment of conflicting expert opinion on an accused's mental state does not necessarily require a rehearing." *Id.* Moreover, the Court explained, "[T]he post-trial evidence as to the extent of the organic brain damage and its impact on appellant's mental responsibility at the time of the offenses was speculative and disputed." *Id.* at 15.

Gray also alleged his counsel were ineffective because, among other allegations, they failed to challenge the professional competence of the mental health professionals who evaluated him before trial, and because they failed to ensure a "complete and competent mental health evaluation of appellant was performed before trial." *Id.* at 19 (internal quotation marks omitted). Our superior court rejected the appellant's attack on his trial counsel's performance, finding there was nothing professionally inadequate in his counsel's reliance at trial on the work of three mental-status experts. *Id.* Additionally, the Court denied his request for a new trial, holding:

> Organic brain damage by itself does not equate to lack of mental responsibility for one's crimes, and its discovery after trial does not necessarily require a new trial. . . . [T]he post-trial evidence was disputed as to the extent of this damage. More importantly, the post-trial evidence was somewhat speculative on the effect of this mental condition on appellant at the time of these offenses and it too was disputed.

*Gray*, 51 M.J. at 14 (citations and emphasis omitted).

We recognize that some of the language excerpted above is taken from the portion of the *Gray* decision addressing the Court's denial of his request for a new trial, and we do not imply that the tests or standards for evaluating such a request are the same as those applicable when evaluating a complaint of ineffective assistance of counsel. Rather, we cite that portion of *Gray* for the proposition that, read in context, to meet his burden

under the prejudice prong of a *Strickland* analysis, the appellant must produce more than the type of "qualified and tentative"[28] assertions argued to us at this juncture.

Courts have repeatedly found evidence of mental problems or infirmities to constitute persuasive mitigation. "[E]vidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional or mental problems, may be less culpable than defendants who have no such excuse." *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) (quoting *California v. Brown*, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring)), *overruled on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002); *see also Allen v. Woodford*, 395 F.3d 979, 1006 (9th Cir. 2005) (noting that "explanatory" mitigating evidence often bears more weight than "humanizing" evidence); *Cannon v. Gibson*, 259 F.3d 1253, 1277-78 (10th Cir. 2001) (finding omitted mitigation information of "serious brain damage" and lack of impulse control would have displaced mitigation information portraying the petitioner as a "kind, compliant, and responsible individual whose involvement in the murder was an aberration").

While this case law establishes that mental disorders and a person's disadvantaged upbringing can be persuasive components of a mitigation case, the simple mention of such evidence—*let alone the mere possibility of the existence of such evidence*—is not presumed to be talismanic. The fact that a person's parents suffered from depression or substance abuse, or that he himself sustained a head injury that *might have* affected his behavior, does not carry the day for a party bearing the evidentiary burden defined in *Strickland* and further fleshed out in cases applying *Strickland* in this context. Rather, an appellant must demonstrate how these data points impacted *his case* in a way that the sentencing authority would have found sufficiently persuasive to impose a different sentence.

Though reasonable minds may differ with regard to whether trial defense counsel's election to forego additional investigation into MP's mental health or upbringing amounted to deficiency, the weight of the evidence adduced at trial suggests this theme would have been an even harder sell than the one involving the motorcycle accident and the possibility of a TBI. We find that appellant has failed to demonstrate a reasonable probability that, but for trial defense counsel's failure to obtain and present this evidence, the result of his sentencing proceeding would have been any different. Therefore, we hold that the appellant's trial defense counsel were not ineffective for failing to investigate and introduce the mental health records of the appellant's mother.

---

[28] *See* note 21.

Although the appellant also questions the decision not to present testimony from Dr. BM, as analyzed previously in addressing the findings phase issues, we find this decision tactical and strategic under the unusual circumstances presented. Dr. CR was not a substitute for Dr. BM's anticipated testimony. Instead, his evaluation was intended to avoid the court-ordered evaluation and ultimately confirmed Dr. BM's deficiencies with respect to his diagnosis of appellant. However, it is not clear that Dr. CR was ever specifically asked about the motorcycle accident and the possibility of traumatic brain injury. On these facts, we do not find trial defense counsel's decision to abandon their earlier plans to use Dr. BM as an expert witness to have been ineffective.

### 3. Evidence of Remorse

The appellant further asks this Court to find ineffective assistance of his trial defense counsel based on their failure to investigate the potential remorse testimony of Deputy Sheriff LF.

### (a) Background

At least one of the appellant's military trial defense counsel, Capt DR, witnessed the appellant become extremely upset during the pretrial Article 32, UCMJ, hearing, when he saw the crime scene evidence for the first time. The appellant began to cry and was consoled by Deputy Sheriff LF during a subsequent recess. Ultimately, the appellant did not return to the proceeding that day. In his post-trial declaration, Capt DR concedes the mitigation specialist recommended pursuing Deputy Sheriff LF as a potential witness and remembers asking her to obtain the sheriff's contact information. While Capt DR does not recall receiving the contact information or attempting to make any contact with the sheriff on his own, he acknowledges he and FS "were very interested in presenting any evidence of remorse [they] could find, as well as evidence that showed [the appellant's] good conduct since his confinement." In that counsel's opinion, "Deputy [LF] could have been a good witness on both issues."

In a post-trial declaration, CP also criticizes trial defense counsel's failure to call a correctional officer, LS, who, according to CP, would have testified as to the appellant's good behavior in pretrial confinement. She alleges FS declined to call Correctional Officer LS because he "thought it might jeopardize Correctional Officer [LS's] standing as a confinement official testifying on behalf of a convicted murderer" and that, in response to hearing this, CP told FS "he needed to stop worrying about winning popularity contests and do what is right for his client."

With regard to the possibility of calling law enforcement witnesses in general, FS offers in his post-trial declaration:

[I] did not trust that the potential sentencing witnesses who worked for law enforcement would hold up under cross-examination. For the marginal value they added, the risk was too great that they would not deliver on the stand, whether because they feared getting in trouble or because the government found out about facts that could have undermined their testimony. I had great respect for the prosecutors in terms of their ability to dig up dirt and to impeach potential defenses witnesses. Because the stakes were so high, I needed complete confidence in our sentencing witnesses. To the extent we did not call law enforcement officers or guards, it was based on a thorough vetting of each potential witness, with an appreciation that the government would be prepared to impeach them with information we may or may not have possessed.

CP observed, in her notes following her interview with Correctional Officer LS:

[LS] is a very sensitive individual. When asked if he would be willing to tell the jury what he had told us, he covered his face, his face reddened and eyes watered. I purposefully changed the subject to give him time to calm down.

. . . .

[LS] has agreed to testify for [the appellant.]

Capt DR recounts his specific recollection of CP's recommendation regarding a witness who, according to her, would testify about the appellant's good behavior in pretrial confinement. He recalls, "We were very interested in this idea and asked her to spend time finding someone who could help with this." Capt DR additionally states:

[CP] reported that she had run into some problems with at least one of the people she spoke with; apparently this person expressed concern about his own career prospects if he assisted us. I do not, however, ever remember [FS] saying he did not want to call one of the correctional officers out of concern for that person's career.

Capt DR also notes that the trial defense team had reservations about calling witnesses to testify about the appellant's good behavior in pretrial confinement because of concerns about the Government's ability to impeach those witnesses with specific instances of the appellant's misconduct. This included their understanding that "[the appellant] had violated the facility's rules by hoarding pills, which the correctional staff thought he was going to use to commit suicide" and "may have also had some other minor incidents in pre-trial confinement." *Id.* Specifically with regard to Correctional

Officer LS, Capt DR reported, "I think he may have also been the person who subsequently voiced concerns for his own career if he were to testify." *Id.*

Capt TS, an appellate defense counsel, avers in a post-trial affidavit that during a telephone interview Capt DR said the reason the trial defense team did not contact Deputy LF was because they "did not have contact information for him." According to Deputy LF, his phone number was publicly listed in the phone book in the county where the trial was taking place at the time of the appellant's trial.

### (b) Whether trial defense counsel were deficient

Examining the record before us, we are mindful of our obligation to make "every effort . . . to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct . . . to evaluate the conduct from counsel's perspective at the time," and to "indulge a strong presumption that counsel's conduct f[ell] within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689; *see also Rompilla*, 545 U.S. at 381 (citing *Strickland*, 466 U.S. at 689). Applying these principles, we do not find FS's stated reason underlying the decision not to investigate further the possibility of using Deputy Sheriff LF or Correctional Officer LS as mitigation witnesses to have fallen below an objective standard of reasonableness.

That said, the appellant points out that Capt DR's stated rationale for not calling Deputy Sheriff LF is not consistent with FS's. Specifically, he notes Capt DR states that they wanted remorse evidence if they could find it, and the only reason Capt DR offers for not calling Deputy Sheriff LF is that he could not find his phone number, which according to Deputy Sheriff LF was right in the phone book.

Considering all the evidence now before us, including the disparity between Capt DR's and FS's explanations of how this issue was handled, we find Capt DR's failure to further investigate whether Deputy Sheiff LF could have offered helpful remorse evidence to constitute deficient performance under the first prong of a *Strickland* analysis.

### (c) Prejudice

Having found deficient performance in trial defense counsel's failure to investigate Deputy LF's potential testimony regarding the appellant's remorse, we must now turn to the issue of prejudice. To prevail on an ineffective assistance of counsel claim, the appellant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* If the ineffectiveness occurred during the

sentencing phase, the defendant must demonstrate "a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.* at 695.

There is no question that the underlying facts of this case present a strong case in aggravation. Overall, the Government's case focused heavily on significant emotional victim impact evidence and a purported callousness or lack of remorse by the appellant. The Government argued, in part, that the appellant committed these offenses because he was "evil" or "just bad." During the presentencing hearing, the prosecution presented evidence that included the appellant's personal data sheet and enlisted performance reports, photographs, and a series of letters the appellant wrote to Ms. SF, a high school youth volunteer at the appellant's church. In these letters the appellant commented on, among other things, the lack of fairness to him, given his incarceration, and anger at God for not intervening and stopping him.

Additionally, the Government placed a great deal of emphasis on victim impact by way of testimony from 14 friends and family members of the victims, SSgt JK, and Dr. CR. Dr. CR evaluated the family members of the victims and testified as to his diagnoses of mental health issues ranging from bereavement and anxiety disorder, to major depression, depressive disorder, and post-traumatic stress disorder.

Finally, the prosecution submitted five stipulations of expected testimony from various witnesses demonstrating the appellant's lack of remorse. Four of these witnesses were friends of the appellant whose expected testimony revealed, on the day following the offenses, the appellant was talking to them on the telephone at various times and making plans for lunch, dinner, and meeting for drinks. One of these witnesses, the appellant's roommate, also referenced a comment from the appellant on 5 July 2004 that "[SrA AS] did not want to be friends anymore." When the appellant and his roommate drove by the crime scene on 5 July 2004, the appellant reportedly said, "I can't be here, I have to go," and began to get out of the vehicle. This was just prior to his detention.

The last stipulation of expected testimony presented was from Dr. VM, who was SSgt JK's treating surgeon. His expected testimony outlined the extensive damage SSgt JK had to his internal organs, the multiple surgeries required to treat his injuries, and the significant scarring as a result of the crime and medical intervention.

On the mitigation side of the scale, trial defense counsel called 15 witnesses, including the appellant's family members, friends, teachers, coach, church volunteers, and former employer, who testified that the appellant was a respectful, happy, polite young man who was never violent. He was described as a good big brother who was

raised in a somewhat restrictive, over-protective home with strong religious beliefs. Although he was depicted as having limited social skills, he was also active in a number of sports, and several witnesses discussed their friendships and associations with him. The witnesses expressed their understanding of the crime committed and their willingness to extend the appellant their ongoing love and support. The majority of these witnesses knew the appellant during or prior to high school. The defense also introduced 22 character letters in support of the appellant, 12 certificates of awards and decorations, 28 exhibits regarding his educational history, including report cards dating back to middle school, 16 pages of photographs, and a four-page unsworn statement. The mitigation evidence presented the appellant as a basically good person with much promise and ability, who had done a terrible thing, and that while punishment—stern punishment—would be appropriate, death would not.

In light of the aggravating evidence in this case, we are unconvinced there is any reasonable probability the outcome would have been different if Deputy LF had testified about the appellant's emotional breakdown during the Article 32, UCMJ, hearing. The overwhelming weight of the evidence paints a picture of a cold, calculated, vicious crime, carried out in the furtherance of a purely protectionist and self-serving objective. At trial, when the appellant chose to make written and verbal unsworn statements, he expressed remorse for his victims and their families in two paragraphs of his written statement and the following exchange during his oral statement:

Q: And, have you felt remorse about what you did that night?
A. Yes.
Q. And, is there anything you want to say to the families today?
A. Yes. To the families, the Schliepsieks and the Bielenbergs, I am so sorry. I am. From the bottom of my being, I am. I'm so sorry that I took your son and your daughter away from you. And, also to Mr. King, I'm so sorry for hurting you.

The Government had ample evidence on which to base an argument that any remorse exhibited by the appellant at the Article 32, UCMJ, hearing was more a matter of self-pity than sorrow for his victims and their families. Prosecution Exhibits 76 and 77, which consist of letters the appellant wrote from jail to friends, provide insight into the issues weighing on the appellant's mind during his pretrial confinement. The following excerpts reflect an overarching theme of self-concern:

Another thing that bothers me is this prison thing. I have read stories that guys do small time first and then work up to the "hard time." Me? I jump straight to hard time. This is a wake up call that is just too long. . . . The Bible says that God won't let you be tempted more than you can bear, and he will provide an escape. I have wracked my brain, and I

still can't find what my escape route was. I suppose I could argue "why me" but you could counter "well why not?" It's just not fair. There I said it. But who said life is fair? These are the thoughts I have daily.

. . . .

. . . Why do I have to be punished this way? I wasn't a hellion. . . . Now I don't know if I'll ever get over this or trust God or anyone again. Someone, actually a lot of people, have told me I could be a "good witness" in prison. No one understands . . . . I barely know who I am in the first place, not to mention betrayed by my own mind. And to top it off I had absolutely <u>no</u> help in my time of need. Oh I get plenty of help <u>now</u>, but at the crucial time I got zip. So why should I be inclined to do anything anymore? I look forward to my death, so I can get out of this hell we call life. Besides, I never asked to be born, and <u>this</u> is what I get. So there, I have vented. I am angry, bitter, and probably resentful to the point of hatred in the future. I expect to get that glassy eyed look like the lion in the zoo in a few years. Now you know what I've been thinking these past few weeks. So there.

. . . .

. . . I was so happy to leave home and embark on my journey and go places I wanted and experience things and generally enjoy life. Now, I'm back where I started. Before I had a light at the end of the tunnel. I just had to bide my time. Now I have no chance. I have nothing. This is the worst thing that could have happened to me. . . . I used to love life and now I hate it. I hate everything.

. . . .

I'm glad you think the question "How are you doing?" is silly. I loathe that question. It's obvious people are oblivious to how I feel when they ask me that. Or they haven't been listening to me, which is common. . . .

Another thing I am 'trying to get through' is my life's sentence description. What I mean is one sentence to sum up my life. That sentence would be "Shut up and take it." I had been waiting a long time for the chance to strike out on my own. I was doing well until I got manipulated into this situation. . . .

. . . .

Anyway, I don't know why I complain it doesn't do any good, and as someone (who has a nice comfy house and a nice comfy job) will inevitably say "someone has it worse than you." So like I said, "Shut up and take it." My life's story.

In *Belmontes*, the appellant was sentenced to death for brutally murdering a woman who interrupted his botched burglary attempt. He subsequently alleged his trial defense counsel were ineffective for failing, among other things, to offer evidence about his difficult childhood and "'extended bout with rheumatic fever,' which led to 'emotional instability, impulsivity, and impairment of the neurophysiological mechanisms for planning and reasoning.'" 558 U.S. at 24-25. His counsel, however, had called several witnesses to humanize him during his sentencing case, and had to carefully avoid "opening the door" to facts associated with a prior, execution-style murder Belmontes had bragged about. *Id.* at 17-19. In finding no ineffective assistance of counsel, the Supreme Court reasoned:

[T]he cold, calculated nature of the [previous] murder and Belmontes' subsequent bragging about it would have served as a powerful counterpoint. The type of "more-evidence-is-better" approach advocated by Belmontes and the Court of Appeals might seem appealing—after all, what is there to lose? But here there was a lot to lose. A heavyhanded case to portray Belmontes in a positive light, with or without experts, would have invited the strongest possible evidence in rebuttal—the evidence that Belmontes was responsible for not one but two murders.

*Id.* at 25.

We recognize *Belmontes* presents a different set of facts from this case, in that the appellant's letters—which the Government could have more vigorously argued demonstrate a lack of remorse—were already in evidence, whereas information about Belmontes' prior murder was not in evidence in his case. But *Belmontes* also supports the principle that where the facts of a case are sufficiently egregious, we may reject an argument that a trial counsel's decision to forego a "shotgun" approach at trial amounted to ineffectiveness. *See Id.* at 27-28.

Every crime meriting a potential death sentence is a "crime of one," and it would be impossible to establish a mathematical equivalency between any two. But just as in *Belmontes*, where the court found it "hard to imagine expert testimony and *additional* facts about Belmontes' difficult childhood outweighing the facts of [the victim's] murder," *Id.* at 27-28, we find it similarly hard to imagine that the appellant's emotional

reaction during the Article 32, UCMJ, hearing would have tipped the *Strickland* balance in any appreciable way in favor of the appellant.

## 4.  Failure to Offer Evidence of Future Violence Risk

The appellant alleges his trial defense counsel were ineffective for failing to present evidence to the members indicating he "posed an extremely low risk of future violence."  Specifically, he argues his counsel were ineffective because the *ABA Guidelines* state that "future dangerousness is on the minds of most capital jurors, and is thus at issue in virtually all capital trials," and because the post-trial submission of Dr. TR opined that the appellant had a low probability of future violence in prison.

First, as noted above, the *ABA Guidelines* are helpful but not binding on practitioners in military courts-martial.  Second, Dr. TR's declaration is, by all indications, a comprehensive literature review on the subject of future dangerousness of capital offenders in general.  Notwithstanding his proffered "personal knowledge of the facts contained in []his declaration and . . . competen[ce] to testify about them," his declaration is quite speculative as applied to the appellant.  Two forensic psychologists who evaluated the appellant, Dr. BM and Dr. CR, both informed the defense team that they would be unable to testify as to the appellant's future likelihood of non-violence based on their evaluations of him.  Additionally, the Government was prepared to affirmatively call Dr. CR to rebut any assertions regarding the appellant's future likelihood of non-violence.  We therefore find no ineffectiveness in trial defense counsel's informed choice not to pursue this theory in the appellant's case.

## 5.  Failure to Offer Testimony of SP and KP

The appellant avers his trial defense counsel were ineffective for not offering the testimony of his half-brother and half-sister, SP and KP, during the sentencing case.  SP and KP were 11 and 14 years old, respectively, at the time of trial.  In a post-trial declaration, KP says she "very much wanted to testify on behalf of [her] brother, was willing to do so, and was not worried about the prosecutors."  Similarly, SP "would have told the court that [he] loved [his] brother very much."  The trial defense team had originally intended to offer the testimony of both children but later decided not to in order to avoid the appearance of trying to evoke sympathy in a way that could potentially backfire.

We find trial defense counsel articulated a strategic and tactical basis for deciding not to call SP and KP and will not second-guess that decision at this juncture.  We find no ineffectiveness in their decision not to call SP and KP.

## 6.  Failure to Object to Inadmissible Victim Impact Evidence and Argument, and Failure to Request Appropriate Curative Instruction

The appellant avers his counsel were ineffective by failing to object to inadmissible evidence in aggravation, in the form of testimony from members of the victims' families, regarding, inter alia, the nature of the offenses the appellant committed and their characterizations of the appellant individually.  During sentencing the fathers of SrA AS and JS testified, sometimes tearfully, about the emotional loss they experienced from the appellant's crimes.  In portions of each of their testimonies, they explained how the manner of their children's deaths punctuated their ongoing mental suffering, recounting in some detail facts previously made clear to the members.  For example, JA's father, JB, noted at one point, "[I]t is bad enough that they are gone and you are going to never be with them.  But, that you have to live with the way that she died.  This is the part that I just cannot – I can't understand.  I cannot tolerate.  Society should not tolerate it."  He further testified:

> And, I just wanted to be there.  If I could have been there in that door when that thing got knocked down.  I mean, can you imagine?  This is not some strong, muscular person who could defend herself.  This is just the biggest act of cowardice to go and do that to a young lady.  I can't—this is just—I mean, she is sitting back behind that door knowing that she is going to die.  And, I've got to live with that the rest of my life . . . .

JS's younger sister testified:

> [I] just kept saying it over and over, "I know she suffered, I know she suffered."  And, all that I had heard was that they were dead in their home.  But, I just knew it.  And, that is the major thing, is knowing that those two—there are so many people out there that loved them, and there are so many people out there that could have been with them that night and comforted them, and they had no one.  They died alone, suffering . . .

The appellant concedes that *Payne v. Tennessee*, 501 U.S. 808 (1991), overturned that portion of *Booth v. Maryland*, 482 U.S. 496 (1987), that had previously held evidence and argument relating to the victim and the impact of the victim's death on the victim's family to be inadmissible at a capital sentencing hearing.  He argues, however, that his trial defense counsel were ineffective when they failed to attempt to limit the testimony of CB, JB, and DS, which came before the members.  This testimony, the appellant contends, violated other portions of *Booth* that still prohibit the admission of a victim's family members' characterizations of, and opinions about, the crime and the defendant.

The appellant cites the *ABA Guidelines* and post-trial affidavits submitted by two attorneys with military experience in capital litigation for the proposition that failure to zealously limit victim impact evidence in a capital trial amounts to an error falling outside the wide range of professionally competent assistance demanded by the Sixth Amendment under *Strickland*. Moreover, trial defense counsel moved in limine to exclude victim impact testimony, evincing their awareness of the importance of limiting such information where possible.

Addressing their rationale for not objecting to victim-impact testimony during trial, FS states he believed they faced a "no win" situation. He explains:

> [W]e raised this concern with the trial judge during an R.C.M. 802 session. We knew the government would push the limits and feared that if we made multiple objections that were overruled, it would be held against [the appellant] by the members. We face [sic] the Hobson's choice of either highlighting unduly prejudicial testimony or losing credibility with the members. Thus, we asked the judge to exercise control over the process under Mil. R. Evid. 403.

Capt DR's explanation tracks with FS's, noting:

> [FS] felt that objecting in front of the members would have a negative impact on how they viewed us and our case and so decided not to object during the testimony of any of their witnesses. After some of the witnesses had testified, we did have an off-the-record RCM 802 session in which we raised our concerns about the testimony of the government witnesses to the military judge and expressed our frustration at the fact that we felt we could not object in front of the members without risking highlighting their improper testimony.[29]

Limiting victim impact testimony is an important consideration in capital sentencing proceedings, with federal courts recognizing *Payne* left intact one significant portion of *Booth*. *See, e.g.*, *Humphries v. Ozmint*, 397 F.3d 206, 217-18 (4th Cir. 2005) (en banc) (noting *Payne* did not alter *Booth*'s holding that admission of victims' opinions of crime and appropriate punishment violates the Eighth Amendment); *United States v. Bernard*, 299 F.3d 467, 480-81 (5th Cir. 2002); *Fautenberry v. Mitchell*, 515 F.3d 614, 638 (6th Cir. 2008) ("The [*Payne*] Court did not disturb that portion of *Booth* that forbids 'a victim's family members' characterization and opinions about the crime, the

---

[29] Given the trial defense team's awareness of the importance of limiting victim impact testimony during sentencing, it would have been a far better practice to have resolved the issue on the record rather than in a R.C.M. 802 conference, as no on-the-record summary of such a conference appears to discuss the issue.

defendant, and the appropriate sentence.”); *Parker v. Bowersox*, 188 F.3d 923, 931 (8th Cir. 1999) (“[F]amily members of the victim may not state ‘characterizations and opinions about the crime, the defendant, and the appropriate sentence’ at the penalty phase . . . .”); *United States v. Mitchell*, 502 F.3d 931, 990 (9th Cir. 2007) (noting under *Booth* family members opinions and characterizations of the crimes and the defendant are irrelevant to a capital sentencing decision); *United States v. Brown*, 441 F.3d 1330, 1351 (11th Cir. 2006) (“[T]he *Booth* prohibition against evidence of family members’ opinions and characterizations of the crime, the defendant, and the appropriate sentence remains good law.”).  The appellant’s trial defense counsel appeared to be at least generally aware of this issue, as evinced by their motion in limine.  However, that said, the motion they submitted was focused on limiting the quantity of victim impact testimony they anticipated the Government would seek to admit.  It did not address the substance of the testimony they sought to limit with reference to *Booth* or *Payne*.[30]

FS’s stated rationale for not objecting during the testimony of the Government’s victim impact witnesses, on its face, falls within the wide range of professionally competent assistance contemplated in *Strickland*.  However, our review of the sentencing proceedings reveals no clear discussion regarding trial defense counsel’s objection to any such testimony as described by FS in his declaration.  Moreover, the fact that they had been sufficiently concerned with the issue to file a motion in limine suggests their awareness of the importance of appropriately limiting such testimony during the sentencing phase of the trial.  The following discussion of the motion occurred on the record:

> MJ:  [T]hat leaves us with the defense motion to exclude the government victim impact evidence. . . . Mark the defense motion as Appellate Exhibit XXIV and the government response is XXV.
>
> [The documents were marked.]
>
> MJ: Other than marking those documents, is there really anything that we can do with this motion?
>
> CIV DC [FS]: No, sir. I think where we are on this one is we’ve set the deadline where the government has to give us notice of their findings and sentencing witnesses, as I recall the 15th of August.  Once we have an idea of how many witnesses they intend to call in sentencing and the length of time that they want to use to present that evidence, then at that point we will be in a better position perhaps to articulate specifically what we’re objecting to, Your Honor.  I think this motion was more on the lines of

---

[30] The Government’s response, however, did reference both of these cases.

putting you on notice that we anticipate there's going to be an issue here and we do intend to challenge it based on just initial representations made by the government. Again, this is one of those motions that I do not think is ripe at this time, but we will address it later on.

MJ: And that's the way I took your motion was exactly that. Is [sic] this is coming down the line, please be ready for it and I appreciate both sides providing the information to me in as timely a fashion as you have thus far. It's extremely helpful.

In his post-trial declaration, Capt DR states that he "drafted and filed [the] motion to limit the victim impact evidence," but "[t]his motion was not taken up the [sic] judge and was never resolved." Capt DJ does not "recall any specific discussions the defense had concerning the government's impact evidence and witnesses." He does recall "there was some debate among the three of [them] and ultimately a decision was made not to object to the majority of the witness testimony."

The Supreme Court observed in *Strickland* that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." 466 U.S. at 690-91. Irrespective of how the outstanding motion in limine was resolved,[31] a reasonable attorney acting on behalf of a client in a capital sentencing case would have researched and understood the extent to which they may have made arguments to limit the substance, as well as the quantity, of victim impact testimony offered by the Government's sentencing witnesses at trial. We find trial

---

[31] Whatever remains of *Booth v. Maryland*, 482 U.S. 496 (1987), in the wake of *Payne v. Tennessee*, 501 U.S. 808 (1991), and footnote two of that decision, we note that certain of the Supreme Court's observations in *Booth* would have limited applicability to the case now before us. In *Booth*, the Court explained that victim impact testimony may be irrelevant because it did not relate to the defendant's culpability:

> The focus of a [victim impact statement], however, is not on the defendant, but on the character and reputation of the victim and the effect on his family. These factors may be wholly unrelated to the blameworthiness of a particular defendant. As our cases have shown, the defendant often will not know the victim, and therefore will have no knowledge about the existence or characteristics of the victim's family. . . . Allowing the jury to rely on a [victim impact statement] could result in imposing the death sentence because of factors about which the defendant was unaware, and that were irrelevant to the decision to kill.

In the case now before us, the appellant was indisputably aware that SrA AS and JS were, by all accounts, in love and happily married. With that knowledge, the appellant stabbed JS to death while SrA AS lay paralyzed, feet away, pleading for mercy. Although the cited language is not controlling, this is not a case where the appellant was ignorant of his victims' relationship—at least to one another—or where that relationship was irrelevant to his decision to kill.

defense counsel's failure to do so in this case to constitute error under prong one of *Strickland*.

However, we do not find their failure in this regard to have resulted in prejudice on the facts of this case. We do not doubt that emotional testimony from the family of murdered victims can be powerful. But "it was never held or even suggested in any . . . cases preceding *Booth* that the defendant, entitled as he was to individualized consideration, was to receive that consideration *wholly apart from the crime which he had committed*." *Payne*, 501 U.S. at 822 (emphasis added). Moreover, in the case now before us, the family members' "characterizations" and "opinions" about the crime were offered not in the abstract, but as integral components of the descriptions of their own emotional injuries—"about the specific harm caused by the crime in question, evidence of a general type long considered by sentencing authorities." *Id.* at 825. We, therefore, do not consider the comments the appellant now challenges, which were isolated and very brief in the overall context of the Government's lengthy sentencing case, to be so unduly prejudicial that they rendered the trial fundamentally unfair. *Id.* More importantly, under the prejudice prong of a *Strickland* analysis, we find no reasonable probability that but for their admission, and trial defense counsel's failure to request a curative instruction, the sentence would have been more favorable to the appellant.

## IV. Additional Sentencing Issues

The appellant raises several other issues relating to the sentencing portion of the court-martial, some of which we address below.

## A. Sentencing Argument

The appellant asserts that trial counsel's comments during the sentencing argument were improper in that they misled the jury to believe that the responsibility for the ultimate sentencing decision lay elsewhere. His position with respect to this issue relies upon the Supreme Court's decision in *Caldwell v. Mississippi*, 472 U.S. 320 (1985), which held that the jury must not be misled regarding the role it plays in the sentencing decision. However, the decision in that case was a plurality opinion where Justice O'Connor was the concurring vote on grounds narrower than those articulated by the plurality. The Supreme Court has since held "her position is controlling." *Romano v. Oklahoma*, 512 U.S. 1, 9 (1994). Therefore, "[t]o establish a *Caldwell* violation, a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law." *Id.* (quoting *Dugger v. Adams*, 489 U.S. 401, 407 (1989)) (alteration in original) (internal quotation marks omitted).

After full review of trial counsel's comments during the sentencing argument, we do not find the comments were false, inaccurate, or misleading. The argument accurately

pointed out, in three passing comments, that there is an appellate process following the verdict, but did not contravene the principle established in *Caldwell* as limited by the concurring opinion.

## B. Military Judge's Instructions

The appellant argues that the military judge erred on several instructional matters. Whether a military judge properly instructs the court members is a question of law we review de novo. *United States v. Hibbard*, 58 M.J. 71, 75 (C.A.A.F. 2003). A military judge's decision to give, or not give, an instruction is reviewed for an abuse of discretion. *United States v. Maxwell*, 45 M.J. 406, 424 (C.A.A.F. 1996).

As previously mentioned, we review new issues raised after a failure to object at trial for plain error, which requires (1) error, (2) that is plain or obvious, and (3) that impacts a substantial right of the appellant. *See Kho*, 54 M.J. at 65; *United States v. Finster*, 51 M.J. 185, 187 (C.A.A.F. 1999) (citing *Powell*, 49 M.J. at 463). The appellant bears the burden of persuading this Court of the plain error, after which the burden shifts to the Government to show that error is not prejudicial. *Powell*, 49 M.J. at 464-65.

When the sufficiency of instructions is attacked, "[t]he ultimate question is whether there is a reasonable possibility that the jury understood the instructions in an unconstitutional manner." *Loving*, 41 M.J. at 277-78 (alteration in original) (internal quotation marks and citation omitted). Additionally, "there is a heightened need for reliability in capital punishment cases." *Id.* On this issue, our superior court has noted that appellate service courts have plenary review authority and "[a] clearer *carte blanche* to do justice would be difficult to express." *United States v. Claxton*, 32 M.J. 159, 162 (C.M.A. 1991).

With these concepts in mind, we review the military judge's instructions in three areas.

## 1. Voir Dire Reference to Sentencing Procedure

During voir dire, the military judge instructed the members that the death penalty was a potential sentence only if the members convicted the appellant of premeditated murder by a unanimous vote. As part of that instruction, the military judge advised the members that the accused was presumed innocent; the Government had the burden to prove his guilt beyond a reasonable doubt; and, since death was a possible punishment option, it was necessary to ask them questions about their views on the death penalty during voir dire. The judge cautioned that the inquiry into their views on the death

penalty "has no relation at all to whether the accused is guilty or not guilty of any offense."[32] The appellant argues the military judge committed plain error in so instructing the members because knowing about the unanimity requirement "undoubtedly influenced" the members' findings deliberations.

We find the military judge did not commit error, plain or otherwise. The military judge acted appropriately when he instructed the members during voir dire that death was a potential penalty only by unanimous vote. By doing so, the military judge ensured that the members who sat on the appellant's court-martial panel were "free from conflict and bias." *United States v. Gooch*, 69 M.J. 353, 357 (C.A.A.F. 2011). The questioning of panel members allows the parties to intelligently exercise challenges for cause and peremptory challenges. R.C.M. 912(d), Discussion ("The opportunity for voir dire

---

[32] The military judge instructed the members using the standard preliminary instructions for death penalty cases set forth in the Department of the Army Pamphlet 27–9, *Military Judges' Benchbook* [hereinafter "*Benchbook*"], ¶ 8–3 (1 April 2001). The military judge instructed the members as follows:

> And before I ask you questions or let counsel do so, it's appropriate that I give you some additional instructions.
>
> This is a capital murder case. I want to direct your attention specifically to Specifications 1 and 2 of Charge I, on the copy of the charges that you have there. Both are a violation of Article 118 of the Uniform Code of Military Justice commonly referred to as premeditated murder. If the accused is convicted of premeditated murder by a unanimous vote, then the court may, but is not required to, impose the death penalty. In the sentencing phase of this trial the death penalty is a permissible punishment only if:
>
> One, the court members unanimously find beyond a reasonable doubt that an aggravating factor exists;
>
> Two, that the court members unanimously find that any and all extenuation and mitigation circumstances are substantially outweighed by any aggravating circumstances to include any aggravating factor. If you unanimously find these two items, then the death penalty will be a possible punishment, but only if you vote unanimously to impose death.
>
> You must bear in mind that even if the death penalty is a possible sentence, the sentence or whether or not to vote for the death penalty is within the sole discretion of each court member. If the accused is convicted of premeditated murder, but the vote for conviction was not unanimous, then the death penalty may not be adjudged. However, you will be required to determine whether the mandatory minimum of life imprisonment or whether confinement for life without the eligibility for parole will apply. Should it become necessary, I'll explain your options to you in much greater detail later in this trial.
>
> Remember, as I previously instructed you, the accused is presumed to be innocent and the burden is on the government to prove his guilt beyond a reasonable doubt. Because one possible punishment in this case is death, it will be necessary to ask you questions regarding your views concerning the death penalty. This inquiry has no relation at all to whether or not the accused is guilty or not guilty of any offense. As I stated before, the accused is presumed not guilty of all of these offenses.

should be used to obtain information for the intelligent exercise of challenges . . . .").  An inelastic predisposition towards a particular punishment is a valid basis for a challenge for cause. R.C.M. 912(f)(1)(N), Discussion; *see United States v. Sonego*, 61 M.J. 1, 4 (C.A.A.F. 2005).  This is especially true in a capital case.  *See Gray v. Mississippi*, 481 U.S. 648, 658 (1987) (finding the test for the removal of a juror who opposes the death penalty is "whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." (citation and internal quotation marks omitted)).

We also disagree that knowledge of the unanimity requirement would have influenced the members during their findings deliberations to the prejudice of the appellant, and the appellant offered no insight into how this may have influenced the members other than to say that it did so "undoubtedly."  We refuse to speculate on this matter.  What we do know is the military judge told the members it was necessary to ask them questions about their views of the death penalty because the appellant was charged with a capital offense.  Using the *Benchbook* instruction, the military judge cautioned the members that the appellant was innocent of the offenses and that the Government had the burden to prove his guilt beyond a reasonable doubt.  He explained that any vote on the death penalty had to be unanimous if the appellant was convicted of the charged offenses.  This laid the groundwork for the individual voir dire of the members by the military judge, trial counsel, and trial defense counsel about their opinion of the death penalty and their ability to be fair and impartial.  As such, we find no error.

### 2.  Presentencing Instructions on Voting Procedure

The appellant next argues that the military judge improperly instructed the members on sentencing deliberation procedures. The appellant relies on our superior court's decision in *United States v. Simoy*, 50 M.J. 1 (C.A.A.F. 1998), to essentially argue that, if there is not unanimous concurrence *the first and only time* the members vote on a proposed sentence of death, it is permanently eliminated as an option.

Our superior court reversed our decision in *Simoy* in part because the judge failed to instruct the members to vote on potential sentences from those least severe to those most severe.  Our superior court discussed the requirement for unanimous findings of the members at each of the four gates of a capital sentence deliberation.  *Simoy*, 50 M.J. at 2. Those gates are:

(1) Unanimous findings of guilt of an offense that authorizes the imposition of the death penalty, R.C.M. 1004(a)(2);

(2) Unanimous findings beyond a reasonable doubt that an aggravating factor exists, R.C.M. 1004(b)(7);

(3) Unanimous concurrence that aggravating factors substantially outweigh mitigating factors, R.C.M. 1004(b)(4)(C); and

(4) Unanimous vote by the members on the death penalty, R.C.M. 1006(d)(4)(A).

*Id.*

After reciting those gates, the Court noted, "If at any step along the way there is not a unanimous finding, *this eliminates the death penalty as an option*." *Id.* (emphasis added).

Contrary to the appellant's argument, we do not interpret this passage in *Simoy* as a substantive limitation on the number of times the members may propose or vote on a proposed death sentence. R.C.M. 1006(d)(3)(A) reads, in pertinent part, "The process of proposing sentences and voting on them may be repeated as necessary until a sentence is adopted." *See also United States v. Thomas*, 46 M.J. 311, 312 (C.A.A.F. 1997). The appellant's construction of *Simoy* theorizes that, although the members failed to reach a required concurrence on any potential sentence, they may "repeat the process of discussion, proposal and voting" only with respect to the potential sentences of life, or life without the possibility of parole. The appellant cites no other support for his proposition, and this *Simoy* interpretation conflicts with the plain wording of R.C.M. 1006(c).

We interpret the *Simoy* language upon which the appellant relies as pertaining to the unanimity required before members may progress from *one gate to the next* in capital sentence deliberations, not the *process of proposing and voting on sentences*, which "may be repeated as necessary until a sentence is adopted" after members have already appropriately arrived at the fourth gate of such deliberations. R.C.M. 1006(d)(3)A). Thus, if at the first gate the members do not unanimously find an accused guilty of an offense that authorizes the imposition of the death penalty, then death is no longer an optional sentence. Likewise, if at the second gate the members do not unanimously find beyond a reasonable doubt the existence of at least one common aggravating factor, then death is no longer an option. If at the third gate the members do not unanimously concur that aggravating factors substantially outweigh mitigating factors, then death is no longer an option. Finally, after having appropriately arrived at the fourth gate in sentence deliberations in a capital case, an accused may be sentenced to death only on unanimous vote of all members. That said, after appropriately arriving at the fourth gate of sentence deliberations in a capital case and properly considering proposed sentences, members may repeat the process of proposing and voting on sentences, from least to most severe, including a death sentence, until a sentence is adopted by the concurrence required under

R.C.M. 1006(d)(4).

With the proper procedure clear, we consider the adequacy of the military judge's instructions to the members. The appellant argues "under the instructions as given, the members would likely believe that provided they did not vote for sentence of confinement for life or confinement for life without eligibility for parole, they could continue to vote on a death penalty repeatedly until they finally reached a unanimous vote." We disagree. In the most pertinent passage, the military judge instructed:

> When you have completed your discussions, any member who desires to do so may propose a sentence. You do that by writing it out on a slip of paper, a complete sentence. The junior member then collects the proposed sentences and submits them to the president, who will arrange them in their order of severity. The court will then vote by secret written ballot on each proposed sentence in its entirety, beginning with the least severe and continuing to the next least severe, until a death[33]—until a sentence is adopted by the required concurrence. You are reminded that the most severe punishment is the death penalty. To adopt a sentence that does not include the death penalty, the required concurrence is three-fourths; that is, nine of the twelve members present. Members, in this connection, you're again advised that the mandatory minimum sentence is confinement for life. The junior member will then collect and count the votes, the count will then be checked by the president, who will immediately announce the result of the ballot to the other members. If you vote on all of the proposed sentences without reaching the required concurrence, repeat the process of discussing, proposal and voting.

Consistent with our analysis above, we find no error, as these instructions were in conformity with the applicable Rules for Courts-Martial and case law. Accordingly, we likewise find no ineffectiveness in trial defense counsel's failure to request a sentencing instruction that a non-unanimous vote for a death sentence during the Gate Four voting eliminates death as a potential sentence.

### 3. Presentencing Instruction on Members' Duty – Community Expectations

The appellant argues that the military judge erred by not instructing the members that they could not consider the "alleged desires of society or any particular segment of society" when determining an appropriate sentence in the appellant's case. The appellant

---

[33] The military judge appeared to misspeak when saying ". . . until a death" but corrected himself immediately, saying ". . . until a sentence is adopted by the required . . . ." The instruction was correctly recited on the written instructions provided to the members.

grounds his argument on the various societal references in trial counsel's sentencing argument.  In support of this argument, the appellant relies on *United States v. Pearson*, 17 M.J. 149 (C.M.A. 1984).  We disagree.

At the conclusion of the sentencing case, the military judge instructed the members on the law applicable to the charges before them for sentencing.  The military judge instructed, in part, as follows:

> In adjudging a sentence, there are several matters which you should consider in determining an appropriate sentence.  Bear in mind that our *society recognizes five principal reasons for the sentence of those who violate the law*.  They are: rehabilitation of the wrongdoer, punishment of the wrongdoer, *protection of society from the wrongdoer*, preservation of good order and discipline in the military, and deterrence of the wrongdoer and those who know of his crimes and his sentence from committing the same or similar offenses.  The weight to be given to any or all of these reasons, along with all other sentencing matters in this case, rests solely within your discretion.

(emphasis added).

Trial counsel then presented the Government's sentencing argument.  In his argument, trial counsel referred to society and victim impact.  The relevant portions are as follows:

> The community looks at this community, the Air Force, as something different, as we know.  And, the Bibb County community has taken us in for this trial, of what is one of the most serious cases you're ever going to find in the Air Force.  People have been here every day and seen different parts of this trial.  People have seen the destruction and devastation that an Airman brought upon a family, upon a community, and on the Air Force.  He even wore his uniform to commit the offenses.  As you think about it, what kind of crime could bring the death penalty in the military?  Try to think of one more serious than this, where it wouldn't be authorized.
>
> . . . .
>
> . . . A community has watched how the Air Force has dealt with it, and the community deserves to hear and see what he did.

Later, trial counsel referred to society and community in the context of the

members' debate about the sentence:

> And, when you have that discussion, it only takes one to say no. You all should talk about death and life without parole. You should debate them, and you should all try to come to a unanimous agreement. Even though the law doesn't require it, you all should, because you'll then be unanimous throughout this process. You should talk about it. You should debate it. You should discuss it always in the context of is it appropriate for this case and come to a decision. I'm not going to spend much time talking about life with the possibility of parole. I cannot imagine how you can sentence an accused who kills two people, almost kills a third, walks out of a jail, someday to return to his life, and those two people never will. Those families will never forget this. This community will never forget this. The Air Force will never forget this. *But, that should be your debate*.

(emphasis added).

> At another point, trial counsel argued the far-ranging impact of the case:

> But, what about the communities who are looking to the Air Force for justice in this case? Because this isn't just an Air Force case. This isn't an Airman who stole from the BX, and you only have to deal with it—the impact on that base. This case has far-ranging impact. As Houston, Peoria, and everyone else looks to see what the Air Force, what the Air Force [sic] views as the right answer when their Airman, and a wife of their Airman, is attacked and killed in base housing by another Airman. You've seen the impact on them, and you've heard about the impact on everybody else.

> . . . .

> . . . All of the 1500 that showed up to the memorial in Peoria. Imagine that number. Thirty or so from here, military members. You've heard about the impact on wives, sisters, brothers, friends, nephews, military members. The list goes on and on. And, [SrA JK] and his family lost two friends that night. You see the impact on him, and you heard about it.

> In rebuttal, trial counsel once again argued the needs of society and the impact on the community:

> [I]n arriving at your determination, select the sentence which best serves the ends of good order and discipline, the needs of the accused, and the

welfare of society. Society is watching this case.

. . . .

. . . As eyes turn here to see what justice in the Air Force is, I would suggest that the Air Force, for all the reasons we've talked about—good order and discipline, punishment, his rehabilitation, protection of society from that man who sits behind me.

. . . .

Offer the families a chance to see justice in our community. Offer the families a chance to see [SrA AS] and [JS] redeemed. Their lives were taken for really no reason. . . . And now you have everybody wondering what is Air Force justice?

At the conclusion of the arguments, the military judge instructed the members on the procedures for their deliberations. He cautioned the members that "[t]he arguments of counsel and their recommendations are only their individual suggestions and may not be considered as a recommendation or opinion from anyone other than counsel." After instructing the members, the military judge asked both trial counsel and trial defense counsel if they had any objections to his instructions or requested additional instructions. Neither side objected, and neither side requested additional instructions.

After reviewing the facts, law, and arguments of both sides, we find that this assignment of error does not present a case of plain error. First, the military judge properly instructed the members on all the required sentencing factors, as well as the societal factors for them to consider during their sentencing deliberations. In this regard, he did not abuse his discretion. The Rules for Courts-Martial and case law permit evidence about how crime impacts society. *See* R.C.M. 1001(b)(4); R.C.M. 1005(e)(1)-(5); *Payne v. Tennessee*, 501 U.S. 808 (1991); *United States v. Stephens*, 67 M.J. 233 (C.A.A.F. 2009).[34]

---

[34] R.C.M. 1005(a) states that the military judge "shall give the members appropriate instructions on sentence." R.C.M. 1005(e)(1)-(5) sets forth the required instructions on sentence, which include (1) a statement of the maximum authorized punishment and mandatory minimum punishment, if any; (2) a statement of the effect of any sentence announced will have on the accused's entitlement to pay and allowances; (3) a statement of the procedures for deliberation and voting on the sentence; (4) a statement that the members are solely responsible for selecting an appropriate sentence; and (5) a statement that the members should consider all matters in extenuation, mitigation, and aggravation. Additionally, the *Benchbook* contains a specific instruction setting forth the reasons for sentencing those who violate the law: (1) rehabilitation of the wrongdoer; (2) punishment of the wrongdoer; (3) protection of society from the wrongdoer; (4) preservation of good order and discipline in the military; and (5) deterrence of the wrongdoer and those who know of his crimes and sentence from committing the same or similar offenses.

The appellant grounds the bulk of his argument on *Pearson*. In *Pearson*, a Marine was tried and convicted of negligent homicide of another Marine. After findings, the prosecution stated it intended to offer matters in aggravation. After the military judge overruled the defense objection, the prosecution called two witnesses. The first witness was a gunnery sergeant for whom the victim had worked. He testified, inter alia, that the decedent was a "great worker, he was loyal, consistent, hard-working, just a definite asset both to the squadron and to the Marine Corps." *Pearson*, 17 M.J. at 150. He also testified that the decedent had intended to stay in the Marine Corps, that 240 enlisted personnel were in the squadron, and that the majority of them were aware of the court-martial. Then, the prosecutor engaged in the following colloquy with the gunnery sergeant:

> Q. What has the impact been on the squadron, with the death of [the victim]?
>
> A. The—immediately upon the death of [the victim], it seemed as though the whole squadron had been shaken apart. We couldn't understand how such a tragedy could come to take place within the command, and in the senseless way that it did. *Since his death, and from that date to this, the whole squadron has been waiting to find out the verdict of this court, and to see how his killer was going to be treated.*

*Id*. at 151. Trial defense counsel did not cross-examine the gunnery sergeant nor did he object to the testimony. The military judge did not give any cautionary instructions about the gunnery sergeant's testimony nor was he asked to do so.

The *Pearson* prosecution then called the decedent's father to testify. He characterized his son as a "perfect son." The prosecutor then had this exchange with the victim's father:

> Q. . . . [W]hat's the impact of [the victim]'s death been on the community of Reeseville?
>
> A. The only word I can use, that doesn't even describe it, is devastating. I don't know—*I've been sitting over there trying to think how I can go back home, how I can call my wife tonight, and how I can go back home to Reeseville, and tell them that the verdict was negligent homicide.*

---

*Benchbook*, ¶ 8–3–21. *See also United States v. Lania*, 9 M.J. 100 (C.M.A.1980) (holding that general deterrence is a relevant factor to consider in sentencing).

*Id.*  During an Article 39(a), UCMJ, session, the military judge admonished the witness that he could not criticize the verdict of the court-martial or suggest that they reached the wrong verdict.  Neither side questioned the witness any further, the defense did not request any cautionary instructions, and the military judge did not give any.  *Id.* at 151-52.

In its decision, our superior court discussed the importance of victim impact testimony but cautioned that it must be factual, non-inflammatory, and non-argumentative:  "*We never want to be guilty of waving the bloody shirt; neither are we to bury the bloody shirt with the victim still in it.*"  *Id.* at 152 (quoting Falconer, Paul R. and Northrop, Edward S., S. Rep. No. 97–532, 97th Cong., 2nd Sess. 13, *reprinted in* 1982 U.S. Code Cong. & Ad. News 2515, 2517).  The Court also noted that "[e]motional displays by aggrieved family members, though understandable, can quickly exceed the limits of propriety and equate to the bloody shirt being waved."  *Id.* at 153.  The Court found that the military judge did not abuse his discretion by permitting evidence of the victim's character and the loss felt by his family and community.  The Court, however, also ruled that the alleged desires of society may not be allowed to interfere with the court's independent function.  Thus, the Court found that the "fundamental sanctity" of the court-martial was violated by (1) the testimony of the victim's father that commented on the court's finding, and (2) the testimony of the gunnery sergeant that implied the "unit was hanging on the outcome of the trial."  In the Court's view, curative instructions were required despite the lack of a defense objection.  *Id.*

We find *Pearson* distinguishable from this case.  In *Pearson*, our superior court rested its decision on the value and role of victim impact testimony.  Unlike this case, the appellant in *Pearson* challenged evidence presented during sentencing via testimony of the victim's father and the gunnery sergeant.  He did not challenge the trial counsel's argument, as in this case.  Moreover, the testimony of both individuals in *Pearson* questioned the actual findings of the court-martial, whereas trial counsel's argument in this case focused on the relevant sentencing factors for the members to consider during their deliberations.  Even so, the appellant asserts that trial counsel's arguments "waved the bloody shirt" such that the military judge was required to give a curative instruction.  When read in its entirety, however, trial counsel's argument was not inflammatory but was within the bounds of delivering hard, but fair blows.  *United States v. Doctor*, 21 C.M.R. 252, 259 (C.M.A. 1956) (holding that although it is permissible for trial counsel to "strike hard blows" during argument, they must be "fair").  Trial counsel's sentencing argument referenced society consistent with the military judge's instructions.  Trial counsel argued that it was the members' job to determine the appropriate sentence, such as when he argued along the lines of (1) "The weight to be given to any or all of these reasons, along with all other sentencing matters in this case, rests solely within your discretion"; (2) "You should talk about it.  You should debate it.  You should discuss it always in the context of is it appropriate for this case and come to a decision"; and

(3) conceding, "But, that should be your debate."

Moreover, when compared to the sentencing argument in other military death penalty cases, we find trial counsel's argument was limited in scope and the military judge did not err by failing to give a sua sponte cautionary instruction. *See United States v. Quintanilla*, 63 M.J. 29 (C.A.A.F. 2006), *aff'g in part and rev'g in part United States v. Quintanilla*, 60 M.J. 852 (N.M. Ct. Crim. App. 2005); *United States v. Loving*, 34 M.J. 956, 962-63 (A.C.M.R. 1992), *aff'd*, 41 M.J. 213. In *Quintanilla*, trial counsel gave a highly-charged sentencing argument. He engaged in tactics such as sitting on the witness stand, screaming at the appellant, and using words such as "bad hombre," "animal," and "gang-banging." Trial defense counsel objected and the military judge gave a curative instruction. The Navy Court concluded that trial counsel and assistant trial counsel crossed the line "between zealous prosecution infused with righteous indignation . . . and unethical conduct" and in doing so "jeopardized the integrity of the trial proceedings." *Quintanilla*, 60 M.J. at 867. Even so, the Navy-Marine Corps Court of Criminal Appeals held that the argument did not impact the sentence because of the instruction. *Id*. On review, our superior court affirmed and ruled that the argument did not prejudice the findings because it was made after findings were entered. *Quintanilla*, 63 M.J. at 39. In *Quintanilla*, the cautionary instruction most certainly saved the case in light of the egregious nature of the argument. Trial counsel's argument in the appellant's case pales in comparison to that in *Quintanilla*.

In *Loving*, trial counsel argued societal factors during his sentencing argument. That appellant challenged the following passage:

> What the defense has glossed over in their entire argument is justice. What sentence serves justice? Crimes, when they're committed, demand punishments that fit them. The message that you send out, and you will send out a message with your sentence today, that message is not going to go just over this installation, but it is going to go across the United States. There's going to be a message that's going to be heard by working people. They need to know that they will not be terrorized in their work places. Americans, members of society, need to know that they will be protected and that they will be protected [sic] and that we will protect and we will vindicate society's victims.

*Loving*, 34 M.J. at 965. The defense objected to the argument, but the judge overruled the objection and proceeded to give the required instructions on sentencing. *Id*. On appeal, the appellant asserted that trial counsel erred in arguing general deterrence. The Army court found no error, holding that the military judge properly instructed the members to take into account the circumstances of the case and the character and propensities of the accused. *Id*. (citing *United States v. Lania*, 9 M.J. 100 (C.M.A.1980))

(holding that general deterrence is a relevant factor when determining a just sentence so long as the military judge instructs the members on other factors, such as rehabilitation, the circumstances of the case, and the character and propensity of the accused).

Here, trial counsel's argument was more limited in scope than that in *Loving* and *Quintanilla*. Although the defense did not object, the military judge did not err by failing to give a sua sponte curative instruction. In fact, the military judge properly instructed the members absent a curative instruction, and trial counsel's argument stayed within the bounds of those instructions.

### C. Other Impermissible Trial Counsel Sentencing Arguments

The appellant also alleges that his trial defense counsel ineffectively stood silent in the face of unlawful argument by trial counsel and ineffectively failed to request curative instructions following such arguments. More specifically, he argues (1) trial counsel improperly referred to whether anyone from the appellant's family or others in the courtroom gallery had ever tried to apologize to the victims' families, and (2) that trial counsel improperly discussed the appellant's opportunity to pursue an appeal if the members sentenced him to death. Trial defense counsel objected to the comments about the conduct of members of the appellant's family, who were in the gallery throughout the trial, on the grounds that there were no facts in evidence on such matters, and that trial counsel was mischaracterizing facts, but did not object to comments relating to the other issue.

As the appellant did not object to the argument about the possibility of an appeal, we review the propriety of that argument for plain error, pursuant to which the appellant must show, to prevail, that the alleged error materially prejudiced a substantial right. To assess prejudice under plain error review "where prosecutorial misconduct has been alleged: '[W]e look at the cumulative impact of any prosecutorial misconduct on the accused's substantial rights and the fairness and integrity of his trial.'" *Erickson*, 65 M.J. at 224 (quoting *United States v. Fletcher*, 62 M.J. 175, 184 (C.A.A.F. 2005)). Following our superior court's analysis in *Fletcher*, we evaluate prejudice with reference to three factors: "(1) the severity of the misconduct, (2) the measures adopted to cure the misconduct, and (3) the weight of the evidence supporting the conviction." 62 M.J. at 184. In the case now before us, and based on the evidence before the members when they sentenced the appellant, the third *Fletcher* factor weighs so heavily in favor of the Government we are confident that the appellant was sentenced on the basis of the evidence alone. *Id*.

We need not address the waived errors separately from the non-waived error as the appellant was not prejudiced by trial counsel's sentencing arguments. Accordingly, he therefore was likewise not prejudiced by the military judge's failure to interrupt the

arguments or issue a curative instruction or by his trial defense counsel's failure to object to these arguments. *See Strickland*, 466 U.S. at 687.

## D.  Erroneously Admitted Victim Impact Testimony

Apart from his trial defense counsel's failure to object to victim impact testimony during sentencing, the appellant also alleges that the military judge committed plain error by admitting testimony in the form of characterizations of the offenses of which the appellant was convicted.  Because no objection was raised at trial, we review a claim of erroneous admission of evidence for plain error. *United States v. Hardison*, 64 M.J. 279, 281 (C.A.A.F. 2007).  "The plain error standard is met when '(1) an error was committed; (2) the error was plain, or clear, or obvious; and (3) the error resulted in material prejudice to substantial rights.'" *United States v. Maynard*, 66 M.J. 242, 244 (C.A.A.F. 2008) (citing *Hardison*, 64 M.J. at 281).  The appellant bears the burden of demonstrating the three prongs of the test are met. *Id.*

Pursuant to R.C.M. 1001(b)(4), trial counsel may present evidence as to any aggravating circumstances directly relating to or resulting from the offenses of which the accused has been found guilty.  As previously discussed in the related ineffective assistance of counsel issue, the family members of the deceased victims testified at length regarding the emotional impact of the appellant's crimes.  In a few isolated comments—made in the context of describing their own emotional pain—some family members characterized the appellant's crimes.  JS's sister, CB, for example, described her pain at knowing "[t]hey died alone, suffering," while JS's father at one point referred to the appellant's crimes as "the biggest act of cowardice."  Regarding his own mental anguish, JS's father added:  "No human being ought to die that way.  No human being deserves this.  Not in a civil society.  This is unacceptable."

Admission of the statements characterizing the appellant's crimes constituted error under *Booth* and *Payne*, even though they were relatively brief and made in the context of the witnesses describing how the appellant's crimes impacted them.  We assume, without specifically finding, that the error was plain and obvious. *Compare People v. Martinez*, 224 P.3d 877, 960 (Cal. 2010) (finding no error in admission of deceased victim's sister's testimony that "what hurt her most was thinking of 'all that [deceased victim] went through' and how she 'suffered that night' before her death"), *with Bernard*, 299 F.3d at 480-81 (finding error, though no prejudice, in admission of deceased victim's mother's testimony, directed at defendants, that "you couldn't even see the innocence of the two you've killed" and father's testimony that the victims "were tragically and recklessly stolen" and "it was just a useless act of violence and a total disregard of life").

Nevertheless, the appellant has failed to demonstrate these comments resulted in any material prejudice. *Cf. Payne*, 501 U.S. at 832 ("[S]urely this brief statement did not

inflame [the jury's] passions more than did the facts of the crime . . . .") (O'Connor, J., concurring). Consequently, we find relief on these grounds unwarranted.

## V. Cumulative Error

We review de novo the cumulative effect of all plain errors and preserved errors. *United States v. Pope*, 69 M.J. 328, 335 (C.A.A.F. 2011) (citing *United States v. Gray*, 51 M.J. 1, 61 (C.A.A.F. 1999)). "Under the cumulative-error doctrine, 'a number of errors, no one perhaps sufficient to merit reversal, in combination necessitate the disapproval of a finding.'" *Id.* (citing *United States v. Banks*, 36 M.J. 150, 170-71 (C.M.A.1992)). We are to reverse only if we find any cumulative errors to have denied the appellant a fair trial. *Pope*, 69 M.J. at 335.

In the case before us, the evidence in aggravation was powerful, plentiful, and persuasive. Against that overwhelming evidence, we balance the errors identified herein. On balance, we find the impact of such errors, considered cumulatively, along with all argued deficiencies in trial defense counsel's effectiveness, not to have denied the appellant a fair trial. *See United States v. Dollente*, 45 M.J. 234, 242 (C.A.A.F. 1996) ("Courts are far less likely to find cumulative error . . . when a record contains overwhelming evidence of a defendant's guilt.").

## VI. Post-Trial Issues

### A. Post-Trial Challenge of Military Judge

The appellant asserts that the military judge erred in denying a post-trial motion challenging the military judge for cause. One basis for the post-trial challenge was that the military judge did not satisfy the regulatory requirements to sit as an Air Force military judge. The crux of the appellant's argument is that, because the military judge failed to maintain his authority to practice law in Florida, he was not qualified to be designated as a Judge Advocate under AFI 51-103, *Designation and Certification of Judge Advocates*, ¶ 2.1 (7 December 2004).[35]

Consistent with our ruling in *United States v. Maher*, 54 M.J. 776 (A.F. Ct. Crim. App. 2001), *aff'd*, 55 M.J. 361 (C.A.A.F. 2001), and our previous Order denying the appellant's Motion to Compel Documents relating to the military judge's licensing status, we find the appellant's claim to be meritless.

---

[35] In consideration of this issue, this court has taken judicial notice of Air Force Instruction 51-103, *Designation and Certification of Judge Advocates* (7 December 2004), and the Rules Regulating the Florida Bar.

## B. Assistant Trial Counsel's Authentication of the Record

The appellant asserts that remand of the case is necessary to correct what is alleged to be an error in the record of trial appearing in the certificate of compliance authenticating the record of the post-trial Article 39(a), UCMJ, hearing. Specifically, the appellant alleges Capt RH improperly signed the certificate as "trial counsel," when in reality, his role was as an assistant trial counsel during a post-trial Article 39(a), UCMJ, session. Additionally, the appellant alleges that Capt RH improperly backdated his signature to reflect a date of "7 Jul 09," when he believes Capt RH's review of the record was not complete at that time.

The appellant previously raised this exact issue in a post-trial motion to remand the record of trial for correction of the certificate of compliance with R.C.M. 1103(i)(1)(A). With respect to this issue, the appellant asserts the panel ignored certain facts. We disagree. Having reviewed the record of trial again and in accordance with our previous ruling on this issue, we find Capt RH was an assistant trial counsel at the post-trial Article 39(a), UCMJ, session and thus was a proper party to sign the certificate of review. R.C.M. 502(d)(5); R.C.M. 1103(i)(1)(A); Air Force Manual 51-203, *Records of Trial*, ¶ 12.1 (17 November 2009); *United States v. Credit*, 4 M.J. 118, 119 n.5 (C.M.A. 1977). We further find the record indicates Capt RH's review was completed on 7 July 2009. The e-mail traffic presented between Capt RH and trial defense counsel fails to establish the contrary. As such, we find no error.

## C. Post-Trial Delay

The appellant alleges three errors relating to the post-trial processing of his case and seeks relief in the form of affirming a sentence of life without the possibility for parole, total forfeitures, reduction to the grade of E–1, and a dishonorable discharge. We find no error.

First, the appellant asserts that a lengthy period of confinement on death row followed by execution constitutes cruel and unusual punishment in violation of the Eighth Amendment and Article 55, UCMJ, 10 U.S.C. § 855. Essentially he argues that the mental anxiety felt during the delay, the anticipation of execution, and his inability to avoid appellate review of his sentence[36] have served to increase his sentence to a degree that is unconstitutional. We disagree.

Whether a punishment constitutes cruel and unusual punishment under the Eighth Amendment or cruel or unusual punishment under Article 55, UCMJ, is a question of law this Court reviews de novo. *United States v. White*, 54 M.J. 469, 471 (C.A.A.F. 2001).

---

[36] Article 61, UCMJ, 10 U.S.C. § 861.

While this Court recognizes there has been a lengthy delay between the convening authority's approval of his sentence and our ruling on the appellate issues, we find this delay harmless beyond a reasonable doubt. As appellant points out in his brief, no American court has ruled that a lengthy period of confinement followed by execution is impermissible, and we decline to adopt such a standard based upon the delay in this case.

Second, the appellant asserts that his Fifth Amendment[37] right to be free from unreasonable post-trial delay has been violated. The Fifth Amendment requires that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law." We note that the overall delay between the time the case was docketed at the Air Force Court of Criminal Appeals and completion of review by this Court is facially unreasonable. Because the delay is facially unreasonable, we examine the four factors set forth in *Barker v. Wingo*, 407 U.S. 514, 530 (1972): "(1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice." *United States v. Moreno*, 63 M.J. 129, 136 (C.A.A.F. 2006). When we assume error but are able to directly conclude that any error was harmless beyond a reasonable doubt, we do not need to engage in a separate analysis of each factor. *See United States v. Allison*, 63 M.J. 365, 370 (C.A.A.F. 2006). This approach is appropriate in the appellant's case. The post-trial record contains no evidence that the delay has had any negative impact on the appellant. Having considered the totality of the circumstances and the entire record, we conclude that any denial of the appellant's right to speedy post-trial review and appeal was harmless beyond a reasonable doubt. Finally, the appellant argues the excessive post-trial delay in this case warrants relief under *United States v. Tardif*, 57 M.J. 219 (C.A.A.F. 2002). While we acknowledge this authority to grant relief absent prejudice to the defense, we decline to do so.

## VII. Assignments of Error Regarding New Convening Authority Action

The appellant alleges four errors each requiring a new convening authority action be issued in this case. The appellant first asserts that a new convening authority action is required because the original convening authority's action was based on a non-verbatim record of trial.

Whether a record of trial is substantially verbatim is a question of law this Court reviews de novo. *United States v. Henry*, 53 M.J. 108, 110 (C.A.A.F. 2000). "A substantial omission renders a record of trial incomplete and raises a presumption of prejudice that the Government must rebut." *Id.* at 111 (citations omitted). Minor errors and omissions in a record of trial are not prejudicial and do not require a new staff judge advocate recommendation (SJAR) or action by the convening authority. *United States v. Loving*, 41 M.J. 213, 289 (C.A.A.F. 1994). Whether errors require a new SJAR and

---

[37] U.S. CONST. amend. V.

action turns on the nature of the errors and whether the errors raise a "reasonable possibility" that the errors affected the convening authority's decision or the SJAR. *Id.*

In preparing the SJAR pursuant to R.C.M. 1106, the SJA indicated that he had "considered all matters in the record of trial." In the Addendum to the SJAR, the SJA advised the convening authority that he "may consider the record of trial." In taking his action, the convening authority noted that he "carefully considered the attached matters," which included the record of trial. Trial defense counsel did not challenge the accuracy of the record of trial.

When this case was originally before this Court, the appellant identified more than 4,000 errors in the trial transcript. The Government subsequently had the record reviewed by two court reporters who identified over 5,000 errors in the trial transcript. On 20 March 2008, this Court ordered the case remanded to the convening authority for correction of the trial transcript. In the same order, this Court denied the appellant's motion to set aside the convening authority's action and specifically commented:

> We would note that not all omissions in the record require a new recommendation and action. This question will turn on the nature of the omission and whether the defects raise a 'reasonable possibility' that the defect affected the convening authority's decision or the SJA recommendation. *See United States v. Loving*, 41 M.J. 213, 289 (C.A.A.F. 1994). This question is best answered by the convening authority and his SJA after the record is corrected in accordance with R.C.M. 1104(d)(2).

Upon remand, the trial transcript was corrected by the preparation of an entirely new transcript. The military judge adopted this new transcript by means of a certificate of correction.

Upon review of the errors and corrections to the transcript, on 5 October 2009 both the new SJA and convening authority determined that no new recommendation or action was necessary. The convening authority purported:

> I have determined that any omissions or defects found in the original transcript of the original proceedings . . . do not raise a reasonable possibility that any such omissions or defects affected the original convening authority's decision or the Staff Judge Advocate Recommendation. Accordingly, I have determined that no new recommendation or action is necessary in this case, and that the Record of Trial is substantially verbatim.

The appellant claims the errors in the original transcript were both quantitatively and qualitatively substantial, rendering the original transcript non-verbatim. We disagree. Considering our review of the errors in the original transcript, just about all of them were minor, inconsequential errors such as grammatical and spelling errors. Despite the relatively large number of errors, they did not change the overall substance of the transcript nor did they affect the ability to ascertain the witnesses' testimony, objections and arguments of counsel, or the military judge's rulings and instructions.

Further, although the SJA was required to use the record of trial in the preparation of the SJAR, the SJA was not required to examine the record for legal errors. R.C.M. 1106. Additionally, as noted in *Loving*, although the convening authority indicated that he reviewed the record of trial, he was not required to do so. *Loving*, 41 M.J. at 289; R.C.M. 1107(b)(1); R.C.M. 1107(c), Discussion.

Although there were numerous minor errors in the original trial transcript, the transcript was still substantially verbatim. Considering the heinous nature of the appellant's crimes, there was no reasonable possibility that the errors affected the convening authority's decision to approve the adjudged sentence. Finally, having reviewed the revised transcript, both the new SJA and convening authority determined that a new SJAR and action were not necessary. Accordingly, the appellant was not prejudiced by these errors and his request for a new action is without merit.

The appellant next claims that a new convening authority action is required because the original SJA, Col JR, who prepared the SJAR, was not disinterested and should not have prepared the SJAR. The specific bases for his claim that the SJA was not disinterested are: (1) the SJA made a silent promise to himself for justice after viewing the murder scene; (2) the SJA was present at trial, communicated with trial counsel, and sat in a particular place in the courtroom; and (3) the SJA had a desire to issue the SJAR before he retired.

Whether a staff judge advocate is disqualified from participating in the post-trial review process is a question of law that we review de novo. *United States v. Taylor*, 60 M.J. 190, 194 (C.A.A.F. 2004). The appellant "has the initial burden of making a prima facie case for disqualification." *Id.* (internal quotation marks and citation omitted). Our court has previously explained that an "SJA is disqualified if she or he has previously served in a conflicting capacity or has other than an official interest in the same case." *United States v. Womack*, ACM S31212, unpub. Op. at 1 (A.F. Crim. Ct. App. 3 October 2007) (internal quotation marks and citation omitted). Our Court also explained that the "SJA, or legal officer, may supply general information to the trial counsel, without having such advice transform him into a prosecutor so as to make him ineligible thereafter to advise the convening authority." *Id.* It is only when "there is extensive participation in a trial that would cause a disinterested observer to

doubt the fairness of the post-trial proceedings, that person is disqualified." *Id.* The phrase "other than an official interest" has been interpreted to mean "a personal interest or feeling in the outcome of a particular case." *United States v. Sorrell*, 47 M.J. 432, 433 (C.A.A.F. 1998) (internal quotation marks and citation omitted). As it relates to allegations of a disinterested SJA, our superior court has stated it has "no illusions that a staff judge advocate as the legal adviser to the convening authority is disinterested in the successful prosecution of those cases referred by the convening authority for trial." *United States v. Caritativo*, 37 M.J. 175, 181 (C.M.A. 1993). However, if the SJA's "conduct cannot reasonably be construed as constituting an improper influence or is otherwise ineffectual, no corrective action is normally required." *Id.*

Concerning the silent promise of the SJA, the appellant relies on an excerpt from an article written after completion of the trial which read: "Col [JR], the Staff Judge Advocate, Warner Robins Air Logistics Center, vividly remembers examining the crime scene that morning and silently promising that the perpetrator would be brought to justice." In a post-trial declaration, lead trial counsel, Col VS,[38] states, "During our brief interview with Col [JR], he did comment on his promise for justice. During our conversation, he did not define what justice was and he did not state what he thought the outcome of any potential case should be. . . . I would note when the comment was made by Col [JR], no-one had identified [the appellant] as a suspect and he had not been apprehended." Col JR states in his post-trial declaration, "In any event, I certainly did not make a crime scene vow to avenge persons then dead, whom I had never known, and at the time and place had very little idea about what had happened to them or where culpability rested. I certainly did not presuppose that justice would include pursuit of a capital case." Col VS confirms in his declaration that Col JR always maintained he did not know if he would recommend the case be referred as capital or otherwise. Likewise, regarding post-trial, Col VS states that Col JR maintained he did not know what his ultimate recommendation would be to the convening authority.

The second alleged basis that Col JR was not a disinterested party is that he attended most days of the trial, communicated with trial counsel, and sat near the victims' family members. According to the post-trial declarations, the appellant is correct that Col JR attended significant portions of the trial, although the exact number of days is unknown. When he was in attendance, Col JR sat on trial counsel's side of the courtroom, near the families of the victims. Col JR also consulted with trial counsel during breaks and was observed tasking one of the prosecutors. However, according to his post-trial declaration, Col JR attended the trial because Public Affairs asked that he be the spokesperson to the media attending the trial and to answer any questions that they may have. He sat on the prosecution side of the courtroom because the courtroom doorway to the hall was on that side and he could discretely enter or leave the courtroom,

---

[38] Colonel VS was a Lieutenant Colonel at the time this declaration would have been made.

as necessary. Further, he did consult with trial counsel during recesses, but it was usually to address logistical issues and did not involve trial strategy. He did on one occasion hand a note to Col VS to let him know that he was leaving for the day, and he tasked Capt JW to provide him with daily updates.

The final allegation that Col JR was not disinterested is that he requested the record of trial be completed in an expedited fashion so that he could issue the SJAR prior to his retirement. The appellant was sentenced on 13 October 2005. According to the post-trial declaration of the court reporter, Ms. HS, sometime around the spring of 2006, Col JR announced that he would be retiring, and the convening authority would be reassigned that summer. Once this announcement was made, Ms. HS states that the transcript became a much higher priority, and it was discussed during weekly meetings. Col JR set a deadline of 8 May 2006 for completion of the record of trial, which was forwarded to the military judge on 13 May 2006. The SJAR was issued by Col JR on 30 May 2006.

In his post-trial declaration, Col JR disputes the appellant's assertion that his desire for completion of the record of trial was for anything other than official reasons. Col JR explained, "I am confident that I never asked or wanted anyone post-trial to accelerate the record of trial at the compromise of quality, nor would I have tolerated the idea." He further explained:

> I would have willingly let another SJA make the recommendation in this case. I gave the deepest and fullest consideration I could muster to each and every decision, recommendation, and advice I made or gave, and would have avoided the occasions to do so had I not been duty bound to do that which is required of an SJA at the times I had that appointment.

Col JR ultimately denies having a personal interest in this case.

We have reviewed the appellant's allegations and find that the bases neither independently nor collectively establish that Col JR had other than an official interest in this case and that he was not disqualified from making his required R.C.M. 1106 recommendation. Although upon viewing the crime scene, Col JR silently promised the perpetrator would be brought to justice, the appellant has not shown that Col JR caused him to be wrongfully charged for his crimes, unfairly denied his requests for witnesses, or that "justice" necessarily meant the pursuit of a capital case. Likewise, we do not find that Col JR's attendance at the appellant's trial indicates he had a personal interest in the outcome of this case. Considering the media interest surrounding the appellant's trial, it was reasonable for Col JR to attend the trial. Also, he discretely sat near the exit door and did not direct the prosecution on its trial strategy. Finally, Col JR's desire to have the record of trial completed and the SJAR issued prior to his retirement is likewise

reasonable under the circumstances of this case. We note that the record of trial was not completed until seven months after completion of the trial. Further, the Addendum to the SJAR, which was the ultimate recommendation made to the convening authority, was not signed by Col JR, but rather by his successor, Col WM, on 6 July 2006.

We further find that a post-trial hearing pursuant to *United States v. Ginn*, 47 M.J. 236 (C.A.A.F. 1997) is not warranted as this issue can be resolved from the record of trial and the post-trial declarations.

In conclusion, the appellant has failed to show that a new convening authority's action is required as a result of the alleged actions of Col JR.

The appellant next asserts that a new convening authority's action is required because the original convening authority's action was based on a different jurisdictional vehicle than is currently before this Court.

Jurisdiction is a legal question we review de novo. *United States v. Daly*, 69 M.J. 485, 486 (C.A.A.F. 2011).

The essence of the appellant's assertion is that the original record of trial prepared under Article 54, UCMJ, 10 U.S.C. § 854, which was used by the SJA to prepare his recommendation under Article 60, UCMJ, 10 U.S.C. § 860, which was subsequently transmitted to TJAG pursuant to Article 65, UCMJ, 10 U.S.C. § 865, and then referred to this Court pursuant to Article 66(b), UCMJ, 10 U.S.C. § 866(b), is not the same record of trial that this Court has now used to perform our Article 66(c), UCMJ, 10 U.S.C. § 866(c) review. Therefore, the appellant claims that we do not have jurisdiction to exercise our Article 66(c), UCMJ, authority. We disagree.

As stated above, when this Court remanded the case for correction of the original record of trial, the decision regarding whether a new action was required was left to the convening authority. As stated above, almost all of the errors were minor in nature. On 18 May 2009, after the record of trial was corrected, the military judge conducted a post-trial Article 39(a), UCMJ, hearing to resolve any outstanding discrepancies in the record of trial. On 20 August 2009, the military judge issued a Certificate of Correction. Thereafter, the new SJA and convening authority determined a new SJAR and action were not required because "any omissions or defects found in the original transcript of the original proceedings . . . do not raise a reasonable possibility that any such omissions or defects affected the original convening authority's action or Staff Judge Advocate's Recommendation."

Contrary to the appellant's assertion, the Government did not create an entirely new transcript, but instead, created a new transcript incorporating the changes agreed

upon by the parties and ultimately resolved and approved by the military judge. As we held above, despite all of the errors and discrepancies, the original record of trial was substantially verbatim, and the errors did not affect the convening authority's decision to approve the adjudged sentence. Therefore, no new action was required as a result of the corrected record, and this Court maintains jurisdiction to conduct our review under Article 66(c), UCMJ.

The appellant's fourth and final asserted error which he alleges requires a new convening authority action is that trial defense counsel provided ineffective assistance of counsel during the post-trial clemency phase. Specifically, trial defense counsel failed to investigate the appellant's closed head injury and failed to present evidence of the motorcycle accident and corresponding head injury to the convening authority. In this assignment of error, the appellant essentially renews his previous argument that trial defense counsel were ineffective in not presenting evidence of the motorcycle accident and a possible TBI. The appellant again argues that because the appellant's expert psychologist, Dr. BM, performed poorly during the *Daubert*[39] hearing, this should have given his trial defense counsel cause to doubt his earlier advice that further testing concerning a TBI would not reveal potentially mitigating evidence. Instead, his trial defense counsel should have revisited this issue. According to the appellant, his trial defense counsel should have heeded the advice of the defense mitigation specialist, Ms. CP, who recommended that they contact Dr. FW, who has opined in a post-trial declaration that he believes that there is a reasonable possibility that the appellant suffered a TBI.

We review claims of ineffective assistance of counsel de novo. *Anderson*, 55 M.J. at 201. To prevail on a claim of ineffective assistance of counsel, an appellant must show both that the counsel's performance was deficient and that the deficiency resulted in prejudice. *Strickland*, 466 U.S. at 687. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686. A successful ineffectiveness claim requires a finding of both deficient performance and prejudice; there is no requirement that we address "both components of the inquiry if the defendant makes an insufficient showing on one." *Id*. at 697. We are not to assess counsel's actions through the distortion of hindsight; rather we are to consider counsel's actions in light of the circumstances of the trial and under the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id*. at 689 (internal quotation marks and citation omitted).

---

[39] *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, (1993).

The prejudice prong is lower in a post-trial ineffective assistance of counsel context than for allegations of ineffective assistance of counsel during trial. *United States v. Lee*, 52 M.J. 51, 53 (C.A.A.F. 1999). Because the convening authority's clemency power is highly discretionary, an appellant gets the benefit of the doubt and need only make "some colorable showing of possible prejudice." *Id.* (internal quotation marks and citation omitted).

The Government likewise renews its position that the appellant's trial defense counsel did not provide ineffective assistance of counsel. The Government reiterates its position that Dr. BM's performance during the *Daubert* hearing did not give trial defense counsel cause to doubt his earlier advice concerning a TBI. The *Daubert* hearing focused on Dr. BM's qualifications to testify as an expert regarding the impact of adrenaline upon the appellant's ability to premeditate the charged murders. Although the military judge ruled that Dr. BM was qualified to testify on the subject, the trial counsel was able to elicit from Dr. BM that there were limited studies to support his theory. However, the *Daubert* hearing had nothing to do with the motorcycle accident and is separate and distinct from his opinion on TBIs.

The Government likewise argues that both Dr. AM, a board certified forensic psychiatrist who conducted the sanity board to assess the appellant's mental capacity, and Dr. CR, the Government's expert psychologist, supported Dr. BM's opinion that the appellant's motorcycle accident did not result in any cognitive impairment. In his report from the sanity board evaluation, Dr. AM wrote:

> [The appellant] has no current medical concerns. He does have a history of a closed head injury on February 23, 2004 from a motorcycle accident. However, a medical record review indicates that the CT scan of the brain was negative for any significant changes. [The appellant] reports no significant problems after the accident.

As previously discussed, Dr. CR evaluated the appellant during the trial to prepare the Government to counter any testimony offered by Dr. BM. From this evaluation, Dr. CR found no signs of any cognitive impairment or neurological impairment. Additionally, according to Dr. CR, the appellant denied ever having had difficulty with anger, rage, aggressive behavior, or impulse control. The appellant attributed his "life problems" to an overly controlling mother and his disciplinarian-lax father.

The Government also submitted the post-trial declaration of then Capt DW, who was the trial defense counsel primarily responsible for preparing the appellant's clemency submission. According to Capt DW:

When I was preparing [the appellant's] clemency case, I focused entirely on providing evidence of [the appellant's] remorse and rehabilitation potential since I believed this was our most likely method of obtaining relief from the convening authority. My strategy was to humanize [the appellant] and demonstrate that he was someone who had acted out of character that evening of the murders. I also wanted to show the convening authority the vast support network [the appellant] had available to help him be rehabilitated if he were given the chance to spend life in prison rather than sentenced to death.

Concerning the motorcycle accident, Capt DW states:

I did not consider using or raising the motorcycle accident as part of the clemency submission. In dealing with convening authorities as both a chief of military justice advising on clemency as well as a defense counsel requesting relief, I found that convening authorities were particularly dismissive of arguments that included anything they might view as an attempt to make excuses. I did not want to include arguments in my personal memorandum that could possibly undermine the effort to demonstrate [the appellant's] remorse and rehabilitative potential. The character witnesses who provided letters could have discussed the accident, however, if they felt they wanted to in the course of writing their letters.

Consistent with his stated objective, Capt DR submitted 43 character letters from the appellant's family, relatives, friends, and former teachers. All of the letters requested that the convening authority grant clemency by reducing his sentence to confinement for life. The letters characterized the appellant as a loving brother and son and someone who felt religion was important. Many of the letters indicated the appellant was raised in a good family with strong Christian values and that he would be a positive influence on others in confinement.

We find that the appellant has not shown he was prejudiced by his trial defense counsel's failure to submit evidence of his motorcycle accident to the convening authority. Similar to their sentencing strategy, trial defense counsel tried to humanize the appellant and show he had some rehabilitative potential preventing death. Despite this sound and reasonable approach, the members sentenced him to death, and the convening authority elected not to grant clemency. Considering the totality of the clemency submission, along with the post-trial declarations and the overwhelming evidence of the horrific murders and attempted murder committed by the appellant, even under the lesser standard of "making some colorable showing of possible prejudice," evidence of a possible TBI would not have changed the convening authority's decision in this case.

## VIII.  Systemic Issues

The appellant next raises the four following "systemic" issues:  (1) the Supreme Court's decision in *Ring v. Arizona* requires that the members find that aggravating circumstances substantially outweigh mitigating circumstances beyond a reasonable doubt; (2) based on the Supreme Court's reasoning in *Ring v. Arizona*, Congress unconstitutionally delegated to the President the power to enact the functional equivalent of elements of capital murder, a purely legislative function; (3) the standard of proof for aggravating circumstances in R.C.M. 1004(b)(4) violates the appellant's right to due process under the Fifth, Sixth, and Eighth Amendments because the facts that form the basis for a determination that leads to the death sentence must be determined by the members beyond a reasonable doubt; and (4) the sentence of death is unlawful because no statute or regulation prescribes a method of execution.

We have reviewed these issues and find them to be without merit.

The Supreme Court decided *Ring v. Arizona*, 536 U.S. 584 (2002), three years prior to the appellant's court-martial.  In *Ring*, the defendant was convicted in Arizona state court of first-degree murder, armed robbery, and related charges.  Under Arizona law, Ring could not be sentenced to death, the statutory maximum penalty for first-degree murder, unless further findings were made by a judge conducting a separate sentencing hearing.  The judge at that stage must determine the existence or nonexistence of statutorily enumerated "aggravating circumstances" and any "mitigating circumstances." A sentence to death could be imposed only if the judge found at least one aggravating circumstance and no mitigating circumstances sufficiently substantial to call for leniency. The sentencing judge in *Ring*, after conducting such a hearing, imposed the death sentence.  The judge found two aggravating factors; one, that the offense was committed for pecuniary gain, and two, that it was committed in an especially heinous, cruel, or depraved manner.  The judge found one mitigating factor, Ring's minimal criminal record, and ruled that it did not call for leniency.

Ring appealed, and the Arizona Supreme Court affirmed his conviction and sentence.  The Supreme Court then granted his petition for writ of certiorari.  The Court held that the Arizona statute, which allowed a sentencing judge to find an aggravating circumstance necessary to impose the death penalty, violated the Sixth Amendment right to a jury trial in capital prosecutions.  *Ring*, 536 U.S. at 609.  In reaching this holding, the Court stated:  "The right to trial by jury guaranteed by the Sixth Amendment would be senselessly diminished if it encompassed the factfinding necessary to increase a defendant's sentence by two years, but not the factfinding necessary to put him to death. We hold that the Sixth Amendment applies to both."  *Id*.  The Court further stated that because "Arizona's enumerated aggravating factors operate as 'the functional equivalent

of an element of a greater offense,' the Sixth Amendment requires that they be found by a jury." *Id*. (quoting *Apprendi v. New Jersey*, 530 U.S. 466, 494 (2000)).

In addition to *Ring*, the appellant's arguments implicate certain sentencing provisions of the Rules for Courts-Martial. Rule for Courts-Martial 1004(b)(4) states, in part, that a sentence of death may not be adjudged unless:

(A) The members find that at least one of the aggravating factors under subsection (c) existed;

(B) Notice of such factor was provided in accordance with paragraph (1) of this subsection[40] and all members concur in the finding with respect to such factor; and

(C) All members concur that any extenuating or mitigating circumstances are substantially outweighed by any aggravating circumstances admissible under R.C.M. 1001(b)(4), including the factors under subsection (c) of this rule.

R.C.M. 1004(c) requires that before adjudging a sentence of death, the members must find, beyond a reasonable doubt, one or more of the aggravating factors listed in subsections (1) – (11) of that rule.

In addition, R.C.M. 1001(b)(4) sets forth the aggravating circumstances trial counsel may present during sentencing and states, in part:

Evidence in aggravation includes, but is not limited to, evidence of financial, social, psychological, and medical impact on or cost to any person or entity who was the victim of an offense committed by the accused and evidence of significant adverse impact on the mission, discipline, or efficiency of the command directly and immediately resulting from the accused's offense. In addition, evidence in aggravation may include evidence that the accused intentionally selected any victim or any property as the object of the offense because of the actual or perceived race, color, religion, national origin, ethnicity, gender, disability, or sexual orientation of any person.

---

[40] At the time of trial, R.C.M. 1004(b)(1) required trial counsel to give the defense written notice, prior to arraignment, of which aggravating factors the prosecution intended to prove. The rule was later amended to further provide that the convening authority "shall indicate" in the referral block of the charge sheet that the case will be tried as a capital case. *See* Historical Executive Orders, *Manual for Courts-Martial, United States*, A25-79 (2008 ed.).

We first address issues 1 and 3 because the appellant raises similar arguments to support his positions. In accordance with R.C.M. 1001(b)(4) and 1004(b)(4), the military judge instructed the members as follows:

> All of the members of the court must agree beyond a reasonable doubt that one or more of the aggravating factors existed at the time of the offenses or resulted from the offenses. . . .

> . . . If you fail to find unanimously that at least one aggravating factor existed, then you may not adjudge a sentence of death. However, if you do find by unanimous vote that at least one aggravating factor existed, then you proceed to the next step.

> In this next step, you may not adjudge a sentence of death unless you unanimously find that any and all extenuating and mitigating circumstances are substantially outweighed by any aggravating circumstances, including the factor or factors as you have found existed in the first step of this procedure. Thus, in addition to the aggravating factors that you have found by unanimous vote, you may consider but are not limited to considering the following aggravating circumstances: Testimony concerning the mental and physical pain suffered by [SrA AS and JS] during the crimes; testimony concerning the physical and mental pain suffered by [SSgt JK] while recovering from his injuries; testimony concerning the mental, physical, and emotional impacts the crimes had on the victims, their families, and their friends; the nature of the weapon used in the commission of the offense; the fact that the offense occurred on base and in base housing; and the fact that the accused wore his military battle dress uniform to commit the crime.

> You must also consider all evidence in extenuation and mitigation and balance them against the aggravating circumstances, using the test that I've previously instructed you on. Thus, you should consider but are not limited to considering the following extenuating and mitigating circumstances: The accused's age and maturity at the time of the court-martial; the accused's military records as described in his Enlisted Performance Reports and in the Personal Data Sheet, which is Prosecution Exhibit 62; the accused's unsworn statement; the accused's background as described in character statements and witness testimony submitted on behalf of the accused; the duration and condition of the accused's pretrial confinement since being placed into pretrial confinement; the accused's express desire to live and for future rehabilitation; the accused's religious

107                                                                                   ACM 36785 (recon)

beliefs; that the accused had no history of physical violence before this case; and that the accused has entered into Stipulations of Fact and Testimony which save the government time and expense during the course of this trial.

We review the completeness of a military judge's sentencing instructions de novo. *United States v. Forbes*, 61 M.J. 354, 357 (C.A.A.F. 2005); *see also United States v. Miller*, 58 M.J. 266, 268 (C.A.A.F. 2003). Such instructions are examined as a whole to determine if they pass constitutional muster. *United States v. Simoy*, 46 M.J. 592, 613 (A.F. Ct. Crim. App. 1996), *rev'd in part on other grounds*, 50 M.J. 1 (C.A.A.F. 1998).

The appellant argues that the military judge improperly instructed the members. He asserts that the Supreme Court's decision in *Ring* required the members to find that the aggravating circumstances substantially outweighed mitigating circumstances beyond a reasonable doubt because the members are making a "finding of fact." The appellant also extends this argument to say that *Ring* further requires the members to first find the aggravating circumstances exist beyond a reasonable doubt before they can even be weighed against the mitigating circumstances.[41] We disagree with the appellant.

We do not read *Ring* as broadly as does the appellant. In *Ring*, the Supreme Court addressed a statutory aggravating circumstance, concluding it was a functional element that must be proven to the jury beyond a reasonable doubt. The statutory factors in this case are those set forth in R.C.M. 1004(c). *Ring* does not require the jury, or in our case the members, to apply the reasonable doubt standard to the balancing or weighing of aggravating and mitigating circumstances as set forth in R.C.M. 1004(b)(4)(C) or to initially find that the aggravating circumstances admissible under R.C.M. 1001(b)(4) exist beyond a reasonable doubt before they are weighed against the mitigating factors. This conclusion is consistent with cases from our superior court and from this Court, and we find nothing in the Supreme Court's decision in *Ring* that requires us to extend its holding beyond the statutory aggravating factors when conducting the weighing/balancing test. *See United States v. Loving*, 41 M.J. 213, 278-79, 291 (C.A.A.F. 1994); *Simoy*, 46 M.J. at 613.[42] Thus, we find the standard for considering and

---

[41] The relevant language of R.C.M. 1004(b)(4) provides that death may not be adjudged unless, inter alia, "All members concur that any extenuating or mitigating circumstances are substantially outweighed by any aggravating circumstances admissible under R.C.M. 1001(b)(4), including the factors under subsection (c) of this rule." R.C.M. 1004(b)(4)(C).

[42] In *United States v. Simoy*, 46 M.J. 592 (A.F. Ct. Crim. App. 1996), *rev'd in part on other grounds*, 50 M.J. 1 (C.A.A.F. 1998), this Court distinguished between the greater burden of proof required for the statutory aggravating factors under R.C.M. 1004(b)(2) and the absence of such a requirement for aggravating circumstances under R.C.M. 1001(b)(4):

> Under R.C.M. 1001(b)(4), the prosecution may always present evidence of aggravating circumstances directly relating to or resulting from the offenses of which the accused is convicted.

weighing aggravating and mitigating circumstances found in R.C.M. 1001(b)(4) and 1004(b)(4)(C) is valid. As such, we find the military judge properly instructed the members consistent with R.C.M. 1004(b)(4), conclude that the holding in *Ring* is not dispositive of these issues, and find no error, plain or otherwise.

Relying on *Ring*, the appellant next asserts that Congress unconstitutionally delegated to the President the power to enact the functional equivalent of elements of capital murder, as set forth in R.C.M. 1004. He asserts that the entire capital sentencing procedure in the military must be re-evaluated in light of *Ring* because the aggravating factors must now be treated as elements of the capital murder offense, which must be set forth by Congress, not the President. We disagree.

We review de novo whether the President's promulgation of R.C.M. 1004 violates separation of power. *See Mistretta v. United States*, 488 U.S. 361 (1989). The United States Supreme Court addressed the power of Congress to delegate to the President its power to establish aggravating factors as part of the military capital sentencing scheme. *Loving v. United States*, 517 U.S. 748, 756-74 (1996). Loving, an Army private, murdered two taxicab drivers and attempted to murder a third, who escaped. A general court-martial convicted him of premeditated murder and felony murder under Article 118, UCMJ. During the sentencing phase of the trial, the members found three aggravating factors and sentenced Loving to death. The Army Court of Criminal Appeals (formerly the Army Court of Military Review) and the United States Court of Appeals for the Armed Forces affirmed. *United States v. Loving*, 41 M.J. 213 (C.A.A.F. 1994). Relying on *United States v. Curtis*, 32 M.J. 252 (C.M.A. 1991), our superior court rejected Loving's arguments that the President lacked authority to

---

In a capital case, the prosecution also presents evidence under R.C.M. 1004(b)(2) of any aggravating factor which authorizes the death penalty. While these two types of evidence sometimes intertwine . . . they do not conflict or amount to a "double counting" of factors.

The aggravating factors of R.C.M. 1004(c) identify the class of murderers eligible for the death penalty in courts-martial. The members must unanimously find beyond a reasonable doubt that the accused fits within that class by finding at least one aggravating factor before it may even consider death. However, once the members find an accused fits within the class eligible for the death penalty, they may also constitutionally consider other aggravating circumstances of the case under R.C.M. 1001(b)(4) in determining whether the accused should be sentenced to death, including the circumstances surrounding any aggravating factors.

Unlike aggravating factors, the members do not have to make findings on whether a particular circumstance is aggravating, extenuating or mitigating. Instead, the trial judge highlights for them various items of evidence which they may consider in determining within which category a particular circumstances falls . . . .

*Simoy*, 46 M.J. at 613 (citations omitted).

promulgate the aggravating factors that enabled the court-martial to sentence him to death. *Id.* at 293. The Supreme Court accepted the case on certiorari and affirmed.

On review before the Supreme Court, Loving argued that the military death penalty scheme exceeded the limits of the delegation doctrine under separation of powers. He posited three arguments: (1) that Congress could not delegate to the President the authority to prescribe aggravating factors in capital murder cases; (2) that even if Congress could delegate such authority, it did not do so by implicit or explicit action; and (3) even if certain actions could be construed as delegations, they lacked an intelligible principle to guide the President's discretion. *Loving*, 517 U.S. at 759.

The Supreme Court rejected Loving's arguments. The Court held that Congress had the flexibility to exercise or share power in certain circumstances, such as when Congress "makes the violation of regulations a criminal offense and fixes the punishment, and the regulations 'confine themselves within the field covered by the statute.'" *Id*. at 768 (citations and alteration omitted). The Court continued: "In the circumstances presented here, so too may Congress delegate authority to the President to define the aggravating factors that permit imposition of a statutory penalty, with the regulations providing the narrowing of the death-eligible class that the Eighth Amendment requires." *Id*.

In addition, the Court also rejected Loving's argument that Congress did not take implicit or explicit action when it delegated authority to the President. In fact, the Court held that Congress exercised its power of delegation in 1950 when it enacted Articles 18, 36(a), and 56, UCMJ, 10 U.S.C. §§ 818, 836(a), 856. The Court found that these Articles "together give clear authority to the President for the promulgation of [R.C.M.] 1004." *Id*. at 770. Finally, the Court upheld the delegation to the President in this case, noting that the President's duties as Commander in Chief require him to take responsible and continuing action over the military, to include courts-martial. As such, the duties delegated to the President to prescribe aggravating factors for capital cases is interlinked with duties already assigned to him by the express terms of the Constitution.[43] *Id*. at 772-73.

---

[43] The Court elaborated by acknowledging that the President can be entrusted to determine what punishments are best suited for the specialized military community, and concluded:

> It would be contradictory to say that Congress cannot further empower [the President] to limit by prospective regulation the circumstances in which courts[-]martial can impose a death sentence. Specific authority to make rules for the limitation of capital punishment contributes more toward principled and uniform military sentencing regimes than does case-by-case intervention, and it provides greater opportunity for congressional oversight and revision.

*Loving v. United States*, 517 U.S. 748, 773 (1996).

We do not read the Supreme Court's opinion in *Ring* as either inconsistent with or overruling its decision in *Loving* or as requiring a scrub of the military capital sentencing scheme. Rather, we agree with the Government that the holding in *Ring* is limited to the Sixth Amendment right to a trial by jury. In *Ring*, the Court did not hold that the aggravating factors are elements of the capital offense itself but are functional elements requiring a jury to find they exist beyond a reasonable doubt. The holding focused on whether the judge, rather than the jury, could find the aggravating factors to impose the death penalty. The Court said "no," explaining that because the enumerated "aggravating factors operate as the 'functional equivalent of an element of a greater offense,' the Sixth Amendment requires that they be found by a jury." *Ring*, 536 U.S. at 609. In the military, R.C.M. 1004 already requires that a panel of members find the existence of aggravating factors beyond a reasonable doubt before a service member may be eligible for the death penalty.

In sum, Congress created the crimes and prescribed the statutory maximum punishment, to include the death sentence, when it enacted the UCMJ. The President narrowed the class of people who would be eligible for the statutory maximum punishment of death. He did so by designating aggravating sentencing factors that must be proved before the maximum punishment may apply. R.C.M. 1004(c). These factors are treated as functional elements because notice must be provided to the accused prior to arraignment, and the factors must be submitted to the panel and proved beyond a reasonable doubt before an accused is eligible for the death penalty. R.C.M. 1004(c). By promulgating R.C.M. 1004, the President was not enacting legislation; rather, he was fulfilling his constitutional duties as Commander in Chief and following his mandate from Congress to prescribe maximum punishments. Thus, we find no error.

The appellant's final argument centers on deficiencies in the form of execution. The appellant cites R.C.M. 1113(d)(1)(A)[44] as stating that a "sentence to death which has been finally ordered executed shall be carried out in the manner prescribed by the Secretary concerned." The appellant argues that his sentence to death is unlawful because no statute or regulation prescribes a method of execution. He asserts that the "Secretary concerned" is the Secretary of the Air Force, who has not designated a method of execution pursuant to R.C.M. 1113(d). According to the appellant, he faces the possibility of being subjected to an unconstitutional form of execution under the Eighth Amendment, which prohibits the infliction of "cruel and unusual punishment," without being able to challenge that form of execution on direct review. Likewise, he argues that he cannot invoke the protections of Article 55, UCMJ,[45] because the Secretary of the Air

---

[44] This rule is now R.C.M. 1113(e)(1)(A). *See* Exec. Order No. 13,468, 73 Fed. Reg. 43, 831 (July 28, 2008) (re-designating subparagraph (d) as subparagraph (e)).

[45] Article 55, UCMJ, 10 U.S.C. § 855, prohibits inflicting "cruel or unusual" punishment upon any person "subject to this chapter."

Force has not designated a method of execution. As a result, the appellant claims that he cannot challenge the method of execution and argues that his sentence to death should be set aside and replaced with confinement for life without parole. We disagree.

Whether the manner in which a sentence is executed constitutes cruel and unusual punishment under the Eighth Amendment or cruel or unusual punishment under Article 55, UCMJ, is a question of law that this Court reviews de novo. *See United States v. Wise*, 64 M.J. 468, 473 (C.A.A.F. 2007).

The United States Supreme Court has held that the lethal injection protocol used by the federal government and several states does not constitute cruel and unusual punishment. *Baze v. Rees*, 553 U.S. 35 (2008). In *Baze*, the Court stated that to constitute cruel and unusual punishment, the execution method must present a "substantial" and "objectively intolerable" risk of serious harm. *Id*. at 50. "[T]he Constitution does not demand the avoidance of all risk of pain in carrying out executions." *Id*. at 47. "Simply because an execution method may result in pain, either by accident or as an inescapable consequence of death does not establish the sort of 'objectively intolerable risk of harm' that qualifies as cruel and unusual." *Id*. at 50.

The Secretary of Defense has appointed the Secretary of the Army as the Executive Agent for Department of Defense Level III corrections and has directed the Secretary of the Army to provide a facility to carry out all executions of military prisoners with approved sentences to death. Department of Defense Directive (DoDD) 1325.04, *Confinement of Military Prisoners and Administration of Military Correctional Programs and Facilities*, ¶ 5.2.5 (17 August 2001) (Certified Current as of 23 April 2007). The Directive also states that the Secretaries of the Military Departments shall "[e]stablish policies and procedures for conducting executions of members of their respective Services having approved sentences to death, and provide oversight responsibility, management, and resources for executions." DoDD 1325.04, ¶ 5.3.7. Although the Secretary of the Air Force is required to establish a procedure for carrying out the death penalty, we find nothing that requires the Secretary to designate the method of execution at the time of sentencing. Thus, we find the appellant's argument to be without merit.

*IX. Summary Assignments of Error*

We have considered the appellant's 57 summary assignments of error. Each makes broad-based attacks on: (1) the role of the convening authority; (2) the court-martial system and procedures; or (3) miscellaneous alleged constitutional violations without further briefing on any of these issues. The majority of the issues presented were previously rejected in *Weiss v. United States*, 510 U.S. 163 (1994), *Solorio v. United States*, 483 U.S. 435 (1987), *Gray*, 51 M.J. 1, *Curtis*, 44 M.J. 106, and

*Loving*, 41 M.J. 213. After consideration of each of the issues, we find them to be without merit. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987) (holding there is no requirement to specifically address each assigned error so long as each error is considered).

## X. Proportionality Review

Although a proportionality review is not constitutionally required, our superior court has held that "this review is required by Article 66(c) in capital cases as part of the 'sentence appropriateness' determination" by the service courts of criminal appeals. *United States v. Gray*, 51 M.J. 1, 61-63 (citing *United States v. Curtis*, 33 M.J. 101, 109 (C.M.A. 1991)).

We have examined a number of cases and have concluded that the sentence is generally proportional to those imposed by other jurisdictions in similar situations. Our examination has included state and federal cases in which the death penalty was imposed that were subsequently reviewed by the Supreme Court, federal appellate courts, or state appellate courts. *See, e.g.*, *Baze v. Rees*, 553 U.S. 35, 46 (2008) (citing *Baze v. Commonwealth*, 965 S.W. 2d 817, 819-20, 26 (Ky. 1997); *Bowling v. Commonwealth*, 873 S.W. 2d 175, 176-77, 82 (Ky. 1993)) (defendant Baze shot and killed two police officers when they attempted to serve felony warrants on him; defendant Bowling shot and killed two adults after striking their vehicle); *Uttecht v. Brown*, 551 U.S. 1, 4-5 (2007) (citing *State v. Brown*, 940 P.2d 546, 556-59 (Wash. 1997)) (defendant killed victim, whom he had raped and tortured, by stabbing her several times in the chest and abdominal areas "because he did not want to leave any witnesses alive"); *Kansas v. Marsh*, 548 U.S. 163, 166 (2006) (defendant broke into home of victim, lay in wait for her to return, then shot and stabbed her before setting her home on fire, resulting in the death of victim and her 19-month-old daughter); *Jones v. United States*, 527 U.S. 373, 376 (1999) (defendant kidnapped victim at gunpoint, sexually assaulted her, then struck her in the head with a tire iron until she died); *United States v. Fields*, 516 F.3d 923, 927 (10th Cir. 2008) (defendant lay in wait near campsite wearing camouflage "ghillie suit" suit before shooting husband and wife, killing both; wife was killed while attempting to flee); *State v. Dann*, 207 P.3d 604, 610-11 (Ariz. 2009) (defendant forced his way into apartment at night and shot his girlfriend, her brother, and a friend who was visiting, killing all three; defendant recounted he shot his girlfriend and her brother "because they laughed at him" and shot the friend "because he witnessed the shootings").

## XI. Conclusion

The approved findings and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of the appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c). Accordingly, the approved findings and

sentence are

AFFIRMED.

HELGET, Chief Judge, and HARNEY, Senior Judge, concur.

ROAN, Chief Judge, HECKER, Senior Judge, and WEBER, Judge, did not participate due to their recusals from the case. ALLRED, Chief Judge, who joined the Court after oral argument was heard en banc, did not participate in this decision. ORR, Senior Judge, retired prior to the decision of the Court and did not participate.

MITCHELL, Judge, concurring *dubitante*:

I join the decision of Senior Judge Marksteiner in its entirety. For the reasons set forth in that opinion, I am convinced beyond a reasonable doubt that the team of trial defense counsel provided the appellant with representation well above the required minimum standards and where their performance may have been below standards that the effect was not prejudicial. I write this separate opinion, concurring dubitante,[46] however, because I share Judge Peloquin's concern, infra, that, in a court-martial referred as capital, servicemembers do not have the same institutional protections as those afforded criminal defendants facing the death penalty in a majority of our Nation's jurisdictions.

The role of an appellate military judge is cabined by Congress and the Court of Appeals for the Armed Forces. *See* Article 66, UCMJ, 10 U.S.C. § 866; *United States v. Nerad*, 69 M.J. 138 (C.A.A.F. 2010); *United States v. Allbery*, 44 M.J. 226, 227–31 (C.A.A.F. 1996) (a service court of criminal appeals does not have discretion to depart from its superior court's precedent). This is not an advisory opinion, as we have jurisdiction over the court-martial and are presented with a dispute between the parties as to the quality of the representation by those counsel. *See United States v. Chisholm*, 59 M.J. 151, 152–53 (C.A.A.F. 2003).

Trial defense counsel in this court-martial met all requirements imposed by statute. *See* Article 27, UCMJ, 10 U.S.C. § 827; Rules for Courts-Martial 501, 502, 503, and 506. Trial defense counsel met the requirements imposed by regulation and were certified as competent by TJAG. Air Force Instruction 51-201, *Administration of Military Justice*, ¶ 5.2.2 (26 November 2003). Trial defense counsel also met all requirements of counsel as addressed in prior precedent established by our superior court. *See United States v. Gray*, 51 M.J. 1, 54 (C.A.A.F. 1999); *United States v. Murphy*, 50 M.J. 4, 10 (C.A.A.F. 1998); *United States v. Loving*, 41 M.J. 213, 300 (C.A.A.F. 1994).

---

[46] Jason J. Czarnezki, *The Dubitante Opinion*, 39 Akron L. Rev. 1 (2006), available at http://digitalcommons.pace.edu/lawfaculty/905/ .

Our superior court has set forth that we are to "remain vigilant as to the quality of representation provided servicemembers in capital cases in the military justice system" on a case-by-case basis. *Gray*, 51 M.J. at 54. The clear case precedent does not allow for this court to establish minimum standards for attorney qualifications in death-penalty cases. *Id.* However, "[w]here a judicial decision is based on public policy and that policy has changed, the doctrine of stare decisis does not prohibit this court from revisiting that decision." *United States v. Falcon*, 65 M.J. 386, 390 (C.A.A.F. 2008).

In evaluating when the imposition of an adjudged death penalty amounts to cruel and unusual punishment, the Supreme Court has emphasized, "By protecting even those convicted of heinous crimes, the Eight Amendment[47] reaffirms the duty of the government to respect the dignity of all persons." *Roper v. Simmons*, 543 U.S. 551, 560 (2005). Eighth Amendment analysis in a death penalty case requires evaluating "evolving standards of decency" as determined by "objective indicia of society's standards, as expressed in legislative enactments and state practice with respect to executions." *Kennedy v. Louisiana*, 554 U.S. 407, 420–21 (2008) (quoting *Roper*, 543 U.S. at 563). "The Eighth Amendment's protection of dignity reflects the Nation we have been, the Nation we are, and the Nation we aspire to be. This is to affirm that the Nation's constant, unyielding purpose must be to transmit the Constitution so that its precepts and guarantees retain their meaning and force." *Hall v. Florida*, 572 U.S. ___, ___ (2014) (slip op at 5–6).

I do not see why the implementation of the Fifth Amendment[48] right to due process and the Sixth Amendment[49] right "to have the Assistance of Counsel for his defence" should not also be influenced by recognition that protecting the rights of those accused of heinous crimes reaffirms our collective respect of the dignity of all persons.

As Judge Peloquin sets forth in his opinion, many of the state jurisdictions which have the death penalty as an authorized punishment include some requirement for minimum qualifications for defense counsel. The same is true within other federal death penalty statutory schemes. "Any alien unprivileged enemy belligerent" who is subject to trial by military commission when any of the charges is capital is entitled to representation "by at least one additional counsel who is learned in applicable law relating to capital cases and who, if necessary, may be a civilian" compensated by the Secretary of Defense. 10 U.S.C. §§ 948c, 949a(b)(2). A learned counsel is defined as "[a] military or civilian counsel, experienced in capital litigation, appointed under the provisions of 10 U.S.C. § 949a(2)(C)(ii)." *Military Commissions Trial Judiciary Rules of*

---

[47] U.S. CONST. amend. VIII.

[48] U.S. CONST. amend. V.

[49] U.S. CONST. amend. VI.

*Court*, RC 4.2.c. (5 May 2014). To emphasize the importance of learned counsel, the *Manual for Military Commissions* prohibits the referral of a capital charge unless learned counsel has been appointed. Rules for Military Commissions 601(d)(2).

The current state of the law is that alien belligerents who are prosecuted under the Military Commissions Act of 2009, 10 U.S.C. §§ 948a, et seq., are entitled to an attorney experienced in capital litigation; yet the brave men and women of our own armed services who fought, captured, or guard those belligerents are not.

By statute, a defendant in the federal court system who is indicted for treason or another capital crime must promptly be assigned, upon the defendant's request, two counsel "of whom at least 1 shall be learned in the law applicable to capital cases." 18 U.S.C. § 3005. This was not always the case. The prior version of 18 U.S.C. § 3005 required capital defendants be represented only by "counsel learned in the law":

> The plain meaning of the phrase "learned in the law" refers to a person who has received a regular legal education, generally signified by admission to the bar. The plain meaning of the phrase does not imply any specialized death penalty experience. If Congress intended that counsel be learned in the law applicable to capital cases, it could have so stated, which it did when it amended [18 U.S.C. § 3005] in 1994. . . . [T]he 1994 amendment did not merely "clarify" the law but rather substantively changed it, creating a new requirement which previously had not existed.

*United States v. McCullah*, 76 F.3d 1087, 1098 (10th Cir. 1996) (citations omitted).

In 1994, Congress decided that criminal defendants who were indicted for a capital offense were entitled to counsel who was more than simply "learned in the law"; Congress specifically enacted legislation to ensure that an accused who faced a possible execution by the State be provided with counsel who had specialized death penalty experience. As of this date, Congress has not provided similar statutory protections to servicemembers who have court-martial charges referred as capital—a disparity that causes me concern.

Congress has twice determined that an individual who faces a possible death penalty must be represented by counsel experienced in the unique challenges of capital defense. Yet, this same institutional protection is not provided to servicemembers. This reflects where we have been as a Nation, and where we currently are; I am convinced that it does not accurately reflect where we as a Nation aspire to be.

SARAGOSA, Judge, with whom PELOQUIN, Judge, joins, concurring in part and dissenting in part:

I concur with the majority of the Court in all respects regarding findings, post-trial processing, instructions, and the variety of additional systemic issues. I write separately in dissent from the majority's opinion finding that the appellant failed to demonstrate ineffective assistance of counsel during the sentencing phase of his court-martial. Consistent with my original opinion on this case, *United States v. Witt*, 72 M.J. 727 (A.F. Ct. Crim. App. 2013), I find trial defense counsel were constitutionally deficient in their representation of the appellant for their collective failure to follow up, investigate, discover, and thereby present extenuation and mitigation evidence. Specifically, counsel prejudicially failed to investigate the appellant's closed-head injury resulting from a motorcycle accident, potential remorse evidence via Deputy Sheriff LF, and the appellant's mother's mental health records and diagnosis, thereby failing to utilize this evidence in preparing for the sentencing case and failing to present any of this mitigation evidence to the sentencer for consideration. The majority rejects the appellant's claim of ineffective assistance of counsel on the basis that he has not established prejudice under the second prong of a *Strickland v. Washington*, 466 U.S. 668 (1984), analysis. I disagree.

When examining whether the appellant was indeed prejudiced by his counsel's errors, it is important to review the history of jurisprudence relating to death penalty cases and the importance and purpose of the extenuation and mitigation case, as it differs dramatically from the typical court-martial proceeding. At common law, the death penalty was mandatory for a wide variety of cases. To alleviate the mandatory imposition of death, various state statutes were passed imparting unfettered discretion to the sentencing body. *See, e.g.*, *McGautha v. California*, 402 U.S. 183, 197-207 (1971) *reh'g granted*, *judgment vacated sub nom. Crampton v. Ohio*, 408 U.S. 941 (1972); *see also Callins v. Collins*, 510 U.S. 1141, 1146-47 (1994) (Blackmun, J., dissenting). Over the years, so much discretion was instilled into the sentencing body that it unleashed a rash of inconsistent applications of the death penalty. *See Furman v. Georgia*, 408 U.S. 238 (1972).

In 1972, the Supreme Court declared that glaring inequities in the administration of death, standardless discretion wielded by judges and juries, and pervasive racial and economic discrimination rendered the death penalty, at least as administered, "cruel and unusual" within the meaning of the Eighth Amendment.[50] *Furman*, 408 U.S. at 239. In the wake of this seminal decision, the Court evaluated a variety of statutory schemes designed to satisfy the need for consistency and rationality. In upholding Georgia's statute in *Gregg v. Georgia*, 428 U.S. 153, 189 (1976), the Supreme Court reiterated,

---

[50] U.S. CONST. amend. VIII.

"*Furman* mandates that where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action."  The Court has since consistently held that the death penalty must be imposed "fairly, and with reasonable consistency, or not at all."  *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982).  The Court has also rejected the extreme consistency provided by mandatory death penalty statutes for limited offenses.  *Woodson v. North Carolina*, 428 U.S. 280 (1976).

In the years following *Furman*, the Supreme Court also began to emphasize how a death penalty case really is different.  In *Woodson*, the Court noted, "Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two."  *Woodson*, 428 U.S. at 305 (opinion of Stewart, Powell, and Stevens, JJ.).  Recognizing the qualitative difference of the death penalty, the Court found "there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case."  *Id.*  The *Woodson* Court went on to elucidate:

> A process that accords no significance to relevant facets of the character and record of the individual offender or the circumstances of the particular offense excludes from consideration in fixing the ultimate punishment of death the possibility of compassionate or mitigating factors stemming from the diverse frailties of humankind.  It treats all persons convicted of a designated offense not as uniquely individual human beings, but as members of a faceless, undifferentiated mass to be subjected to the blind infliction of the penalty of death.

*Id.* at 304.

In response to *Furman* and *Gregg*, Rule for Courts-Martial (R.C.M.) 1004 was created to give limitation, structure, and consistency to capital litigation in the military.  *See* Analysis of Rules for Courts-Martial, *Manual for Courts-Martial, United States*, A21-76 (2012 ed.).  The Rule combines procedures of "weighing" aggravators and mitigators adopted by some jurisdictions with procedures used by jurisdictions that do not require a balancing component.  This combined procedure was explained and approved in *Loving v. Hart*, 47 M.J. 438, 442 (C.A.A.F. 1998):

> The military capital sentencing procedure set out in RCM 1004 and 1006 establishes four "gates" to narrow the class of death-eligible offenders.  The first two gates parallel nonweighing jurisdictions in that the members must convict by unanimous vote (RCM 1004(a)(2)) and then find at least one aggravating factor by unanimous vote (RCM 1004(b)(4)(A)).  Only after these two gates are passed does the weighing process begin.  The third gate

is a "weighing" gate, where the members must all "concur" that extenuating and "mitigating circumstances are substantially outweighed by any aggravating circumstances," including the aggravating factors under RCM 1004(c). *See* RCM 1004(b)(4)(C). Only after these three gates are passed does an accused become "death eligible."

I emphasize that, at the third gate in the court-martial sentencing proceeding, the members are weighing the totality of the sentencing evidence put before them: mitigation, extenuation, aggravating factors, and aggravating circumstances. And even when the members unanimously find that the collective aggravation evidence *substantially* outweighs the extenuating and mitigating circumstances, a death sentence *is not a certainty*:

> The fourth and final gate is the sentencing decision itself under RCM 1006. Even if all members concur that extenuating and mitigating circumstances are substantially outweighed by aggravating circumstances, they must *separately consider* whether to impose the death sentence. A death sentence requires the unanimous vote of all members. RCM 1006(d)(4)(A).

*Loving*, 47 M.J. at 442 (emphasis added).

The majority opinion appears to focus only on the balancing of evidence required at Gate Three, while ignoring the members' unfettered authority at Gate Four to exercise compassion, mercy, and complete discretion before rendering a decision on the ultimate punishment of death—regardless of the balance struck at Gate Three. Whether the majority is inadvertently disregarding Gate Four or collapsing it with Gate Three, the end result is the application of a standard I believe inconsistent with the clear intent of R.C.M. 1006(d)(4)(A) and *Strickland* as further addressed in detail below.

In this case, the issue is the members' deliberation at this "fourth and final gate." Once the members moved beyond the balancing required in Gate Three, they were then required to consider whether death was an appropriate sentence for the individual, now convicted, before them. In fact, the members were specifically instructed, "If you unanimously find one or more aggravating factors and even if you unanimously determine that the extenuating and mitigating circumstances are substantially outweighed by the aggravating circumstances, you still have the absolute discretion to decline to impose the death sentence." This absolute discretion is what makes it critical for the members to be presented with and consider all of the mitigating evidence relating to the appellant. To deny the members the opportunity to accord significance to relevant facets of the character and the record of the accused, or to the circumstances of the particular offense, is to exclude "from their consideration in fixing the ultimate punishment of death

the possibility of compassionate or mitigating factors stemming from the diverse frailties of humankind." *See Woodson*, 428 U.S. at 304.

"[T]he imposition of death by public authority . . . is so profoundly different from all other penalties . . . ." *Lockett v. Ohio*, 438 U.S. 586, 605 (1978). The Supreme Court "has gone to extraordinary measures to ensure that the prisoner sentenced to be executed is afforded process that will guarantee, as much as humanly possible, that the sentence was not imposed out of whim, passion, prejudice, or mistake." *Eddings v. Oklahoma*, 455 U.S. 104, 118 (1982) (O'Connor, J., concurring). Consideration of the unique aspects of an individual, with full discretion for the members to allow for a measure of compassion and mercy, is what Gate Four is all about. In fact, the sentencer "may determine the weight to be given relevant mitigating evidence"—in this case, evidence omitted due to counsel's errors—"[b]ut they may not give it no weight by excluding such evidence from their consideration," *Eddings*, 455 U.S at 114-15, and neither should this Court.

Our law insists that "the sentencer know and consider the defendant as a human being before deciding whether to impose the ultimate sanction." *Boyde v. California*, 494 U.S. 370, 387 (Marshall, J., dissenting). This "operates as a shield against arbitrary execution and enforces our abiding judgment that an offender's circumstances, apart from his crime, are relevant to his appropriate punishment." *Id.* "[T]he risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty . . . is unacceptable and incompatible with the commands of the Eighth and Fourteenth Amendments." *Lockett*, 438 U.S. at 605. To deny the members the opportunity to consider this appellant's circumstances, apart from his crime, where those circumstances were relevant to his appropriate punishment, absolutely undermines any confidence I can place in their decision so grave as to determine whether a human life should be taken or spared. There can be no greater prejudice to the appellant.

As the asserted issue in this case is one of ineffective assistance of counsel, I now turn to the requirements set forth in *Strickland*. First, an accused's representation is constitutionally deficient if it falls "below an objective standard of reasonableness" or "outside the wide range of professionally competent assistance." 466 U.S. at 688, 690. Second, in order to prevail an appellant must establish that counsel's "deficient performance prejudiced the defense." *Id.* at 687.

Because "[t]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order [the Court in *Strickland* did] or even to address both components of the inquiry if the defendant makes an insufficient showing on one," *United States v. McConnell*, 55 M.J. 479, 481 (C.A.A.F. 2001) (second alteration in original) (quoting *Strickland*, 466 U.S. at 697), the majority chose to first address the prejudice prong of *Strickland*. Without a finding of prejudice, it was not necessary to

address whether counsel were deficient in their representation. As such, it is necessary in this dissent to articulate why both prongs of the *Strickland* test are satisfied.

The appellant's assignments of error allege numerous allegations of ineffective assistance of counsel during the sentencing phase of the court-martial. I find three of the issues appellant raises meritorious: (1) his trial defense counsel failed to investigate evidence deriving from the appellant's hospitalization and closed-head injury after a motorcycle accident four months prior to the commission of the murders; (2) his trial defense counsel failed to investigate and obtain mental health records pertaining to the hospitalization of the appellant's mother at an inpatient mental health facility; and (3) his trial defense counsel failed to investigate and develop evidence of remorse through Deputy Sheriff LF.

When the issue is the adequacy of counsel's investigation for the sentencing phase of a capital trial, "hindsight is discounted by pegging adequacy to 'counsel's perspective at the time' investigative decisions are made." *Rompilla v. Beard*, 545 U.S. 374, 381 (2005) (citing *Strickland*, 466 U.S. at 689). To assess the thoroughness of counsel's investigative efforts, this Court must review performance for "reasonableness under prevailing professional norms." *Wiggins v. Smith*, 539 U.S. 510, 523 (2003) (citing *Strickland*, 466 U.S. at 688).

The Supreme Court has historically noted that the ABA Standards for Criminal Justice, including the Guidelines for Appointment and Performance of Counsel in Death Penalty Cases, are good guidelines for assessing "prevailing professional norms" and determining what is reasonable. *See Strickland*, 466 U.S at 688-89; *Williams v. Taylor*, 529 U.S. 362, 396 (2000); *Wiggins*, 539 U.S. at 524; *Rompilla*, 545 U.S. at 387. Yet, while these standards are instructive, they are not mandated for military defense counsel. *United States v. Murphy*, 50 M.J. 4, 9, (C.A.A.F. 1998) (citing *United States v. Loving*, 41 M.J. 213, 300 (C.A.A.F. 1994)), *quoted in Loving v. United States*, 68 M.J. 1, 19-20 (C.A.A.F. 2009) (Stucky, J., concurring in part and in the result). With respect to investigative efforts, Guideline 10.7 of the ABA Guidelines sets forth that "[c]ounsel at every stage have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty." American Bar Association *Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases* (rev. ed. 2003), *reprinted in* 31 Hofstra L. Rev. 913, 1015 (2003). The Commentary to Guideline 10.7 states counsel needs to explore medical history, including hospitalization, mental illness, family history of mental illness, physical injury, and neurological damage. *Id*. at 1022. Guideline 10.11 also sets forth an ongoing duty of counsel to "seek information that supports mitigation or rebuts the prosecution's case in aggravation." *Id*. at 1055. In *Wiggins*, the Supreme Court focused on trial defense counsel's investigation and stressed that counsel, in most cases, must pursue all reasonable leads.

As the majority opinion sets forth, trial defense counsel secured the services of a professional mitigation specialist and a forensic psychologist to assist with the trial preparation. The question presented is whether, despite the assistance of a mitigation specialist and forensic psychologist, trial defense counsel's investigation into mitigating evidence fell short of performance expected by reasonably competent counsel. I find the three areas noted above to be constitutionally deficient as described further herein.

*Motorcycle Accident Injury*

The appellant asserts trial defense counsel were ineffective when they failed to investigate and develop potential mitigation evidence stemming from a motorcycle accident. The motorcycle accident occurred approximately four and a half months prior to the commission of the murders and attempted murder for which the appellant was found guilty. Specifically, the appellant argues counsel were remiss in failing to further investigate whether the appellant's closed head injury may have resulted in a traumatic brain injury and thus failing to present such evidence to the members at sentencing. There is no question that the record is silent with respect to any evidence of this motorcycle accident.

"[R]easonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." *Rompilla*, 545 U.S. at 383 (citing *Wiggins*, 539 U.S. at 525). However, competent counsel must undertake a certain threshold of investigation by being reasonably diligent prior to making the strategic decision to "draw [the] line." *Id.*

Further, as the Supreme Court has pointed out:

[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Strickland*, 466 U.S. at 690-91.

With respect to this issue, the focus is not whether trial defense counsel acted reasonably in not presenting evidence of the motorcycle accident and closed head injury

to the court-martial panel. Rather, the focus of this issue is whether the decision of trial defense counsel to limit the scope of their investigation into potential mitigating evidence stemming from that motorcycle accident was itself reasonable. To analyze the decisions of counsel in this case, an extensive timeline of events is necessary.

In August 2004, the mitigation specialist sent a memorandum to the appellant's military trial defense counsel strongly recommending a full battery of psychological testing. She further conveyed her opinion that they had a responsibility to pursue any possible brain damage due to the closed head injury from the motorcycle accident and reported changes in behavior since that time. She conveyed to trial defense counsel that this was an important area of inquiry. She described her experience with closed head injuries and how often times such an injury can explain aberrant behavior. She made clear her recommendations for further investigation, neuropsychological testing, and brain scanning.

In October 2004, the defense forensic psychologist consultant, Dr. BM, conducted a series of psychological and neuropsychological tests on the appellant, but he had not yet reached any diagnosis. At this time, he had only met with the appellant twice: once on 4 October 2004, when he interviewed the appellant for approximately 5-6 hours, and once on 5 October 2004, when he spent an additional 7-8 hours conducting tests with the appellant and generated two pages of notes. It is unclear when the tests were actually scored, but the next two meetings with the appellant were not until June 2005.

Between October 2004 and June 2005, the mitigation specialist continued to insist on further neuropsychological testing and brain imaging to determine whether there was any evidence of a traumatic brain injury. She specifically recommended consultation with Dr. FW who specialized in this area.

In November 2004, approximately eleven months prior to the sentencing phase of the appellant's court-martial, Major JW, appellate defense counsel, sent the appellant's civilian trial defense counsel an e-mail referencing a prior conversation about an article on brain scans; he included the website link for the article and offered to fax the article. The article was entitled, "Mr. Chiesa's Brain: Can High-Tech Scans Prove That Criminal Acts are the Result of a Damaged Brain?".

The appellant had three trial defense counsel working on his case, all of whom were aware of the appellant's motorcycle accident four and a half months prior to the murders. Counsel were in possession of the appellant's medical records pertaining to treatment following the accident and a pretrial sanity board report that briefly discussed the closed-head injury. Both sources reflected the appellant's loss of consciousness at the time of the injury. The mitigation specialist obtained the damaged motorcycle helmet and gave it to trial defense counsel as a possible exhibit for trial. She further revealed to

them the appellant's roommate's observations of a change in the appellant's behavior following the motorcycle accident. The majority now takes exception to the accuracy of that assertion, but the relevance of this is not necessarily its accuracy, but the need to investigate further to determine its accuracy. Part of her rationale for insisting defense counsel speak to Dr. FW and conduct additional testing was the fact that a change in personality may be indicative of a traumatic brain injury and if he suffered a traumatic brain injury that would assist in potentially explaining these horrific events perpetrated by the appellant. Given all of the evidence known at that point, even if the roommate's observations were not accurate, there can certainly be no argument that the murder of two people, and nearly a third, was itself a marked departure from the usual character, personality, and behavior of the appellant.

At some point, the defense team asked Dr. BM about the mitigation specialist's suggestion that additional testing and inquiry into the possibility of traumatic brain injury be conducted. He ultimately advised trial defense counsel that he saw no value to be gained by conducting further neuropsychological testing. He opined that additional testing would not provide any more information than they already had and that the accident and concomitant injuries were not the source of the appellant's behavior or an explanation for his actions. Counsel indicated that they "knew the [G]overnment would likely fund whatever relevant expert or testing [they] requested."

Despite the mitigation specialist's insistence on consultation with a neuropsychologist and completion of additional brain scanning, trial defense counsel did not consult with the recommended neuropsychologist, did not request additional brain imaging, and did not interview further witnesses with respect to the motorcycle accident. Instead, trial defense counsel assert that they did not continue investigation into this area because they relied upon the advice of a forensic psychologist consultant, who, in contradiction to the mitigation specialist, opined there was "no value to be gained by conducting further neuropsychological testing," and "additional testing would not provide . . . any more information than [they] already had." They further characterize their decision not to present the known evidence of this motorcycle accident, closed-head injury, and subsequent behavioral changes as a "tactical decision." Trial defense counsel reasoned that they "would lose credibility if [they] tried to make something of [the motorcycle accident] that the experts could not justify."

Ultimately, the responsibility to investigate potential leads into mitigating evidence lies squarely on counsel. While counsel may and should, to a degree, rely on the expertise of their expert consultants, they may not delegate their decisions. "Only once either the expert or counsel has consulted all readily available sources can counsel's reliance on the expert's opinion be reasonable." *Wilson v. Sirmons*, 536 F.3d 1064, 1089-90 (10th Cir. 2008). Counsel must also consider all known facts and circumstances and must pursue all reasonable leads.

Trial defense counsel's sole reliance on Dr. BM's opinion was unreasonable for several reasons. First, counsel were faced with diverging opinions on the issue from two experienced experts. One, CP, had prior experience in dealing with traumatic brain injury at the sentencing phase and the presentation and impact of mitigation evidence such as this closed-head injury. The other trained in the field of psychology. I believe reasonable counsel would endeavor to resolve this dispute by simply picking up the phone and contacting Dr. FW with some basic level of inquiry. Second, while Dr. BM was a forensic psychologist who may have been qualified to perform some neuropsychological tests, he did not possess the same qualifications as Dr. FW as a neuropsychologist, and therefore it was not reasonable to rely on his opinion in an area outside of his area of expertise. Third, assuming *arguendo* it was reasonable to rely on Dr. BM's advice preliminarily, such reliance is reasonable precisely until the moment it proves otherwise.

In this case, once it became obvious that there were significant problems with Dr. BM's evaluation, scoring, and diagnosis of the appellant, such that his testimony became riddled with credibility issues and was no longer useful at trial, any reliance on his prior opinions became unreasonable and warranted immediate reevaluation. Once Dr. BM acknowledged his own inconsistencies and Dr. CR challenged the accuracy of Dr. BM's analysis, trial defense counsel had a duty to reassess the case, their strategy, and their anticipated presentation of evidence for the sentencing case. The situation was exacerbated with the decision not to use Dr. BM at all in sentencing. Dr. BM's issues came to light during the *Daubert* hearing on 26 September 2005. The presentencing phase of the court-martial did not begin until 6 October 2005. Counsel never requested a continuance or delay, never attempted to secure a new forensic psychologist consultant, and there is no evidence they conducted any subsequent investigation into this known alternative explanation for the appellant's behavior.

As for counsel's fear of losing credibility by making something of the motorcycle accident that the experts could not justify, I have difficulty reconciling that with the decision not to investigate. It is unclear to me how counsel can make a deliberate decision not to investigate possible brain trauma from the motorcycle accident, then cite the very same lack of evidence of brain trauma to justify failing to present evidence of the undisputed motorcycle accident itself.

I find trial defense counsel's performance unreasonable, as it falls below that of reasonably competent counsel. An analysis of counsel's perspective at the time reveals a quantum of evidence already known that would lead a reasonable attorney faced with the task of saving a client from the death penalty to investigate further. *See Wiggins*, 539 U.S. at 527. Trial defense counsel chose to forego investigation into the possibility of traumatic brain injury, despite conflicting expert opinions, a lack of any diagnosis yet

that would provide explanation for the appellant's aberrant behavior, independent information from appellate defense counsel highlighting the possibility of a correlation between a closed head injury and criminal acts, and noted behavioral changes in appellant following the accident, not the least of which were the murderous acts themselves.

Given the evidence outlined above, I find a reasonable attorney handling a death penalty case would have investigated this issue further. In essence, there was no tactical or strategic decision not to pursue this lead; instead, there was simply a decision not to investigate because one of two experts, who later proved unreliable, felt the quest would be fruitless. Given the stakes in a death penalty case and the need to convince just one member that death is not warranted, I also find no reasonable tactical or strategic purpose for failing to present the known evidence of the motorcycle accident to the members. Even without expert testimony, the undisputed evidence of the accident was persuasive and relevant mitigating evidence about the appellant. Counsel's lack of investigation falls short of providing effective assistance of counsel within the meaning under *Strickland* and the Sixth Amendment.[51]

The constraints placed on this potential lead were also unreasonable in light of what appellate defense counsel actually discovered and the ease with which this evidence could have been obtained. Had trial defense counsel simply contacted Dr. FW, as insisted upon by CP, they would have discovered the following: the sole CT scan done immediately after the accident could not exclude a traumatic brain injury because an immediate CT scan is mostly sensitive to acute bleeding rather than the longer term consequences of a traumatic brain injury; a review of Dr. BM's testing results plainly suggested left hemisphere damage; the behavioral changes following the accident and the appellant's uncharacteristic behavior on the night of the homicides are highly typical of the impairment in emotional self-regulation and impulse control that results from left anterior temporal lobe damage; even a mild traumatic brain injury can affect impulse control, normal cognitive functions, emotional self-regulation, and behavior; based on known evidence, Dr. FW would have expected proper scanning to show the appellant suffered from a traumatic brain injury; and, even without additional testing, Dr. FW could have given helpful and relevant testimony concerning the possibility of a traumatic brain injury in the appellant.

*Mental Health Records of the Appellant's Mother*

The appellant also asserts that his trial defense counsel were ineffective when they failed to investigate his mother's mental health history and obtain his mother's mental health records from an inpatient stay.

---

[51] U.S. CONST. amend. VI.

While the majority presents a very lengthy analysis of the post-trial issues involving the appellant's mother's mental health records, it appears their opinion is based on a lack of prejudice rather than an analysis of counsel's performance. When trial defense counsel on the case intentionally forgo investigation into the area of a potential traumatic brain injury because they want to stay true to their theory of the case that appellant's actions were directly influenced by his historical familial experiences, childhood, and the manner and environment in which he was raised, there seems to be no question that failure to obtain the records from the appellant's mother's inpatient stay was deficient.

The commentary to ABA Guideline 10.7 sets forth that family mental health history should be sought. This history was the trial defense team's sole theory as to what caused appellant to commit these unspeakable acts. At least one of the trial defense counsel acknowledges, "[A]s part of the case theory rested on Dr. [BM]'s assessment of [MP]'s past mental health concerns . . . we would have wanted these records." However, none of the trial defense counsel presents any tactical, strategic, or other reason as to why investigation into this known lead was not pursued. In addressing the issue, civilian trial defense counsel states, "To the extent we did not seek [MP]'s mental health records, in my mind it was simply that Dr. [BM] did not ask us to obtain them. Had he done so, we would have had trial counsel obtain them." This statement leaves the impression that trial defense counsel inappropriately attempted to delegate the decisions regarding diligent investigation to their expert. None of the trial defense counsel has offered any reasonable explanation for why the records, which were relevant to their stated theory of the case, were not sought.

Counsel may not simply hire an expert and then abandon all further responsibility. Counsel ultimately has the obligation to perform as reasonably diligent counsel and to ensure adequate preparation and investigation for the sentencing phase. It is the attorney who bears the "responsibility to investigate and bring to the attention of mental health experts who are examining his client, facts that the experts do not request." *Wallace v. Stewart*, 184 F.3d 1112, 1116 (9th Cir. 1999).

Trial defense counsel's lack of investigation in this area was constitutionally deficient. The appellant's mother's refusal to sign a consent form to obtain the records is irrelevant. Trial defense counsel's duty is to their client, period. They knew of the appellant's mother's mental health history, the recommendation of the professional mitigation specialist to obtain the records, the theory of the case propounded by their expert forensic psychologist, and the ABA Guidelines. The performance of counsel in failing to obtain these pertinent records or investigate this known lead of an inpatient mental health stay fell below the standards of competent counsel. Whether there is any prejudice as a result of this failure will be addressed below.

*Evidence of Remorse*

The third area I find meritorious is the appellant's assertion that his trial defense counsel were ineffective for failing to investigate the potential remorse testimony of Deputy Sheriff LF. I agree with the majority that evaluation should focus on "'counsel's perspective at the time' investigative decisions are made." *Rompilla*, 545 U.S. at 381 (citing *Strickland*, 466 U.S. at 689).

There is no question that trial defense counsel desired to present remorse evidence in mitigation. The record reveals a concerted effort on the part of the prosecution to paint a picture of the appellant as lacking in remorse. Surely trial defense counsel were aware of this strategy, as they successfully avoided the live testimony of multiple witnesses by entering into stipulations of expected testimony. These witnesses all presented evidence of the appellant making social plans for 5 July 2004, the day following the murders.

Trial defense counsel has a fundamental duty to investigate evidence to rebut the Government's potential aggravation evidence. *See* ABA Guideline 10.11. They simply failed to follow up on this known lead and have offered no tactical or strategic reason why they failed to do so. Counsel concede the mitigation specialist recommended pursuing Deputy Sheriff LF as a potential witness and at least one counsel remembers asking her to obtain his contact information. He further acknowledges they "were very interested in presenting any evidence of remorse [they] could find, as well as evidence that showed [the appellant]'s good conduct since his confinement. In [that counsel's] opinion, Deputy [LF] could have been a good witness on both issues." Civilian trial defense counsel's affidavit expounds generalities about his lack of confidence in potential law enforcement witnesses. However, FS's personal feelings about a witness he has never met and never spoken to provide no factual basis from which he could assess Deputy Sheriff LF's potential as a witness or susceptibility to cross-examination.

Trial defense counsel failed to effectively investigate Deputy Sheriff LF as a potential mitigation witness. From the record, it appears that any decision not to interview him or call him as a witness was, at best, arbitrary. Counsel did not interview Deputy Sheriff LF, evaluate his potential testimony, observe his demeanor as a potential witness, or investigate possible impeachment material. I conclude that trial defense counsel's uninformed strategic or tactical decision is not objectively reasonable and is constitutionally deficient.

*Prejudice*

Even if an attorney's performance is deficient, an appellant is not entitled to relief unless "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a

probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. When the deficient performance of counsel occurs during the sentencing phase, that requires the appellant to establish "a reasonable probability that a competent attorney, aware of [the available mitigating evidence], would have introduced it at sentencing," and "that had the jury been confronted with this . . . mitigating evidence, there is reasonable probability that it would have returned with a different sentence." *Wiggins*, 539 U.S. at 535, 536. "[A] defendant *need not* show that counsel's deficient conduct *more likely than not* altered the outcome in the case." *Strickland*, 466 U.S. at 693 (emphasis added).

The majority misapplies the *Strickland* standard in three ways. First, it addresses each of the alleged deficiencies raised by appellant and assesses its individual potential for prejudice in appellant's sentencing case. This approach is contrary to that set forth in *Strickland*. The ultimate determination as to whether the prejudice prong of the *Strickland* test is met is based upon consideration of counsel's errors as a whole, rather than individually. *Strickland*, 466 U.S. at 693-94.

Second, the majority opinion aptly states that to assess prejudice, "we reweigh the evidence in aggravation against the totality of available mitigating evidence." *Wiggins*, 539 U.S., at 534. However, this "reweighing" was not intended to exclusively apply to the Gate Three analysis. True, to pass Gate Three in a military court-martial the members must unanimously vote that the mitigating circumstances are substantially outweighed by the aggravating circumstances. R.C.M. 1004(b)(4)(C); *Loving*, 47 M.J. at 442. It is also true that one way to show a reasonable probability of a different result would be for the appellant to establish that upon reweighing the evidence this balance would have been different. However, it is not the only way. The critical question is whether "there is a reasonable probability that at least one juror would have struck a different balance" in weighing the evidence for and against sentencing the defendant to death. *Wiggins*, 539 U.S. at 537. This is a discretionary decision for each court member subject to no specific balance. This is the focus of Gate Four, largely unaddressed by the majority.

Third, the majority establishes a heightened standard of proof for the appellant inconsistent with *Strickland*. The majority is bogged down in the mire of a hypothetical battle of the experts as to whether or not the appellant can prove he suffered a traumatic brain injury as if that is a legal prerequisite to prevailing on the prejudice prong of *Strickland*. At some point, the majority opinion essentially equates prejudice to proof that the appellant actually suffered a traumatic brain injury. The opinion undertakes to rescript the sentencing case with its own rendition of how such testimony might have been presented and rebutted and ultimately concludes that unless appellant can present evidence on appeal that he in fact suffered a traumatic brain injury and that such injury in fact influenced his behavior, then he cannot establish a reasonable probability of a different outcome. In several places, the majority suggests that the omitted evidence

could not be mitigating such to affect the appellant's moral culpability unless he could affirmatively establish a traumatic brain injury that influenced his behavior and excused his conduct. I disagree with the heightening of a standard that does not exist in *Strickland*. Instead, *Strickland* requires us to look at the all of the evidence presented on appeal, both good and bad, *Wong v. Belmontes*, 558 U.S. 15, 26 (2009), and determine whether there is a reasonable probability that just one court member would have voted against death, thereby changing the outcome. *Strickland*, 466 U.S. at 694. The focus should be on Gate Four of a death penalty sentencing hearing. At this stage of the sentencing decision, there are no elements to meet, no standards of proof, no burden of persuasion required, just the absolute discretion of the court members to consider all facets of the crime and the individual characteristics of this person who committed it to render the ultimate decision as to whether he is sentenced to death or not. R.C.M. 1006(d)(4)(A). It is with that in mind, that the *Strickland* standard on prejudice must be analyzed.

Our role is not to determine whether prejudice existed such as to excuse the appellant's actions; that would be a findings issue. In *Hodge v. Kentucky*, Justice Sotomayor, dissenting from a denial of certiorari, wrote that the Kentucky Supreme Court "misunderstood the purpose of mitigation evidence" when it "reasoned that Hodge's mitigation evidence might have altered the jury's recommendation only if it 'explained' or provided some 'rationale' for his conduct." 133 S. Ct. 506, 509 (2012) (Sotomayor, J., dissenting from denial of certiorari). Justice Sotomayor went on to state, "We have made clear for over 30 years, however, that mitigation does not play so limited a role." *Id.* (citing *Lockett v. Ohio*, 438 U.S. 586, 604, 605 (1978); *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982); *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 252 (2007)). As in *Hodge*, the omitted evidence due to counsel's errors need not have offered any "rationale" for the murders in order for the panel to have considered it as weighty mitigation. *Id.* at 510. It would be enough if there were a "reasonable probability" that, because of the appellant's closed-head injury and signs of remorse, the members' "reasoned moral response" would instead have been to spare his life and sentence him to life imprisonment instead of death. *Id.* at 510.

There is no question that the facts of this crime are gruesome. Two people, and nearly a third, died at the hands of a fellow Airman who by all accounts was their friend. The evidence presented during the findings case offered little explanation and weak motive for these horrible acts. The aggravation case consisted of the very facts of the crime that made this case "death-eligible," the impact on the victims and their surviving family members, evidence that the appellant demonstrated a lack of remorse following the murders, and with no other explanation for the acts, an argument that the appellant was simply "evil." The majority opinion expounds on the details of this presentation.

What was lacking in the aggravation case was any evidence that the appellant had a prior history for violence. In fact, he had no criminal history at all; no administrative discipline of any kind. Moreover, there was no evidence whatsoever to deduce that the appellant had a propensity for future violence.

The mitigation case presented included character letters and testimony from friends, teachers, religious leaders, and family members who all described the appellant as a well-mannered, respectful youth, who never caused any trouble. While there was ample testimony regarding his mother's troubled upbringing, there was no nexus of this turmoil to the appellant's life. Other than his knowledge of his parent's divorce and his mother's brief inpatient stay for mental health issues, there was little, if any, evidence to indicate he was even aware of his mother's issues. All in all, the extenuation and mitigation case as presented was benign.

In this case, there were three trial defense attorneys, none of whom had ever handled a capital case before. While our superior court has declined to mandate compliance with the ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases, *United States v. Loving*, 41 M.J. 213, 300 (C.A.A.F. 1994), the guidelines exist for a reason. They exist because of the finality of death and simple fact that the presentation of a case in extenuation and mitigation is different from any other aspect of litigation; it is different from a findings case, and it is different from a standard sentencing case.

In any other type of litigation, a counsel's job is to appeal to the jurors, whether unanimously or by majority, to render a decision in favor of their client's position. Completely contrary to this is the unique and sole objective for defense counsel in a death penalty case—to present a case filled with relevant and persuasive mitigating and extenuating evidence with the distinctive goal of reaching just a single court member who will employ his or her unfettered discretion at the Fourth Gate and deny a vote for death, thereby sparing the life of their client. Because of the inimitable backgrounds, experiences, and convictions of court members, the mitigation specialist, CP, appears to have been advising defense counsel of the critical need to present all of this evidence in hopes of appealing to that one court member rather than selecting a single theory in sentencing. This is an aspect of capital litigation unfamiliar to defense counsel in this case[52] and a point of consternation between him and his learned advisor. For this reason,

---

[52] While I recognize FS may have extensive experience in litigating cases before military members, his affidavit is illustrative of his frustration with CP's perspective and the lack of value he placed in her experience dealing exclusively with death penalty cases:

> [I]t must be noted that while I valued [CP]'s work and input, I felt that she did not fully appreciate the unique challenges of defending military cases with members senior in rank to the accused as opposed to trying a case before a civilian jury. I spent most of my entire professional life

I concur with the opinions of Judge Mitchell and Judge Peloquin advocating for minimum qualifications for death penalty counsel in the military. The failure to recognize CP's expertise in this area led counsel to make the investigative decisions that I find constitutionally deficient.

While I find that counsel was deficient in failing to obtain appellant's mother's mental health records, I readily point out that the majority of the information contained therein was indeed cumulative and presented to the members through witness testimony. Unfortunately, it was not appellant's mother on trial, so the weight to be placed on the evidence of her upbringing could only be established by its impact on the appellant's life. One potential connection to the appellant was her Axis II diagnosis that was discovered in the missing mental health records—the same Axis II diagnosis established by Dr. BM for appellant independent of that knowledge. That being said, one may be curious as to how that information and like-diagnosis may have impacted Dr. BM's overall case presentation and reliability, but given the extreme speculative nature of such, I find it adds very little to the overall assessment of prejudice.

Given the Government's concerted effort at showing the appellant's lack of remorse, it was necessary to rebut such evidence with the best evidence at trial defense counsel's disposal. The lack of investigation into Deputy Sheriff LF's potential testimony left their arsenal wanting of such remorse evidence. Of the 15 defense witnesses, only three presented any remorse evidence. The first was Ms. SF, who testified that she had received approximately six letters from the appellant while he was in custody and that they conveyed "a tone of remorse." However, she was extensively cross-examined on specific passages from those letters that were not expressive of remorse and the letters were ultimately introduced into evidence by the Government. The second witness was Mr. RJ, a former employer of the appellant, who testified that he received one letter from the appellant and believed "he was remorseful of what he has had [sic] done." Finally, the appellant's father testified that in phone calls with the appellant, "he was so full of guilt and remorse, self-loathing that it took all my strength [voice shaking] sometimes to get him up and maybe make him laugh. Some of the phone calls were so exhausting that I would actually spend the next day in bed. They were just so painful." Only one of the numerous character letters admitted by the defense at sentencing reflected a showing of remorse by the appellant. In addition to this evidence, the appellant expressed his remorse both in his oral and written unsworn statements.

---

defending military cases in front of members. My approach is to be focused in presenting a defense or a sentencing case. In other words, I do not as a rule call marginal witnesses or raise marginal issues before members. In my opinion there is too much risk they will ultimately hurt your case. [CP] seemed to be more willing to throw everything against the wall and hope that at least one member would respond . . . .

Had Deputy Sheriff LF been contacted, the defense would have learned the content of his testimony. His written declaration submitted on appeal does not just express a conclusion that the appellant was remorseful but paints a powerful image of a young man broken down by remorse.

Deputy Sheriff [LF]'s declaration contains, in part, the following passages:

3. During this Article 32 hearing, I witnessed [the appellant] overcome by emotion. When the prosecution presented its evidence against [the appellant], he broke down and sobbed uncontrollably. This happened, in particular, when crime scene photos were displayed. I saw a broken young man, in great pain and despair. He was so emotionally overcome that he had to excuse himself from the hearing.

4. I accompanied [the appellant] to another part of the courthouse while the hearing continued. He continued to display sadness and great emotion. I took it upon myself to give him comfort and spiritual guidance. I wrapped my arms around him to give him a hug. I whispered words of encouragement to him in hopes of consoling him. I wanted him to know that he was walking with God. I told [the appellant] that God loved him and that I loved him. I interpreted [the appellant's] emotion to be genuine and sincere. I would not have approached him otherwise. I believe he was remorseful for what he had done.

. . . .

8. If I had been asked to testify on behalf of [the appellant], I would have done so. I would have told the court-martial about my interaction with him during his Article 32 hearing, our spiritual discussion, and my observations of his emotion and remorse. In my experience in law enforcement, I have dealt with numerous murderers, rapists, and other violent criminals. I have never testified on behalf of any of them. Only one other time did I observe the emotion and remorse, and sincerity of such, like I did of [the appellant] in another defendant.

9. However, I never spoke to any of [the appellant]'s attorneys.

None of the other remorse evidence presented came close to the picture painted by Deputy Sheriff LF as evidenced by his post-trial declaration. Furthermore, the record reveals the panel's keen interest in the appellant's remorse as a court member presented

questions to Mr. RJ about the remorse he gleaned from the appellant's letter.[53] Given a strong focus of the Government's sentencing case was the appellant's lack of remorse, the interest in the appellant's level of remorse demonstrated via the court member's question, and the limited amount of remorse evidence presented by the defense, Deputy Sheriff LF's testimony would have presented an unbiased and new perspective on the issue otherwise absent from the appellant's mitigation case.

Above all else, the failure to investigate the possibility of a traumatic brain injury and failure to present evidence of the same is undeniably prejudicial. Even the basic fact of a closed-head injury resulting from a motorcycle accident four and a half months prior to the murders is sufficient to cause a reasonable juror to pause and question whether such injury could offer an otherwise wanting explanation for these acts or given the members new medical information to consider in evaluating whether death is an appropriate sentence. Counsel's deficient approach of not exploring the leads with respect to the possibility of a traumatic brain injury was amplified by the lack of any other mitigation or extenuation evidence that may have shed light on motive or why this aberrant behavior transpired. After Dr. BM was rendered unavailable and Dr. CR's independent evaluation revealed nothing helpful to the appellant's strategy in sentencing, the defense was "left without what [they] had viewed would be helpful psychological testimony and forced to rely entirely upon evidence from [the appellant]'s friends and family." This loss of psychological testimony rendered the defense strategy hollow and ineffective against the Government's argument that these crimes were committed because the appellant is evil and some people are just bad.

The affidavit of Dr. FW sheds light on the possibility of a traumatic brain injury. Of course, we would expect cross-examination and evidence to the contrary had it been presented, but such cross-examination would simply have left the matter before the court members to assess credibility between the experts and to individually decide how much weight to give the evidence. Cross-examination and an opposing expert view does not preclude the reasonable probability that just one juror would weigh this evidence of a closed-head injury and possibility of a traumatic brain injury and find the appellant's moral culpability reduced just enough to deny the death penalty when asked to vote.

---

[53] The court member probed the issue of remorse as follows:

> Q. Okay. You indicated that you believed from the tone of [the appellant]'s letter that he was remorseful. What was it about the tone of that letter that—first off, let me ask you, did he actually say that he was remorseful?
> A. No, he did not.
> Q. Okay. But it's from the tone of the letter, the entire letter, that gave you that appreciation of your belief that he was remorseful?
> A. Yes, it did.

Courts have repeatedly found evidence of mental problems, arguably including the effects of traumatic brain injury, to be powerful mitigation. "[E]vidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to . . . emotional and mental problems, may be less culpable than defendants who have no such excuse." *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) (quoting *California v. Brown*, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring)), *abrogated on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002); *see also Allen v. Woodford*, 395 F.3d 979, 1006 (9th Cir. 2005) (noting that "explanatory" mitigating evidence often bears more weight than "humanizing" evidence); *Cannon v. Gibson*, 259 F.3d 1253, 1277–78 (10th Cir. 2001) (finding omitted mitigation information of "serious brain damage" and lack of impulse control would have displaced mitigation information portraying the petitioner as a "kind, compliant, and responsible individual whose involvement in the murder was an aberration"). Yet, as highlighted by *Hodge*, 133 S. Ct. at 509, mitigation evidence is not limited to evidence that may explain behavior; it may also include relevant factual information about this appellant's recent medical history.

In *Caldwell v. Mississippi*, 472 U.S. 320 (1985), the Supreme Court overturned a capital sentence as inadequately reliable because of a statement made by the prosecutor during the closing argument of the sentencing phase of the trial. In reaching that conclusion, the Court observed that capital sentencing jurors, required to determine "whether a specific human being should die at the hands of the State," *Id.* at 329, are "placed in a very unfamiliar situation and called on to make a very difficult and uncomfortable choice." *Id.* at 333. Such court members, called upon to make this extremely weighty decision, might reasonably find any one of a variety of mitigating or extenuating circumstances significant enough to cause them to decline to vote for the ultimate determination of death for this specific human being.

The "truly awesome responsibility" imposed upon capital sentencing juries cannot be taken for granted. *McGautha v. California*, 402 U.S. 183, 208 (1971), *reh'g granted, judgment vacated sub nom. Crampton v. Ohio*, 408 U.S. 941 (1972). The sentence in this case is simply not reliable due to the substandard performance of trial defense counsel and the prejudice to the appellant directly caused by the lacking evidence in mitigation and extenuation that should have been investigated and ultimately presented to the court members. The undiscovered and absent mitigating evidence, taken as a whole, "might well have influenced the jury's appraisal" of the appellant's moral culpability. *Wiggins*, 539 U.S. at 538 (quoting *Williams*, 529 U.S. at 398).

The death sentence handed down at trial in this case did not come easy. It was far from a quick and obvious decision. The members deliberated for nearly twelve hours over a three-day period before reaching their death sentence. With that in mind, the probability is indeed reasonable that any one member might have embraced the

uninvestigated and omitted mitigating evidence regarding an undisputed recent motorcycle accident, the undisputed concomitant closed-head injury, and expert testimony supporting the simple possibility of a traumatic brain injury. Coupled with the emotionally impactful, yet missing, remorse evidence Deputy Sheriff LF could have supplied to rebut the prosecution's argument the appellant felt no remorse, I find the existence of a reasonable probability, sufficient to undermine the confidence in the outcome of this case. There is ample evidence to establish prejudice—that just one member would hear it all and decide against death.

Having found both constitutionally deficient performance as well as prejudice, I would reverse the sentence in this case and remand for a new sentencing hearing.

PELOQUIN, Judge, concurring in part and dissenting in part:

I join with Judge Saragosa concurring with the majority's opinion except as to its finding that the appellant failed to demonstrate ineffective assistance of counsel in the sentencing phase of his court-martial. Because I believe trial defense counsel were ineffective by failing to investigate and present evidence of the appellant's remorse, closed-head injury, and mother's mental health records, I would set aside the sentence and remand this case for a new sentencing hearing. I write separately to address the lack of minimum qualification requirements within the military justice system for counsel defending a military member facing the death penalty—requirements of experience and training that, in my estimation, may well have precluded trial defense counsel's errors.

Our superior courts remind us often that death is different. The absolute finality of the decision to execute appropriately drives layers of safeguards and review to ensure the propriety, equity, and fairness of the punishment with as high a degree of certainty a system managed and implemented by human beings can muster.

To underscore Judge Saragosa's opinion, we should note Justice Brennan's words in *Strickland v. Washington*, 466 U.S. 668 (1984), describing the unique nature of the sentencing phase of a capital case and the Supreme Court's heightened attention to such proceedings:

> [T]he consequences to the defendant of incompetent assistance at a *capital sentencing* could not, of course, be greater.
>
> . . . .
>
> Because of the basic difference between the death penalty and all other punishments, this Court has consistently recognized that there is a

corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.

. . . .

> *In the sentencing phase* of a capital case, what is essential is that the jury have before it *all possible relevant information* about the individual defendant whose fate it must determine. For that reason, we have repeatedly insisted that *the sentencer* in capital cases must be permitted to *consider any relevant mitigating factor*.

*Strickland*, 466 U.S. at 704-05 (Brennan, J., concurring in part and dissenting in part) (emphasis added) (citations, alterations, and internal quotation marks omitted). And it is the capital defendant's counsel who are best positioned, and ultimately responsible, for ensuring "all possible relevant information" and "any relevant mitigating factor" is presented to the sentencing authority for consideration.

The *Strickland* standard for assessing ineffective assistance of counsel, reiterated in *Wiggins v. Smith*, 539 U.S. 510, 534 (2003), provides:

> The defendant must show that there is a reasonable probability that, but for the counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a *probability sufficient to undermine confidence in the outcome*.

*Strickland*, 466 U.S. at 694 (emphasis added).

Judge Saragosa's dissent articulately and accurately discusses trial defense counsel's failures in developing and presenting the appellant's sentencing case and the resulting prejudice. A sentence to death must be by unanimous vote of the members. We cannot know what deliberations or discussions took place among the members; nor can we know what sentences may have been proposed by one or more members; nor can we know the vote count for any sentence other than death, if one was proposed.

We do know that a sentence to death was voted on, and the vote for death was unanimous. We know that several pieces of mitigating evidence were not presented in sentencing. We know that this evidence was championed by the defense team's mitigation expert. We know that trial defense counsel disregarded their mitigation expert's advice, even after having to abandon their planned sentencing tactics and strategy. We know that each member of this Court has determined that some or all of this mitigating evidence is relevant. And we know one vote not in favor of death would result in a different outcome.

Trial defense counsel's failure to investigate and present this mitigating evidence deprived the sentencer of the opportunity to consider all possible relevant information. Without this evidence before the sentencer, "a reasonable probability [of a different result] sufficient to undermine confidence in the outcome" is most certainly raised. *Strickland*, 466 U.S. at 694. Had trial defense counsel performed in a more diligent manner, and given due regard and deference to their highly experienced capital mitigation expert, one could espouse confidence in the outcome knowing the members had all relevant mitigation evidence before them to consider before rendering a sentence. *See Id.* at 705 (Brennan, J., concurring in part and dissenting in part).

With that said, the root cause of this prejudice and the root cause for this lack of confidence in the outcome is trial defense counsel's lack of competence, lack of qualifications, and lack of experience.

This court-martial was convened in accordance with the UCMJ and the *Manual for Courts-Martial* (*MCM*), *United States* (2005 ed.). The UCMJ and the *Manual* mandate the provision of defense counsel to an accused and outline basic requirements for detailing such counsel. *See* Article 27, UCMJ, 10 U.S.C. § 827; Rules for Court-Martial (R.C.M.) 501, 502, 503, and 506. *See also* AFI 51-201, *Administration of Military Justice*, ¶¶ 5.2-5.3 (26 November 2003); AFI 51-201, ¶¶ 5.3-5.5 (6 June 2013). These authorities provide that trial defense counsel may be detailed from any branch of military service to defend a servicemember, and that civilian counsel may represent an accused provided no expense accrues to the Government. However, aside from designation and initial certification of counsel, no further training or experience is required before military counsel may represent an accused in a capital case. Similarly, no training or experience, other than Federal or State bar membership, is required before a civilian counsel may defend a capital case at court-martial.

To date, our superior court has elected to not involve itself in mandating, endorsing, or recommending minimum qualifications and experience levels for counsel providing representation in capital trials. *See United States v. Gray*, 51 M.J. 1, 54 (C.A.A.F. 1999) ("[W]e again decline the invitation to establish such a [minimum] standard on our own."); *United States v. Murphy*, 50 M.J. 4, 9-10 (C.A.A.F. 1998) ("[W]e have chosen the route illuminated by the Supreme Court in *United States v. Cronic*, 466 U.S. 648 (1984), . . . . [, which] compels us to look at the adequacy of counsels' performance, rather than viewing the limited experience of counsel as an inherent deficiency."); *United States v. Loving*, 41 M.J. 213, 300 (C.A.A.F. 1994) ("[W]e decline to mandate minimum standards based on years of practice or numbers of cases tried.").

Nevertheless, our superior court has recognized the court's role of "remain[ing] vigilant as to the quality of representation provided servicemembers in capital cases in

the military justice system." *Gray*, 51 M.J. at 54. Addressing a due process argument for minimum qualifications, the *Gray* court went on to say: "[D]espite 21 U.S.C. § 848(q)(5)-(7),[54] the few state authorities cited by appellant in his brief, and the American Bar Association Guidelines, we are not persuaded that '[c]ontemporary practice' demonstrates a 'settled view' on this question." *Id.*

We do not know what "few state authorities" were cited by the appellant in *Gray* in 1999. However, we do know that today 34 jurisdictions in the United States, including the United States military, retain the death penalty within their penal codes.[55] Of those 34 jurisdictions, 24 have adopted and articulated minimum qualification and experience standards for counsel appointed to represent defendants facing the death penalty.[56] Using 2013 data as a yardstick, in October 2013 there were 3,088 inmates on death row in the United States.[57] The 24 jurisdictions with minimum counsel standards accounted for 2,901 of these inmates.

The minimum qualification standards vary among those 24 jurisdictions. The standards require anywhere from 3 years' criminal litigation experience to 10 years' criminal litigation experience, with the majority of the jurisdictions requiring no less than 5 years' criminal litigation experience. Of the 24 jurisdictions, 18 mandate lead defense

---

[54] 21 U.S.C. § 848(q)(5)-(7) (repealed 2006 and recodified as 18 U.S.C. § 3599(b)-(d)), requires attorneys appointed for indigent defendants in capital cases at trial or on appeal to have a minimum amount of felony trial or felony appeal experience, respectively. Additionally, the court is also authorized to appoint "another attorney whose background, knowledge, or experience would otherwise enable him or her to properly represent the defendant, with due consideration to the seriousness of the possible penalty and to the unique and complex nature of the litigation." *See Harbison v. Bell*, 556 U.S. 180, 190 (2009).

[55] Alabama, Arizona, Arkansas, California, Colorado, Delaware, Florida, Georgia, Idaho, Indiana, Kansas, Kentucky, Louisiana, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, South Dakota, Tennessee, Texas, Utah, Virginia, Washington, Wyoming, the United States Federal Government, and the United States Military.

[56] Ala. Code § 13A-5-54; A.R.S. Rules. Crim. Proc., Rule 6.8; Ark. Admin. Code 160.00.2; Cal. Rules of Court, R. 4.117; Fla. R. Crim. P. 3.112; Ga. Sup. Ct. Unified Appeal Procedure, Rule II.A.; Id. Crim. R. 44.3; Ind. R. Crim. P. 24(B); Kan. Admin. Regs. § 105-3-2; La. Admin Code. tit. 22, pt. XV, § 915; Mont. Sup. Ct. Standards for Competency of Counsel for Indigent Persons in Death Penalty Cases, § I; Nev. Sup. Ct. R. 250.2; North Carolina Rules on the Commission of Indigent Defense Services, Pt. 2, App. 2A (Feb. 10, 2006); Rules of Superintendence for the Courts of Ohio, Sup. R. 20.01 (Mar. 1, 2010); Okla. Indigent Def. System Capital Trial Application, http://www.ok.gov./OIDS/index.html (last visited May 27, 2014); Oregon Public Defense Services Commission Qualification Standards for Court-Appointed Counsel to Represent Financially Eligible Persons at State Expense, Standard IV, Section 5 (Dec. 21, 2013); Pa. R. Crim. P. 801; S.C. App. Ct. R. 421, S.C. Code Ann. § 16-3-26; Tenn. Sup. Ct. Rules, R. 13; Tex. Crim. Proc. Code Ann. art. 26.052 (West); Utah R. Crim. P. 8; 6 Va. Admin. Code § 30-10-10; Wash. Super. Ct. Spec. P. Rules—Criminal (Sprc), Rule 2; United States Federal Courts, *Guidelines for the Administration of the Criminal Justice Act*, vol. 7, pt. A, ch. 6, § 620.30.

[57] *See Death Row Inmates by State*, Death Penalty Information Center, http://www.deathpenaltyinfo.org/death-row-inmates-state-and-size-death-row-year (last visited May 27, 2014).

counsel have capital trial experience and/or significant murder trial experience.[58] Those 18 jurisdictions account for nearly 2,600 of those 3,088 inmates on death row.

Those jurisdictions most active in trying capital cases, and most experienced in trying capital cases, have deemed it appropriate and necessary to create, adopt, and implement minimum qualification and experience standards for counsel defending capital cases. Presumably, these standards have been adopted in light of the uniqueness of capital litigation, the significant consequences in play, and these jurisdictions' experience gained over the course of their extensive capital practice.

This data suggests that the landscape of "contemporary practice" has changed since the *Gray* court spoke. With the jurisdictions representing 94% of death row inmates having adopted minimum qualification standards for capital defense counsel, it would seem a "settled view" has been reached that such standards are to be commended.

As noted above, under the UCMJ and the *Manual* there are no minimum qualification standards for counsel appointed to defend a capital case aside from certification under Article 27, UCMJ. In the United States Air Force Judge Advocate General's Corps, that certification is met after completion of a 9-week staff officer course and serving as assistant trial counsel or trial counsel in a handful of courts-martial.[59] In the Air Force, the authority to detail defense counsel has been delegated from The Judge Advocate General to the Chief, Trial Defense Division and other delegees. AFI 51-201, ¶ 5.2 (26 November 2003); AFI 51-201, ¶ 5.3 (6 June 2013), *see also* R.C.M. 503.

In the instant case, the Government opted to detail two trial defense counsel to the appellant. When he was assigned to defend the appellant, the senior military defense counsel, Captain (Capt) DR, had been a member of the bar for two-and-a-half years, had prosecuted six cases of unknown complexity, and had served as a trial defense counsel for twelve months, defending nine cases. He had no capital trial experience and little training on the subject of capital trials[60] prior to being detailed. The assisting military

---

[58] A.R.S. Rules. Crim. Proc., Rule 6.8; Ark. Admin. Code 160.00.2; Cal. Rules of Court, R. 4.117; Fla. R. Crim. P. 3.112; Ga. Sup. Ct. Unified Appeal Procedure, Rule II.A; Id. Crim. R. 44.3; Ind. R. Crim. P. 24(B); La. Admin Code. tit. 22, pt. XV, § 915; Nev. Sup. Ct. R. 250.2; North Carolina Rules on the Commission of Indigent Defense Services, Pt. 2, App. 2A (Feb. 10, 2006); Rules of Superintendence for the Courts of Ohio, Sup. R. 20.01 (Mar. 1, 2010); Oregon Public Defense Services Commission Qualification Standards for Court-Appointed Counsel to Represent Financially Eligible Persons at State Expense, Standard IV, Section 5 (Dec. 21, 2013); Pa. R. Crim. P. 801; Tenn. Sup. Ct. Rules, R. 13; Tex. Crim. Proc. Code Ann. art. 26.052 (West); Utah R. Crim. P. 8; 6 Va. Admin. Code § 30-10-10; United States Federal Courts, *Guide to Judiciary Policies and Procedure*s, vol. 7, pt. A, ch. 6, § 620.30.

[59] *See* Air Force Instruction 51-103, *Judge Advocate Professional Development*, ¶ 4 (3 September 2013).

[60] According to Captain DR's post-trial declaration, his total capital defense training consisted of (a) attending a Naval JAG School training course titled "Defending Complex Cases," one day of which was devoted to defending capital cases; and (b) attending a three-day course sponsored by the National Association of Criminal Defense

defense counsel, Capt DJ, had been a member of the bar for less than three years, had prosecuted 14–15 cases of unknown complexity, and had never served as a trial defense counsel prior to his assignment to the appellant's defense team. He had no capital trial experience or training prior to being detailed.

The appellant, of his own accord, procured the services of a private attorney, Mr. FS. Mr. FS had been practicing law for 25 years with significant trial and appellate defense experience in courts-martial. However, he had no capital trial or capital appellate-level experience. As the lead counsel, he determined the division of labor among the defense legal team. While he focused primarily on the findings phase of the court-martial and preparing a defense against the allegations of premeditated murder, Capt DR was assigned primary responsibility for preparing the sentencing case.

None of the appellant's attorneys met the minimum qualification standards required of capital defense counsel, specific bar admission aside, as adopted in 18 jurisdictions which account for over 80% of the capital cases in the United States. And lead counsel for the appellant's sentencing case did not meet the minimum qualification standards in any of 24 jurisdictions with minimum qualification standards accounting for 94% of the capital cases in the United States. In fact, none of the appellant's trial defense counsel met the minimum statutory qualifications governing counsel appointed to defend in federal capital cases. *See* 18 U.S.C. § 3005 (requiring at least one court-appointed counsel to be "learned in the law applicable to capital cases"); *see also Guidelines for the Administration of the Criminal Justice Act*, vol. 7, pt. A, ch. 6, § 620.30.

To be fair, Capt DR, Capt DJ, and Mr. FS certainly appear to be capable, conscientious attorneys who worked diligently and tirelessly to defend their client. But in light of the import the overwhelming majority of capital jurisdictions accord to minimum standards for capital defense counsel, it strains credibility to conclude their judgment, efforts, and decisions were not handicapped by their own lack of training and experience.

"Confidence in the outcome" is necessarily tied to confidence in the process by which the outcome was reached. In reviewing counsel's performance, we have only the record of trial and the appellate briefs to consider. We cannot know what conversations trial defense counsel did not have, or what avenues, tactics or strategies were never considered in light of their inexperience and lack of training.

This proceeding was defended by inexperienced counsel, presided over by a trial judge with no capital experience, in a jurisdiction that has little experience in trying

---

Lawyers (NACDL) entitled, "Making the Case for Life," which focused on "jury selection, developing mitigation evidence, and working mitigation into the findings case."

capital cases.[61]  If we are to "remain vigilant as to the quality of representation provided servicemembers in capital cases in the military justice system," we cannot ignore the trial practice in the overwhelming majority of our Nation's capital jurisdictions.  We cannot dismiss the cumulative wisdom and experience of those jurisdictions as we review the capital practice in the military justice setting generally, and in this case specifically.  In light of the attorney qualification standards that guide capital defense across the Nation, and in light of these trial defense counsel's performance, my confidence in the process that brought about the outcome, and in the outcome itself, is undermined.

Exercising vigilance, as commended by our superior court, we can find a number of avenues which could be pursued to ensure capital courts-martial are defended by the high standards the rest of the Nation demands.  I suggest, and invite my colleagues' concurrence, that the most prudent and efficient course of action would be for the services to adopt the "learned counsel" capital defense counsel standards already established for other Federal jurisdictions.[62]  Understandably, given the limited capital practice of the services, it may prove difficult for the service TJAGs to train and retain military counsel who meet this "learned counsel" criteria.  It would seem a cooperative effort between the services, the Federal Office of Defender Services, and the Federal Death Penalty Resource Counsel Project, may provide the services with access to capital certified counsel already employed by the federal government.

As guardians of justice, we ought not sit idly by and allow servicemembers to be represented at a capital trial with any less vigor or expertise than that accorded to the rest of our Nation's populace.  While our courts do show deference to military commanders and the chain of command in many aspects of military discipline and military affairs, such deference is not unlimited.  In the matter of a capital trial, I am unable to conceive a reasonable argument supporting such disparity, or even potential for such disparity, in defense representation standards applied to courts-martial as compared to civilian jurisdictions.



FOR THE COURT

STEVEN LUCAS
Clerk of the Court

---

[61]  *See The U.S. Military Death Penalty*, Death Penalty Information Center, http://www.deathpenaltyinfo.org/us-military-death-penalty#facts (last visited May 27, 2014) (since 1984 there have been 47 capital courts-martial resulting in 15 adjudged death sentences).

[62]  *See* 18 U.S.C. §§ 3005, 3599; Administrative Office of the United States Courts, *Guide to Judiciary Policies and Procedures*, Vol. 7, Pt. A, Ch. 6, §§ 620.10.10, 620.30.